207 N.J. Super. 169 (1984)
504 A.2d 66
URBAN LEAGUE OF ESSEX COUNTY, NORTH JERSEY COMMUNITY UNION, AMY INGRAM, JOHN LIGON AND JOSE MUNIZ, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS,
v.
TOWNSHIP OF MAHWAH, BOROUGH OF RAMSEY, NEW JERSEY, BOROUGH OF SADDLE RIVER, NEW JERSEY AND BOROUGH OF UPPER SADDLE RIVER, NEW JERSEY, DEFENDANTS.
v.
BEAVER CREEK, INC., A NEW JERSEY CORP., EMSEY-MC BRIDE, A JOINT VENTURE; FRANKLIN COMMONS EAST, A NEW JERSEY PARTNERSHIP; FRANKLIN COMMONS WEST, A NEW JERSEY PARTNERSHIP; AND HIGH DEBI HILLS CORP., A NEW JERSEY CORPORATION, PLAINTIFFS-INTERVENORS.
Superior Court of New Jersey, Law Division Bergen County.
August 1, 1984.
*175 Richard Bellman for plaintiff (Steel & Bellman, attorneys).
E. Carter Corriston and Brian T. Campion for defendant Mahwah Tp. (Breslin & Breslin, P.A.).
John P. Nulty for plaintiff-intervenor Beaver Creek, Inc. (Bannon, Rawding, Nulty & McDonald, attorneys).
Frank Holahan for plaintiff-intervenor Emsey-McBride (Harwood, Lloyd, Ryan, Coyle & McBride, attorneys).
Glenn W. Banks for plaintiff-intervenor Franklin Commons East.
James W. MacIsaac for plaintiffs-intervenors Franklin Commons West and Ridge Gardens.
Robert K. Hartmann and Michael P. O'Rourke for plaintiff-intervenor High Debi Hills Corp. (Hartmann, Brooks & Van Dam, attorneys).
HARVEY SMITH, J.S.C.

I  PROCEDURAL HISTORY
The first dozen years of this controversy, from the filing of the Complaint in February 1972 to publication of the Mount Laurel II opinion on January 20, 1983, are chronicled in the Supreme Court decision. Southern Burlington County N.A.A.C.P. v. Mount Laurel Tp., 92 N.J. 158, 332-336 (1983). However, as a result of Mount Laurel II, the focal point of this *176 litigation has shifted and the case in its present form bears little resemblance to the pre-1983 lawsuit. This is primarily because the Urban League has been joined in its quest for zoning changes by developers seeking a realistic opportunity to build low and moderate income housing at a profit.
Three months after the decision, Philip B. Caton was appointed as the expert to assist the Court in determining Mahwah's fair share of the present and prospective regional need for low and moderate income housing. In further compliance with the Supreme Court mandate, an expedited fair share hearing date was set. Prior to the hearing, over the municipality's objection, Beaver Creek, Inc. was permitted to intervene and seek a builder's remedy provided that it abide by all previous scheduling.
Three witnesses testified at the fair share hearing. The court-appointed expert presented his fair share formula consisting of three elements of equal weight: vacant developable land, commercial and industrial ratables in the region and employment growth. The resulting allocation of Mahwah's fair share of the regional need through 1990, in his opinion, was 699 units.
Alan Mallach, the Urban League's expert, voiced two objections to Caton's approach. He criticized the failure to include families living in physically standard units who spend more than 25% of their gross income for housing. Mallach also disagreed with Caton on the number of physically sub-standard units that comprised the indigenous need.
Michael F. Kauker, Mahwah's planner, took issue with Caton's regional definition but frankly admitted it was a "judgmental call." There was no allegation that the eight county region defined was unreasonable. He also challenged as being outdated the statistics used by Caton to establish the amount of vacant developable land.
Both Mallach and Kauker disagreed to some extent with the allocation process used by Caton. They disputed the weight or lack of weight given to employment base, fair share figures *177 assessed against inner cities and selection of a vacancy rate percentage. Nevertheless, all the experts agreed Mahwah has not met its fair share obligation.
Although the arguments against those aspects of Caton's reports have some merit, they involved judgmental decisions and "fine-tuning." All of these calculations are by nature somewhat speculative because they are based upon assumptions and projections over time. Consequently, the conclusions reached by Caton were found to be totally credible.
Shortly after the hearing, a Letter Opinion accompanied by the following Implementation Order was issued:
A fair share hearing in accordance with Supreme Court mandate having been conducted on September 6 and 7, 1983, and it being found that the Township of Mahwah has not met its Mount Laurel obligation:
It is on this 16th day of September 1983, ORDERED:
1. The fair share for Mahwah through 1990 is 699 units to be distributed as follows:

 present need  low income units  266 moderate income  104
 prospective need  low income units  203 moderate income  126
 ___ ___
 469 230

2. The Township of Mahwah shall have 90 days from the date of this Order to revise the zoning ordinance to achieve compliance with Mount Laurel objectives.
3. Philip B. Caton of the firm of Clarke and Caton 342 West State Street, Trenton, New Jersey 08618, is hereby appointed as special master to assist the municipal officials in achieving compliance.
4. The master's fees for the fair share hearing shall be paid by the Township of Mahwah.
5. The master shall consider any application to construct Mount Laurel type housing and shall consider any zoning modifications to implement such a plan. The master may, in his discretion, schedule hearings for the presentation of any such plans and notify any appropriate entities, including the parties to this litigation, so as to permit them to be in attendance at any such presentations. In the event any such presentations embody plans which are consistent with Mount Laurel, the master shall make such determinations as he deems appropriate.
6. This being considered an ongoing emergent matter, the master may, upon telephone notice to all counsel, apply to the Court for further instruction.
*178 Following the Implementation Order, seven additional developers came forward to present plans for the construction of Mount Laurel housing on specific sites. Thus, the governing body was confronted with the necessity of considering eight major development applications as part of its rezoning obligation. In the ensuing 90 days, the Planning Board and Governing Body considered developers' submissions and obtained written reports from traffic consultants, engineering experts, the Chief of Police, the Township Superintendent of Schools and the Chairman of the Mahwah Environmental Commission.[1] P. David Zimmerman was retained by the Township as an additional planning expert and on December 23, 1983, the Mount Laurel II Housing Plan, prepared by Kauker & Zimmerman, was submitted to the governing body.
The philosophy embodied in Mahwah's housing plan was to achieve compliance with a minimal addition to the housing stock. By rehabilitating dilapidated structures, obtaining rent subsidies for qualified tenants and permitting the construction of accessory units in all residential districts, they felt some of the need could be met without new construction. Another approach was to obtain public funding for construction of subsidized housing on particular sites to be occupied exclusively by low income people. Nevertheless, even under their projections, the planners were forced to turn to interested private developers and allow construction of a substantial number of units under a mandatory set-aside program.[2] From the very beginning the governing body was concerned because extensive *179 use of this method, although likely to produce the required units, could almost double the housing stock and change the character of the community.
The court-ordered rezoning process culminated in the Township Committee's adoption of an ordinance to implement the Mount Laurel II Housing Plan.[3] Three sites were rezoned, given a new ML-1 designation and were earmarked exclusively for public housing. An additional three sites were rezoned and given a new ML-2 designation for private development with a 25% mandatory set-aside. Accessory apartments were made conditional uses in all residential districts and some unnecessary cost-generating requirements were eliminated. The Mahwah Housing Commission was created to encourage rehabilitation of dilapidated units, to work with the Bergen County Housing Authority in an effort to secure public sector funding, and to assist in expediting new private sector construction.
The municipality's position is that Ordinance #851 satisfies its obligation as shown on the following chart prepared by its planners:

*180
 SUMMARY OF HOUSING PLAN FOR MAHWAH TOWNSHIP, N.J.
 1980 1983 1984 1990
 Low Moderate Low Moderate Total
 1. Accessory Apartments - - 80 20 100
 2. Bergen County Housing
 Authority
 Public Units - - 42 42 84
 Section 8 - - 30 10 40
 Manufactured Housing - - 5 5 10
 3. Mahwah Housing Project 41 41
 4. Rehabilitation HIP 36 12 77 25 150
 5. Mandatory Set-Aside
 (Private Development) 225 150 375
 ___ __ ___ ___ ___
 Totals 36 12 459 293 800
 Total Low Needed  466 Units
 Total Moderate Needed  230 Units
 Total Needed  699 Units

Although municipal officials claimed they had achieved compliance, none of the interested developers believed Ordinance #851 provided any realistic opportunity for construction. Prior to rezoning, Mahwah's planning experts had given a numerical ranking to each proposed project. However, the Ordinance placed only the two highest ranked proposals in an ML-2 zone. Of the six denied rezoning, four sought intervention to challenge their ranking and seek builders' remedies. Those rezoned asked intervention to attack objectionable ordinance provisions and protect their new zoning designations.
On February 22, 1984, an order was issued instructing the Master to review Ordinance #851 for compliance and report his findings to the Court. The order also permitted all developers who previously submitted proposals to intervene by March 1, 1984. The following developers asked for and were granted leave to intervene:

*181
 Units
 Intervenor Acreage Proposed Zone
Kilmer Woods 93 1400 ML-2
Franklin Commons West 20 284 ML-2
Ridge Gardens 38 540 PRD-6
Beaver Creek 48 672 R-20
Franklin Commons East 44 624 R-20
High Debi Hills 32 404 C/R-40

The Master's report took issue with the Kauker-Zimmerman conclusion that Ordinance #851 provided a realistic opportunity for creation of 800 lower income units. Caton felt the allowance of accessory apartments, rehabilitation of dilapidated units and public sector new construction would realistically provide a maximum of only 129 units, leaving the balance of required units to be provided through a mandatory set-aside program. He also criticized the mandatory set-aside percentage and the failure of the ordinance to eliminate cost-generating requirements not necessary for public health and safety.
All six intervening developers joined the Master in alleging it was not economically feasible to build under the terms of the ordinance. Their experts concluded a 25% mandatory set-aside as well as cost-escalating ordinance standards effectively precluded any chance for a profitable project. Absent substantial relief from the Court, they flatly stated these projects would be abandoned in favor of more profitable investments.
The compliance hearing began as scheduled on April 4, 1983. Since it was the first one ever held, the question of burden of proof was raised at the outset. It was ruled that the municipality had the burden of proving compliance and must first submit evidence to justify its position on the effect of Ordinance #851. Trial commenced with the issue of whether fair share credit was to be given the municipality for 100 units of accessory apartments.

*182 II  ACCESSORY APARTMENTS
To draft an Ordinance for implementation of their Mount Laurel II Housing Plan, Mahwah's experts examined its present housing stock with an eye toward converting parts of existing houses into lower income units. They found 68.8% of the 3,809 units in the municipality were one-family houses with three or more bedrooms, thus suitable for conversion into multiple units. Next, analysis of accepted demographic material confirmed the size of individual households in the township has been shrinking largely because of the increased divorce rate, the trend toward postponing marriage and the growing number of senior citizens. This led them to conclude Mahwah's aging stock of roomy houses was an underutilized resource readily available for use in the effort to achieve compliance.
P. David Zimmerman, the Township's expert in this field, explored the various alternatives for housing lower income people in these existing houses. He considered legalizing "granny flats", small self-contained removable units designed for installation in backyards. Although they are extensively used in Australia, this concept was rejected because it was untested in this country and could significantly alter existing neighborhood character. The concept of "shared housing", where kitchens and other major facilities in existing houses are used in common, was also rejected. He believed legitimization of this practice would be akin to legalizing rooming houses and not appropriate for a suburban municipality like Mahwah.
Accessory apartments, on the other hand, presented a different set of facts, which led Zimmerman to conclude they could provide an acceptable solution. Accessory apartments are created by converting part of a single family residence into an independent unit which shares only a yard, off-street parking and perhaps an entrance. They are an inexpensive source of new housing, allow more efficient use of existing structures, help insure proper maintenance of older homes, ease the financial burden of senior citizen homeowners and enable single *183 parents to keep their children in a stable environment in the wake of divorce.
In an attempt to project the number of accessory apartments that would be built over the next six years should Mahwah revise its ordinance to permit them, Zimmerman surveyed municipalities which had adopted such regulations in the past. He found a lack of data in New Jersey and, consequently, focused upon the experience of five municipalities in other states. His study encompassed the history of accessory apartments in Westport, Connecticut; Weston, Connecticut; Babylon, New York; Lindenhurst, New York and Renton, Washington. Taking an average of percentage of accessory units in each town (8.2% to 14.2%), he divided these figures into the average time accessory apartment ordinances had been in effect (23.2 years) and ascertained an annual absorption rate (0.36% to 0.66%). Applying this annual absorption rate to Mahwah, he concluded 116 accessory apartments (the average between 82 and 150) would be built by 1990. To be conservative, he reduced this figure to an even 100 units. This turned out to be only 2.6% of the Township's housing stock, well below the 8.2% to 14.2% found in the municipalities studied. This lower absorption rate convinced him a realistic opportunity existed for the production of these apartments, providing building costs would allow marketing at appropriate rents. To test this theory, he developed a specific pro-forma for Mahwah using a $10,000 average cost of conversion and the following presumptions:

 (a) A $10,000 home improvement loan at 14% for 15
 years ....................................... $133.18 per month
 (b) Increased taxes ............................. 16.38 per month
 (c) 10% profit on $10,000 ....................... 83.33 per month
 _______
 TOTAL $232.89 per month
 ===== =======

Applying Caton's regional income data, Zimmerman determined a two-person low income household can afford a monthly rental of $266 for a one-bedroom apartment and a moderate income *184 household can afford $432 for the same unit. This led him to conclude accessory apartments "are eminently affordable to all low and moderate income households."
With a potential monthly income stream of up to $432 measured against expenses of only $149.56, Zimmerman felt the potential profit was large enough to make conversion an attractive proposition to homeowners. As an added incentive, he reasoned, market value of real estate would increase at least in the amount spent for the home improvement. He suggested if the proposed Mahwah Housing Commission promoted this program, there was a strong likelihood more than 100 lower income households would be living in accessory apartments by 1990.
Mahwah's Township Committee incorporated Zimmerman's recommendations into Ordinance #851. Accessory apartments were legalized for the first time and permitted as conditional accessory uses in all residential zones. A limitation of one accessory unit per house was imposed with the further requirement it be situated entirely "within the habitable portion of the principal dwelling." The floor area had to be not less than 400 square feet nor more than 800 square feet and cover no more than 30% of the principal dwelling. Occupancy was limited to a maximum of three people. Each unit was required to have its own kitchen, bathroom and entrance. Owner occupancy of either unit and adequate off-street parking for both units was mandatory. A certificate of occupancy would be issued "only if at least one of the households has a low or moderate income."
The other three experts who reported on this subject agreed that authorization of accessory apartments is an acceptable mechanism to help achieve compliance under most circumstances. However, the restrictive provisions in this ordinance combined with the nature of Mahwah's housing stock caused them to sharply dispute Zimmerman's projections. Caton was conservative in his prognostication about the future effectiveness of these provisions. Both Alan Mallach, the Urban League's *185 expert, and Peter Abeles, Franklin Commons East's expert, believed these amendments would not result in the production of any significant number of lower income units.
Zimmerman's five town study was attacked as being misleading because nearly all the conversions included in his computations had taken place prior to the enactment of ordinances. Once accessory apartments were legitimized, very few subsequent conversions had been reported. Although accessory apartments comprise 10% of Babylon's housing stock, only six applications have been processed since passage of its ordinance in 1980. In Princeton Township, one of the few New Jersey municipalities to allow accessory apartments and similar to Mahwah in many respects, only 16 conversions under the ordinance were reported over a 10 year period.
Mallach testified Zimmerman's conclusions were distorted by the input of the data from Babylon. That municipality, he pointed out, has a completely different type of housing stock than Mahwah where houses were selling last year at prices well over $100,000. In Babylon, prior to its ordinance, there were scores of vacant tract houses for sale and homeowners were more concerned about paying mortgages than preserving property values. In his opinion, Mahwah homeowners would not convert 1/3 of their $100,000 houses into rent-controlled apartments. Caton concurred noting Zimmerman's projection has a fundamental problem: the absolute lack of precedent. None of the other ordinances referred to imposes a price ceiling on rentals.
Much of the criticism of Zimmerman's pro forma was based upon a total lack of back-up information. The $10,000 estimated conversion cost was considered much too low and 15 year home improvement loans at 14% interest are no longer available. Other deficiencies were the failure to include utility charges, insurance premiums and reserve for maintenance and repairs. Mallach determined these apartments could not possibly rent for less than $304 to $416 a month. Both he and *186 Abeles were of the opinion there would be only a trickle of conversions unless a direct financial incentive is given to home-owners.
Turning to the ordinance restrictions, they found no basis for the one unit per single-family home limitation. The consensus was the number of units should be dictated by available space and house configuration. Locating the accessory apartments entirely within the habitable portion of the principal dwelling was also deemed arbitrary since it eliminated the use of attached garages and prevented any structural additions. The limitation on square footage in many cases would prevent the most economical type of conversion (simply partitioning off a second floor). The limit on the number of occupants was found to bear no relationship to health and safety standards. In sum, these unnecessary conditions would, in all probability, inhibit homeowners from undertaking these building alteration projects.
Zimmerman's contention that real estate value would be increased by the cost of conversion was emphatically rejected. With houses selling in and above the $100,000 range, the other experts considered an accessory apartment for tenancy by a lower income household a deterrent to resale and a depressant of market value. Most prospective purchasers would want these homes for their own family use and the prospect of dispossessing a lower income tenant before reconverting would hurt future sales.
Caton's projections accepted Zimmerman's formula, but made adjustments to compensate for the distortion caused by the inclusion of Babylon. He then reduced his figure to reflect the anticipated slow beginning of the program and negative effect of the rent ceiling. Predicated on the assumption of an ordinance modification to allow the use of attached garages, he concluded Mahwah should be credited with a total of 25 units.
Given a less restrictive ordinance, the potential exists for municipalities to use this mechanism more productively. However, *187 based upon the evidence in this case, the accessory apartment provisions of Ordinance #851 provide a realistic opportunity for the production of 25 units of lower income housing (5 low and 20 moderate).

III  PUBLIC SECTOR
Mahwah plans to provide 325 units of lower income housing through the public sector, both by new construction and use of existing structures. A substantial portion of these units will be the result of on-going independent programs of the Bergen County Housing Authority; others will be the product of cooperative agreements which have already been executed between the Township and the Authority.

A  PUBLIC HOUSING
The Kauker-Zimmerman report claims credit for 54 units of public housing by new construction. "Stag Hill Site A", an eight acre tract owned by the County and under contract to the Authority, and two smaller parcels, have been rezoned for this purpose. These parcels have been designated ML-1, requiring 100% of the units be available for low and moderate income households. HUD has given site approval and reserved funds for a specific project on "Stag Hill Site A". Forty-five units, all exclusively designed for low income renters, will be constructed there. An additional nine units will be built on a different parcel under contract to the Authority. These sites have received HUD approval, are appropriate for development and the Authority has successfully completed projects of this type in the past.
Caton agreed all 54 of these units should be credited toward the fair share.
The Township also claims credit for 30 moderate income units under an "Affordable Housing Program" sponsored by the Bergen County Housing Authority. The Authority buys the land, makes site improvements and, through public bidding, *188 contracts for construction. The purchasers pay only actual construction costs, which have been averaging $40,000. Because a $10,000 down payment is required, acquisition is limited to the upper segment of moderate income families. These units will be built on "Stag Hill Site A" in conjunction with the rental housing.
The Authority has been successful in providing these affordable units in the past and the Master expects continued success. He believes the combination of low and moderate income housing by rental and ownership opportunities will provide a good economic mix on the site and agrees Mahwah should receive full credit for these 30 units. During the trial Carla Lerman, Executive Director of the Bergen County Housing Authority, testified funds are available for an additional five units. Her testimony is credible and gives Mahwah credit for all 35 units.

B  MAHWAH HOUSING PROJECT
The Kauker-Zimmerman report proposed a "Mahwah Housing Project" be constructed on an eight acre parcel owned by the County known as "Stag Hill Site B." Three development options, with varying numbers of lower income units, were proposed.
The first option involved a HUD program in which three or more bedroom apartments would be constructed for rental to lower income families. A total of 477 of these units may be made available by HUD in this fiscal year. They will be allocated throughout Region 2, an area encompassing New York, New Jersey, the Virgin Islands and Puerto Rico. Mahwah plans to construct 80 of these units on this site. Carla Lerman testified the only action taken by the Authority has been to request an allotment of 100 of these units from HUD. The program has not yet been advertised throughout the County and no site selections have been made. Mahwah's only action has been to express an interest to the Authority.
*189 The Master found that no realistic opportunity for this type of construction exists, because Mahwah's chance of obtaining such a large percentage of the Region 2 allocation is remote.
The second alternative was for the Township to seek HUD funding through the Bergen County Community Development Block Grant Program. These funds would be used to provide infrastructure improvements on the site, making it economically feasible to build 80 units, 41 of which would be affordable to low income families.
The third option was to induce the County to sell this parcel to a developer at private sale, on condition lower income housing be built. The raw land cost would be set low enough to allow the developer to profitably build 84 market rate units and 24 subsidized units.
Utilization of "Stag Hill Site B" for any type of Mount Laurel housing seems unlikely in the foreseeable future. The evidence shows it to be topographically unsuitable in many respects. The proposed alignment of Highway I-287 borders the property and has caused the Bergen County Housing Authority to reserve consideration of acquisition at this time. The present ML-1 zoning designation precludes the private development options and the proposal to sell public lands to a private developer without open bidding or specific statutory authority is of questionable legality.
There is no realistic opportunity for the creation of lower income units through any of these options.

C  RENT SUBSIDIES:
The Township intends to participate in a HUD Section 8 Rental Subsidy Program. This is a mechanism to subsidize renters spending more than 30% of their gross income for housing. Tenants qualifying under federal guidelines are issued a Certificate of Participation, which requires them to find an apartment at a rental not exceeding the regional ceiling fixed by HUD. The landlord must agree to participate before *190 HUD will subsidize the difference between the approved rent and the amount the tenant is able to pay.
This program is already available to Mahwah tenants under the auspices of the Bergen County Housing Authority. However, only six certificates are being used in the Township, mainly because rents exceed the HUD maximum. Twelve other families are on the waiting list, but there is no guarantee future participants will find qualified housing in the municipality.
Both Caton and Mallach agree this rent subsidy program is not an appropriate tool to be used in the context of meeting fair share. It is an income transfer device, which neither creates new housing nor rehabilitates substandard units. In addition, families living in physically standard units but forced to spend more than 25% of their gross income on housing were specifically excluded in the fair share computations. Had they been included, the fair share number would be substantially greater than the 699 units identified.
The municipality is entitled to no credit toward the fair share for this program.

D  REHABILITATION:
Kauker and Zimmerman originally reported the existence of 150 dilapidated units in the Township, all of which were to be rehabilitated by 1990. A dilapidated housing unit is defined as one with multiple serious deficiencies in need of substantial rehabilitation in order to be suitable for permanent habitation. Lower income occupants of such units are an underhoused segment of the population, generally comprising the bulk of the indigenous component of a municipality's present housing need. See Mount Laurel II  Challenge and Delivery of Low-cost Housing, Center for Urban Policy Research, Rutgers (1983). Consequently, any such unit salvaged through rehabilitation while remaining affordable should be credited against the township's fair share obligation.
*191 The Bergen County Home Improvement program (HIP) provides the only public funding currently available for this purpose. Financial assistance for rehabilitation is given to lower income households in the form of low interest or deferred payment loans for correction of serious code violations relating to health and safety. A mere 13 rehabilitations have been completed in Mahwah under this program since 1980 and only five applications are currently being processed. Nevertheless, the township planners hope to substantially increase the number of HIP applications by utilizing the proposed Mahwah Housing Commission. They intend to educate the target population through an aggressive out-reach campaign and urge owners of dilapidated houses to take advantage of the County's program.[4]
In his fair share report, the Master identified 102 substandard units as the indigenous component of Mahwah's present need; the Township subsequently reduced its figures to conform. Furthermore, since only owner-occupied units are eligible for HIP loans, Caton estimated the number of dilapidated units that would qualify by applying the owner-to-renter ratio which presently exists in Mahwah. This eliminated tenant-occupied units, leaving a balance of 60 eligible structures. He concluded it would be realistic to expect 1/3 of these to be rehabilitated by 1990; ten low and ten moderate. The evidence clearly supports the Master's conclusion.

E  MANUFACTURED HOUSING:
Credit for ten units of manufactured housing is claimed by the municipality. The basis for this assertion is its proposed participation in an experimental program sponsored by the Bergen County Housing Authority. This project would entail *192 acquiring suitable sites in Mahwah for the construction of rental housing by a prefabricated technique.
This pilot program is too speculative at this juncture to be given credit.

F  CONCLUSION:
The evidence compels a finding that Mahwah's claim for credit of 325 public sector housing units is overstated. Based upon the testimony and exhibits, the Township has demonstrated a realistic opportunity for the production of only 109 units, 64 low and 45 moderate.

IV  OVERZONING
The mandatory set-aside is the only other device in Ordinance #851 designed to provide a realistic opportunity for construction of Mount Laurel housing. Since the extent of its use now becomes the pivotal issue, a recapitulation of the effect of prior rulings on Mahwah's fair share obligation will clarify the extent of the problem. So far, credit has been disallowed for 291 units claimed by the municipality as shown on the following chart:

 CLAIMED BY MAHWAH ALLOWED BY THE COURT
 Low Moderate Total Low Moderate Total
Accessory Apartments 80 20 100 5 20 25
Bergen County Housing
Authority
 Public Units 42 42 84 54 35 89
 Section 8 30 10 40 0 0 0
 Manufactured Housing 5 5 10 0 0 0
Mahwah Housing Project 0 41 41 0 0 0
Rehabilitation HIP 113 37 150 10 10 20
 _______________________ ______________________
Totals 270 155 425 69 65 134
====== === === === == == ===

Subtracting credits allowed by the Court from the total fair share obligation leaves a deficit of 565 units to be provided *193 through the mandatory set-aside ordinance provisions.[5] However, in order to achieve compliance, it will be necessary to either rezone or fashion remedies for a greater number of units.
In Oakwood at Madison, Inc. v. Tp. of Madison, 72 N.J. 481 (1977), the Supreme Court recognized the necessity for overzoning. Judge Conford, dealing with production of least-cost housing, noted:
sound planning calls for providing for a reasonable cushion over the number of contemplated least cost units deemed necessary and believed theoretically possible under a particular revision. Plaintiff adduced testimony that a reasonable margin over any formulaic quota was necessary in order to produce any likelihood of achievement of the quota. The reasons are evident. Many owners of land zoned for least cost housing may not choose to use it for that purpose. And developers of least cost housing may not select all of the zoned land available therefor, or at least not within the anticipated period of need. Thus, overzoning for the category desired tends to solve the problem. [Id. at 519.]
In Mount Laurel II, the Court applied this concept to fair share obligations holding, "a realistic opportunity to provide the municipality's fair share may require over-zoning, i.e., zoning to allow for more than the fair share if it is likely, as it usually is, that not all of the property made available for lower income housing will actually result in such housing." [92 N.J. at 270; emphasis supplied.]
Even Mahwah's housing plan recommended zoning for a surplus of 101 units "to assure greater ability to implement and achieve compliance." During the trial, the opinions of experts were so varied as to be of little assistance. Zimmerman's report recommended zoning for 101 extra units. In his testimony, he attributed the entire surplus to accessory apartments and public sector housing. He said no overzoning was required *194 in the private sector because applications by builders assured the construction of the mandated units. The Master testified the extent of overzoning should depend on the reliability of the local housing plan, the final content of the ordinance and the size of the various development proposals. Under the facts in this case, Caton felt the extent of overzoning could be reduced from the current 101 unit projection. Peter Abeles opined site and financing problems will prevent successful completion of some of these projects. Overzoning is modest insurance that the Mount Laurel obligation will be met. He recommended 20% to 25% overzoning. Alan Mallach testified if there were no ready builders and this were merely a rezoning of vacant sites, 50% overzoning would be appropriate. In this case, he felt 10% overzoning would be adequate unless Kilmer Woods decides not to construct lower income housing. In that event, he feels there should be a total rezoning.
Throughout these proceedings some developers have voiced an intention to abandon their projects unless the mandatory set-aside provisions of Ordinance #851 are substantially changed. Kilmer Woods is the largest project involved and at the required 25% set-aside, would provide 325 lower income units. It has a preliminary site plan approval for construction of 500 luxury townhouses on the site under the prior zoning (PRD-6). Emsey-McBride, the developer, maintains this site plan is protected from the zone change to ML-2 for a period of 3 years from the date of preliminary approval under N.J.S.A. 40:55D-49. Depending on the outcome of this litigation, it intends to decide at some future time either to build lower income housing or litigate the novel issue of whether the constitutional dimensions of Mount Laurel II predominates over the statutory protection afforded by the Municipal Land Use Law.
Ridge Gardens, Franklin Commons East and Franklin Commons West are separate entities with aspects of common ownership and a single managing partner. At the required 25% set-aside, they would provide 362 lower income units. Thus, *195 the fate of 72% of the potential lower income units involved rests in the hands of two decision-makers. If either one abandons his project any prospect of meeting the fair share will be greatly diminished.[6]
Mixed income developments under a mandatory set-aside concept have never before been attempted in New Jersey. The total absence of precedent, the concentration of power, the hazards of the construction business, the vicissitudes of the economy and the spectre of protracted litigation make completion of every one of these projects extremely questionable. Considering the evidence in this case, overzoning of 25% of the units to be furnished through private sector construction is necessary to provide a "reasonable cushion". Thus, a total of 706 units must be provided through mandatory set-asides: 565 deficit and 141 overzoning.

V  COMMUNITY IMPACT
In order to provide 706 units of lower income housing under a mandatory set-aside program, a total of from 2824 to 3530 new units would have to be constructed. This will almost double the existing housing stock and, according to the township's experts, have a tremendous adverse impact on the community. Mahwah's position is the Court should either postpone its Mount Laurel II obligation or phase it over a period of years.
Throughout this litigation, Mahwah maintained the belief compliance should be achieved with minimal addition to the housing stock. This was grounded on the assumption any significant addition will cause a precipitous rise in municipal taxes and change the rural character of the community. To advance this argument, Kauker discussed the "community character" *196 which currently exists in Mahwah. He explained the community character is the way people perceive their environment; their reactions to visual impacts of buildings and land use, attitudes about the way individuals interact, even perceptions while sitting in traffic. Planners gauge this character by examining several factors: population change, rate of this change, density, land use mix, financial ability of the municipality to provide services and changing relationships with other communities.
Kauker described Mahwah as a diverse but well-balanced community with varied housing types. The municipality is approximately 26 square miles which includes 16 square miles of conservation zone. According to the 1980 census, the population was about 12,100 people living in 3,721 housing units. He explained that the population is distributed into identifiable neighborhoods, each with distinctive characteristics.
Fardale, located in the southeast corner of Mahwah, is a low density area, consisting mostly of single family homes on one acre lots. It also contains a PRD zone with a clustering of townhouses. The township's western section is largely pastoral with a scattering of one family homes and limited capacity roads. The central area is low-density with many open spaces and mostly 1 acre zoning. A good deal of its land mass lies in the conservation area of the State Development Guide Plan. Ramapo Ridge is the neighborhood designated by the Governing Body for high-density development. It is zoned for and has been developed with office buildings and townhouses. Kilmer Woods, the largest Mount Laurel II development, is planned for this area with the municipality's approval. West Mahwah, an older area located north of Route 17, is densely developed with commercial uses, garden apartments and older homes on small lots. Cragmere, located in the northeastern section between Franklin Turnpike and Airmont Avenue, consists of many different housing types: old homes on small lots, new homes on 1/2 acre and acre lots, garden apartments and a PRD development. Masonicus, the northeasterly section of town, *197 east of Airmont Avenue, contains one family houses, townhouses, and is similar to Fardale.
Kauker then turned to the impact immediate compliance would have on Mahwah. He calculated an average growth rate from 1950-1980 of 850 units per decade. To project the rate from 1980-1990 he used three different formulas: under Ordinance #851 there would be 1925 new units; using Caton's 22% set-aside, 2,796 units; and with a 20% set-aside, 3,495 new units would result. The population would rise from 12,100 to a possible total of 24,386, what he termed a "population explosion."
Another significant aspect of impact was the projected change in ratio of single-family to multi-family units. Currently, Mahwah has roughly 66% single family dwellings, while in Northern Bergen County 90% of the housing units are single-family. Projecting the 24,386 population and total of 8,409 units in 1990, the ratio of single to multi-family will become approximately 44% single and 55% multi-family. He noted that only the urbanized South Bergen towns have more multi-family than single-family homes. This factor alone, he stated, would change Mahwah from a semi-rural to an urban or semi-urban community.
Kauker also noted Mahwah's current share of Bergen County's housing units of 1.25% would rise to 2.14% in 1990. This would result in an "unfair share" for the township. Based upon a telephone survey, he formed the opinion the housing market in Mahwah's region cannot absorb all the market rate units that would be built under the mandatory set-aside program. According to this reasoning, if Mahwah and only a few other towns are compelled to fulfill their Mount Laurel II obligation, the market would be saturated and the rest of the municipalities would be "held harmless" from producing lower income housing.
The Master and other experts disagreed with Kauker's opinion of negative results which would occur if compliance is *198 achieved. They asserted community character involves the mix of land uses and their proportions, not visual impressions. Impact really involves the effect of development on infrastructure, i.e., roads, sewers, water supply and municipal services. All agreed Mahwah's infrastructure is sufficiently developed to accommodate all the Mount Laurel II construction required with little difficulty. Even if visual impressions were considered, the impact of new construction would be trivial because all the new set-aside developments would occupy less than two% of Mahwah's land mass.
Moskowitz was the only expert who agreed with Kauker the change in proportion from 60% single-family/40% multi-family units to 45% single-family/55% multi-family units would be substantial. The others characterized the proportional change as insignificant, noting an increase in multi-family units is a trend in all communities due to the prohibitively high cost of one family houses. Also, they felt Kauker's assumption that 50% or more multi-family is some sort of standard for urban character is simply incorrect. Hence, Kauker's theory that compliance would change the semi-rural nature of the community is unfounded.
The notion that compliance would cause a precipitous rise in taxes was advanced by Zimmerman. Based upon his calculations, the municipal tax burden of set-aside and public housing units will be significantly greater than tax revenues generated. This difference, which he termed a municipal subsidy, would be $1,557,000 or $500 more in taxes for each present homeowner.
The other experts rejected this theory for several reasons. There was no reliable back-up data to support any of his calculations and the industrial and commercial segments of the tax base were not included. Indeed, the rezoning of Franklin Commons from an industrial zone to ML-2 by the township is inconsistent with Mahwah's argument. It was also pointed out single-family houses cost municipalities more than they generate *199 in taxes and multi-family units generally break even or produce revenue.
Finally, to ameliorate this alleged negative impact, the township planners advanced the argument any fair share should be phased. It was suggested the development occur over 18 years, representing three Master Plan periods, as had been recommended for settlement in other communities involved in Mount Laurel II litigation.
The evidence in support of the community impact theory was unpersuasive. There was a total lack of underlying data produced to verify Mahwah's position. The "destruction of neighborhood" theme, created by Kauker for this litigation, is totally subjective and not based upon established planning principles. The true measure of community impact is the capacity of infrastructure to absorb new construction. Clearly, Mahwah's roads, sewers, utilities, schools and water supply system are all capable of accommodating the required development.
The change in ratio of one family homes to multi-family units is of little significance. Even absent Mount Laurel II, all experts agreed economics have changed the pattern of development in Northern Bergen County. Zimmerman's prognostication of a $500 per year tax increase for present homeowners is totally unfounded.
The postponement for phasing argument has already been disposed of by the Supreme Court. In response to Mount Laurel I, Mount Laurel Township rezoned and included "control provisions" to equate the fulfillment of its fair share obligation with fulfillment of similar obligations by other municipalities in the county. The trial court found no provision in Mount Laurel I making a fair share obligation dependent upon the action of other municipalities. So. Burl. Cty. N.A.A.C.P. v. Tp. of Mt. Laurel, 161 N.J. Super. 317, 348 (Law Div. 1978). Mount Laurel II specifically approved this ruling. 92 N.J. at 304 n. 54.

*200 VI  THE MANDATORY SET-ASIDE PERCENTAGE
The Implementation Order of September 6, 1983, in addition to requiring the revision of Mahwah's zoning ordinance, directed the Master to consider specific proposals by developers. To this end, Caton conferred with various municipal officials and set informal guidelines to assist interested developers. The township planners wanted to have these developments designed in a manner compatible with the existing housing stock. Instead of high rises, they suggested townhouses with building heights similar to those previously constructed in the municipality or condominium flats with densities approximately the 14 units per acre found in the Garden Apartment (GA-200) District.
In order to determine economic feasibility, prospective developers had to ascertain the required number and sales price of the mandated lower income units. The original proposals were all based upon a 20% set-aside, i.e. four market rate units for each lower income unit. Sales prices of the lower income units were computed on the basis of income ceilings furnished by the Master.[7]
All proposals submitted were evaluated by township planners as part of the site selection process. They considered the following "potential development impacts" for all projects: on-site environmental impact, community-wide impact and compliance with current standards. The category of environmental impact dealt with the effect of the individual project on land and vegetation, flooding and streams, form and location of buildings, interior road network and parking and proximity to social and cultural amenities. Community-wide impact was *201 identified as increased demand on utilities, off-site traffic and population density. Compliance with current standards included consistency with existing master plan and zoning controls, potential for completion of the project and consistency with Mount Laurel objectives.
Community-wide impacts were the most heavily weighted, and environmental impacts the least. The proposals were then ranked in order of their desirability: (1) Kilmer Woods; (2) Franklin Commons West; (3) Ridge Gardens; (4) Cherry Hills West; (5) Beaver Creek; (6) Minetto; (7) High Debi Hills; (8) Franklin Commons East; (9) Cherry Hills East; (10) Buehler.[8]
The township planners had not anticipated the number of developers eager for an opportunity to provide lower income housing. Zimmerman testified the balanced Mahwah Housing Plan called for about 1/2 of its fair share obligation or 350 units to be provided through mandatory set-asides with a total new construction limited to 1,000 units. This would require a 33 1/3% set-aside, forcing builders to subsidize each lower income unit with profits from only two market rate units. A 20% set-aside would result in 1750 new units which, in his opinion, would radically change the character of the municipality.
In Ordinance #851, the Township Committee settled on a 25% set-aside at a density of 14 units per acre and a height limitation of three stories. They also incorporated a number of cost reduction provisions for construction in the ML-2 zone. The new zone included only three tracts that would adequately provide the required private sector construction:

*202
 Total Units at Lower Income Units
 14 per acre at 25% set-aside 
Kilmer Woods 1300 325
Franklin Commons West 200 50
Lotito 16 4
 ____ ___
Total 1516 379
===== ==== ===

Kauker and Zimmerman considered the 25% set-aside reasonable. They believed the 14 unit per acre density in ML-2 zones automatically increased raw land values to an extent large enough to enable developers to profitably subsidize at a 3 to 1 ratio. The basis for this conclusion was a new methodology they devised and used to economically evaluate each developer's submission. The first step was to ascertain the land value after rezoning by taking the proposed sales price of the market rate units, multiplying it by 14 for each acre and ascribing a land value of 10% of that figure. Next, they computed an anticipated profit on all units by applying a profit percentage to the proposed sales price. Then, they estimated the savings developers would realize in site preparation because of the ordinance cost reduction provisions. The total increased land value, profit on construction and site preparation savings were termed a "found resource."
The second step was to calculate the dollar amount of the subsidy needed for the lower income units. This was done by adjusting the developer's estimated construction costs downward to arrive at what they considered the reasonable cost of construction. Then, the gross income to be derived from the sale of lower income units was calculated by using the Master's figures to compute allowable sales prices. Subtracting allowable sales prices from the reasonable construction costs yielded the subsidy required. This was dubbed the "shortfall."
Finally, the "shortfall" was deducted from the "found resource" to ascertain the net financial gain or loss resulting from the rezoning. A good deal of testimony concerned the *203 application of this methodology to the financial data furnished by Emsey-McBride in the pro forma for Kilmer Woods. Despite many concessions about the accuracy of the figures used, Kauker and Zimmerman concluded this project would yield astronomical profits. And, they were convinced an economic analysis of the other proposals would show the same result, i.e., FOUND RESOURCE minus SHORTFALL equals WINDFALL.
None of the other experts agreed with either the approach or conclusions of the township planners. Initially, there is no uniform existing base price of land upon which to assess the value of these diverse properties for the purpose of measuring an increase in value attributable to the zone change. The sites involved were located in a variety of districts: Kilmer Woods and Ridge Gardens were PRD-6 (townhouses at six units per acre); Franklin Commons West was GI-200 (general industrial); Beaver Creek and Franklin Commons East were R-20 (single-family on 1/2 acre lots) and High Debi Hills was R-40 (single-family on one acre lots).
Secondly, construction under a mandatory set-aside program is completely different from building under the pre-existing ordinance. Even in the PRD-6 district, the increase from 6 to 14 units per acre is so great as to represent a change in kind, not degree. Tight plot plans, minimum amenities and scaled down individual units are required in ML-2 construction. While undisputed evidence showed present low density townhouses in Mahwah are selling in the $150,000 range, market rate units in ML-2 developments are projected at $50,000 to $90,000. Obviously, land values will not increase in proportion to the number of units, especially in an experimental mixed income development.
Thirdly, there is no sound basis upon which to gauge anticipated building costs. The expert testimony varied between $28 and $48 per square foot for "sticks and bricks" construction costs in today's marketplace. It is reasonable to anticipate a delay in the commencement of construction until the appellate *204 process is completed in this case. None of the witnesses even dared to project future building costs.
Finally, the township planners estimated there would be a savings of from $500 to $1,000 per unit for site improvement costs because of the ordinance amendment. They considered this part of the "found resource" and credited it as a gain to the developer. Elimination of restrictions and exactions not related to public health and safety are required by Mount Laurel II and Mahwah's experts' premise results in a surcharge to developers for eliminating the very cost-generating requirements responsible for inflated housing prices.
In sum, Mahwah's planners were more concerned with limiting production of new units and preventing windfall profits than providing a reasonable opportunity to construct lower income housing. To this end, they requested proposals based upon a higher than 20% set-aside. Several developers offered 22% on condition tax abatements be granted or major off-site improvements be provided. The Township, however, deemed these submissions as admissions which bolstered their position on profitability.
The Master conditionally endorsed a 22% set-aside provided sufficient concessions and incentives were granted. His position was based upon updated income figures which substantially raised sales prices of subsidized units. Since the original proposals anticipated profitability at 20%, he reasoned this added revenue should make 22% feasible. Not totally enamored of a requirement above 20%, he reported: "... while a distinction of 2% might seem diminimus (sic), it could actually reduce the total residential rezoning required by as much as 250 units."
The other experts were all adamant that any increase above the 20% set-aside would unnecessarily jeopardize the prospects for construction. Alan Mallach testified the 25% set-aside deviates from the position of the Supreme Court in Mount Laurel II and disregards the historical basis for the 20% *205 set-aside. Since there are willing builders with ample developable sites in Mahwah, the only possible reason for proposing the higher level is to discourage construction. He pointed out a 20% or less set-aside has been the national experience with few deviations; e.g. a 12 1/2% set-aside Maryland program has produced over 5,000 lower income units, a 25% set-aside California program has been successful but under much more liberal income conditions for buyers of subsidized units. He emphasized there is no history of any lower income units being produced under a 25% set-aside with the stringent Mount Laurel income restraints. The difference between a 20% and 25% set-aside imposes a significant increase in cost to the builder, affects marketability and increases the risk.
Peter Abeles not only agreed with Mallach but testified the 20% set-aside should be adopted on a state-wide basis. He said the surest way to stop Mount Laurel type development is to increase the set-aside precentage. Twenty percent (20%) has become the generally accepted standard in pending litigation and adjudication of a specific percentage in each case will lengthen and add to the cost of litigation. Put another way, it is unnecessary to reinvent the wheel in every case.
Harvey Moskowitz, one of Kilmer Woods' experts, pointed out that although Mount Laurel II referred to 20% as a minimum, it has already become a standard. He likened it to set-back requirements where the minimum also becomes the maximum. His opinion was the additional financial risk imposed by a 25% set-aside will effectively prevent construction. Robert Mcauliffe, Kilmer Woods' other expert, echoed Moskowitz' sentiments. He testified any increase in the 20% set-aside would change the social complexion of the development and cause Kilmer Woods to abandon its project because of the increased marketing risk.
The weight of the credible evidence presented combined with the intent of Mount Laurel II and marketplace factors *206 compels a finding that a 20% set-aside is the maximum permissible to engender the construction of lower income housing.

VII  THE LOW/MODERATE RATIO
The apportionment of the 699 units comprising Mahwah's fair share obligation has been set at 230 units of moderate and 469 units of low income housing.[9] Facially, it would appear this 2 to 1 ratio of low to moderate should be incorporated into the mandatory set-aside program by requiring two low for every moderate unit. During the rezoning process, the Master requested developers to structure their pro formas on the basis of providing 60% low and 40% moderate income units. Nevertheless, the submissions made and the ordinance enacted provided an even split: 50% moderate and 50% low.
Obviously, if all developments are built out at this ratio there will be a surplus of moderate and a shortage of low income units. Unless a total much greater than the fair share is provided, the prospective need for low income housing will not be met. For obvious economic reasons, none of the developers have challenged the 50%/50% split. Even the Urban League has adopted this position for the reasons set forth below in the report of Alan Mallach:
The 50/50 standard, which is supported in the Mount Laurel II decision implicitly at 309, reflects both practical and theoretical considerations. The practical grounds are straightforward: since each low income unit is substantially more financially burdensome for a developer, any increase in the number *207 of low income units makes the financial feasibility of the development, that much more problematical. This is extremely important, since (a) it is in the interest of the Mount Laurel remedy to make development feasible; and (b) there is a finite limit to the amount of additional cost which can be added to market units, where one is trying to develop a relatively affordable market-rate product. Moderate income units can be provided with a modest subsidy; low income units require a deep subsidy, perhaps as much as $20,000/unit.
If the 50/50 approach were dramatically at variance with the distribution of need, it might be necessary to reappraise the above point, and perhaps seek alternatives (a smaller overall percentage, perhaps, with more low income units than moderate income units). It is not seriously at variance with the need, for one compelling, although unfortunate, reason. The mandatory set-aside approach simply cannot subsidize units down to the level where the very poor can afford them. There is a de facto floor on the affordability of a unit provided through this approach, which is likely to be in the area of 40% of median at a minimum. If one looks at the distribution of households between 30% and 80% of median, rather than from 0% to 80%, one finds that the split is 60% moderate income and 40% low income.
This analysis might suggest that a 60% moderate/40% low split would be appropriate. This, however, is not the case, for two reasons. First, within the present need category, there is a disproportionate concentration of low income households, which dictates provision of more low income units. Second, the ability of low income households to find minimally acceptable housing at a price they can afford within the existing (used) housing market is substantially less than that of moderate income households. For these reasons, it is desirable to seek to meet a greater part of the low income need, within that income range which can be accommodated through the set-aside approach, than the moderate income need. Thus, the 50/50 approach appears to balance both practical and theoretical consideration.
It should be noted that Mallach's report goes on to identify an "intermediate" segment of the lower income population as those households earning between 50% and 65% of the median. He observes that affordable housing for this particular segment is often overlooked by municipalities and developers in the course of structuring Mount Laurel compliance strategies.
The Master dealt with this problem by requiring developers to target their prices, for planning purposes, toward households earning 65% and 50% of the median. This would allow for the price structure to be subsequently refined to a full range of income levels equally above and below these benchmarks without economic penalty to the developer; i.e., 30% to 50% for low income and 50% to 80% for moderate income. Thus, the rezoning *208 process in Mahwah has provided for the needs of a reasonably broad range of lower income levels.
With regard to the proportion of low versus moderate income units, the evidence established if more than 1/2 of these subsidized units are sold to low income households the resulting socio-economic composition of individual developments will adversely affect marketability. Accordingly, the township's requirement that developments include a minimum of 50% of the lower income units for low income households is at the reasonable maximum for proportionality. The proposed developments in Mahwah are each sufficient in size to accommodate a 50/50 distribution of low/moderate units.

VIII  REMOVING EXCESSIVE RESTRICTIONS AND EXACTIONS
The astronomically high cost of housing in New Jersey motivated the Supreme Court in Mount Laurel II to order the removal of all municipally-created barriers to construction of mandated lower income housing. When it rendered the decision in 1983, the Court had documentation before it that the average 1981 new home price in New Jersey had been $75,000, a figure affordable by only 1 in 20 families. 92 N.J. at 212 n. 6. Other factors indicated judicial intervention could significantly lower housing costs. For example, in 1972, evidence demonstrated the selling price of some new single-family homes could have been decreased from $57,618 to $33,843 by merely reducing lot size and frontage requirements. 92 N.J. at 259 n. 25.
In dealing with the problem, the Court specifically required elimination of zoning and subdivision restrictions and exactions not necessary for the protection of health and safety. In so doing, they recognized achieving the delicate balance between required cost reduction measures and protection of health and safety would be difficult in future cases. Guidelines were set instructing trial courts to consider updated standards in the construction field in conjunction with specific evidence submitted *209 by the parties to determine whether municipally-imposed housing costs have been sufficiently reduced. 92 N.J. at 259. In the case of Mahwah, developers advocated specific ordinance revisions to achieve the required cost reduction and furnished a good deal of credible evidence on the subject. The municipality offered virtually no opposition on this point.
The evidence established house sales in Mahwah during 1984 have been averaging $150,000; in nearby Saddle River the average sales price is $450,000. The current price of housing in Northern Bergen County is shown in the 1984 Annual Survey of Bergen County Housing Developments:

Price Project Name Location Plot Size
$ 115,000 Tributary Woods Englewood 2713
$ 115,900 Willow Court Townhouses Englewood 2 acres
$ 174,900 West Woods Norwood 100 X 100
$ 179,900 Hemlock Estates Midland Park 100 X 150
$ 189,900 Fardale Estates Mahwah 24,800
$ 210,000 Midvale Estates River Vale 18,000
$ 229,900 West Woods Norwood 100 X 100
$ 279,000 Aris Estates Allendale 3/4 acre
$ 285,000 Manor Estates Washington Twsp. 1 acre
$ 298,900 Hidden Acre Estates Wyckoff 25,000
$ 300,000 Saddle Ridge Estates Upper Saddle River 1 acre
$ 320,000 Tivon Construction Woodcliff Lake 23,500
$ 344,900 Town & County Developers Woodcliff Lake 3/4 acre
$ 359,900 Five Oaks Haworth 45,000
$ 359,900 Town & County Developers Montvale 1 acre
$ 389,900 Town & County Developers Montvale 1 acre
$ 449,900 Lily Pond Franklin Lakes 1 acre
$ 449,900 Town & County Developers Upper Saddle River 1 acre
$ 450,000 Leonard Estates Franklin Lakes 1 acre
$ 475,000 Forest Ridge Upper Saddle River 1 acre
$ 525,000 Rio Vista Cresskill 1 acre
$ 648,000 Twinbrook Estates Saddle River 2.14 acres
$ 675,000 Urban Farms Franklin Lakes 1 acre
$ 685,000 Saddle River Estates Saddle River 2 acres
$ 685,000 High Ridge Saddle River 2 acres
$ 735,000 High Ridge Saddle River 2 acres

*210
$ 749,500 Powder Hill Estates Saddle River 2 acres
$ 750,000 Timberline Manor Alpine 2 acres
$ 759,000 Nigro Construction Co. Saddle River 2 acres
$ 995,000 High Ridge Saddle River 2 acres
$1,000,000 Rio Vista Alpine 2 acres
 "The Well-to-do Buoy the Market," The Record (Hackensack, N.J.)
 May 20, 1984, Section R at 2.

With a single exception, every witness who dealt with the subject recognized a tremendous demand for conventional housing in the Mahwah region at more affordable prices.[10]
Naomi D. Friedman, a local real estate broker testified prospective purchasers looking for housing under $100,000 are regularly directed to either Rockland County, New York or Central New Jersey. There was a unanimity of opinion that potential first-time home buyers with annual incomes of less than $30,000 are effectively cut out of the Mahwah market because no quality housing is currently being offered at an appropriate price range.[11]
*211 A Housing Market and Feasibility Analysis prepared for Beaver Creek by Real Estate Research Corporation verified the existence of a large market for housing at prices, expressed in 1983 dollars, from between $56,000 and $81,250 per unit. The report concluded smaller units in this price range will attract a diverse group of buyers, most with annual incomes in the $25,000 to $30,000 range. They found significant numbers of these potential home buyers live in Northwest Bergen County and are eager to purchase housing if it can be marketed in this price range.
Mandatory set-aside developments involve concepts totally different from those employed in building conventional projects. Townhouses currently being built in Mahwah at 4 or 6 to an acre at prices in excess of $100,000 are not suitable market rate units for Mount Laurel type development. Mixed income projects at 14 to an acre cannot be expected to compete with these low-density luxury developments. Market rate units must be priced below existing levels yet high enough to subsidize lower income units. Marketability becomes the key issue. All developers concurred in the findings of Real Estate Research Corporation and projected their sales prices for market rate units between the low $50,000's and high $80,000's. This reaches the untapped market of potential home buyers who cannot afford the current Mahwah prices but earn more than 80% of the region's median income. To provide a realistic *212 opportunity for builders to sell some units for as little as $50,000, subsidize others and still make a reasonable profit, requires Mahwah's ordinances be thoroughly cleansed of cost additive measures not necessary for health and safety.
Minimum standards relating to health and safety factors fall into many areas. Conceptually, local regulations in this field can be divided into two categories. There are the land planning provisions governing set-backs, placement of buildings, buffering, amount of open space, densities, etc., which are generally found in zoning codes. Subdivision and site plan ordinances usually set forth technical standards for performance criteria concerning construction of roadways and parking areas, surface drainage, land clearing and soil removal and other site improvements.
John Rahenkamp, an expert in landscape architecture and land planning was retained by Beaver Creek to review Mahwah's existing development codes. He is nationally recognized for his work in the area of reducing building costs through the use of innovative but proven techniques. Rahenkamp analyzed Ordinance #851 in light of other code requirements to determine whether the township had reduced unnecessary cost generating requirements to the extent required by Mount Laurel II.
He began by analyzing the design and engineering standards in Mahwah's ordinances relating to on-site improvements, then made a judgment as to whether each required improvement was really necessary for public health and safety. If unnecessary, it was eliminated. If necessary, he looked for less costly recognized engineering methods to produce the required results. His preference was to keep land in its natural state, allow for flexibility in site plan design, take advantage of natural contours and encourage innovative use of materials. This low technology approach, in his opinion, is equally as effective but less costly than traditional rigid site improvement requirements. Rahenkamp concluded Ordinance #851 failed to *213 comply with Mount Laurel II and the municipality's efforts resulted in only minimal savings. The Master concurred.
Other experts on behalf of developers also provided reports and testimony on the subject of cost reduction supplementing Rahenkamp's study. The municipality did not offer a single shred of evidence to contradict the recommended cost reduction provisions.
If traditional zoning laws were applicable, the more costly municipal requirements would be upheld as a reasonable exercise of governmental discretion and Rahenkamp's recommendations would carry no legal weight. Actually, the existing regulations may well be valid when applied to construction in other zones. However, in zones designated for the production of lower income housing, site plan and subdivision regulations are valid only if they eliminate all restrictions and exactions not necessary for the protection of health and safety. Consequently, the cost reduction provisions of Ordinance #851 as they affect Mahwah's development regulations must be evaluated under the new test set forth in Mount Laurel II.
Therefore, the Court's evaluation of each cost reduction provision contained in Ordinance #851, in light of the uncontradicted evidence presented, follows:

ORDINANCE #851 § 9A  PHASING
1. THE APPROVING AGENCY MAY REQUIRE THE CONSTRUCTION OF A DEVELOPMENT IN TWO OR MORE STAGES AND MAY PHASE THE CONSTRUCTION OF STAGES IN PERIODS OF TWO OR THREE YEARS BETWEEN ISSUANCE OF BUILDING PERMITS FOR EACH STAGE.
2. WITHIN THE ENTIRE DEVELOPMENT IF DEVELOPED IN ONE STEP, OR WITHIN EACH STAGE IF THE DEVELOPMENT IS A STAGED PROJECT, LOWER INCOME *214 HOUSING SHALL BE PHASED IN ACCORDANCE WITH THE FOLLOWING SCHEDULE:

 MINIMUM
PERCENTAGE OF TOTAL PERCENTAGE OF LOWER
DWELLING UNITS INCOME DWELLING UNITS
(BUILDING PERMITS) (CERTIFICATES OF OCCUPANCY)
 25 10
 50 25
 75 50
 100 100

THE ABOVE PERCENTAGE SHALL REFER TO THE PERCENTAGE OF TOTAL DWELLING UNITS HAVING FINAL SITE PLAN OR SUBDIVISION APPROVAL AND THE PERCENTAGE OF LOWER INCOME DWELLING UNITS COMPLETED AND CERTIFICATES OF OCCUPANCY ISSUED.
COMMENT: The purpose of Paragraph 1 is to lessen the impact of sudden development on the municipality. By controlling the pace of development, the township will be able to better manage off-site problems caused by new construction such as traffic, water supply and sewerage disposal. However, it can also be used as a tool to prevent construction of lower income housing by failing to issue building permits for periods of two or three years. The evidence established Mahwah's infrastructure is capable of handling the extent of new development required. The pace of construction should be governed by market conditions. This paragraph is unreasonable.
Paragraph 2 limits the issuance of building permits for market rate units until a set percentage of subsidized units have been sold. This is designed to prevent developers from selling only market rate units, harvesting a profit, then abandoning the project. The ordinance ratio, however, fails to take in account the need to allow the sale of market rate units at the beginning of a project in order to provide sufficient cash flow to subsidize the lower income units. The schedule below, recommended *215 by Rahenkamp, assures the construction of both types of housing in tandem while providing the builder with a more reasonable opportunity to develop.

Market Rate Housing Lower Income Housing
Percentage (Maximum) Percentage (Minimum)
 Up to 25% 0% (none required)
 25% + 1 unit At least 10%
 Up to 50% At least 25%
 Up to 75% At least 50%
 75% + 1 unit At least 75%
 Up to 100% 100%

ORDINANCE #851 § 9B  FEES AND WAIVERS OF FEES
1. THE APPLICABLE APPROVING AGENCY SHALL WAIVE SUBDIVISION AND SITE PLAN APPLICATION FEES FOR EVERY UNIT DESIGNATED AS LOWER INCOME HOUSING.
2. FOR ALL NON-LOWER INCOME UNITS THE FOLLOWING FEES SHALL ACCOMPANY THE APPROPRIATE APPLICATION.
A. FILING FEE FOR PRELIMINARY APPROVAL: ONE-HUNDRED DOLLARS ($100) PLUS FIVE ($5.00) DOLLARS FOR EACH PROPOSED DWELLING UNIT.
B. FILING FEE FOR FINAL APPROVAL: TWO DOLLARS AND FIFTY CENTS ($2.50) FOR EACH PROPOSED MARKET RATE DWELLING UNIT.
3. NOTWITHSTANDING ANY OTHER ORDINANCE REQUIREMENT OF THE TOWNSHIP OF MAHWAH, PROFESSIONAL AND LEGAL REVIEW FEES SHALL BE PROPORTIONATELY REDUCED BY THE PERCENTAGE OF LOWER INCOME UNITS CONTAINED IN THE DEVELOPMENT.
4. THE APPLICANT SHALL DEPOSIT THE SUM OF FIVE (5%) PERCENT OF THE COSTS OF SITE IMPROVEMENTS TO COVER ENGINEERING INSPECTION OR OTHER INSPECTIONS *216 OR REVIEW OF THE PROJECT. SUCH SUM SHALL BE IN THE FORM OF ESCROW ACCOUNTS IN AMOUNTS AND IN A FORM ACCEPTABLE TO THE APPROVING AGENCY. SUCH FUNDS SHALL BE USED BY THE TOWNSHIP ONLY FOR THE PURPOSES RELATING TO THE APPLICATION, AND SHALL BE EXPENDED ONLY FOR THE ACTUAL OUTLAYS INCURRED AS A RESULT OF THE APPLICATION. IF ACTUAL INSPECTION COSTS BASED UPON TIME AND EXPENSE RECORDS ARE LESS THAN THE FIVE (5%) DEPOSITED, THE BALANCE SHALL BE RETURNED TO THE APPLICANT. IF ACTUAL COSTS BASED UPON TIME AND EXPENSE RECORDS ARE MORE THAN THE FIVE (5%) PERCENT DEPOSITED, THE APPLICANT SHALL PAY THAT AMOUNT TO THE TOWNSHIP.
COMMENT: Paragraphs 1 and 2 result in a cost saving of only $7.50 per lower income unit.
Paragraph 3, while facially reducing review fees, makes no provision for payment of the difference by the municipality. Hence consulting professionals are expected to provide 100% of the work for only 80% of their standard fee. Since they set their own billing rates without outside control, this provision is still tantamount to issuing a blank check.
Although authorized by N.J.S.A. 40:55D-53(h), the 5% unstaged escrow fund in Paragraph 4 is unreasonable. At an estimated site improvement cost of $7,500 per unit, developers would have to post $375 in advance to cover inspection fees. In large projects, the escrow required sometimes exceeds design engineering fees and may exceed a quarter of a million dollars. Rahenkamp felt engineers in the public sector, whose only function is to make inspections, should not be paid more than 20% of the amount paid to the engineers who design and supervise the entire project.
In New York City, Abeles pointed out, self-inspection by engineers and architects in the employ of private builders is *217 permitted, eliminating this cost entirely. The experience in New York City shows the public interest has been adequately protected because these professionals are required to certify their findings at the risk of losing their licenses and must carry malpractice insurance.
A 1983 study by Passaic and Bergen County civil engineers indicates professional review services can be obtained at from $30 to $75 per unit. An escrow requirement in excess of that range will unnecessarily add to the ultimate cost of housing. Section 9B fails to recognize the need for either set inspection fees or open bidding in Mount Laurel II projects.

ORDINANCE #851 § 9C  APPLICATION PROCEDURE FOR DEVELOPMENT IN THE ML-1 OR ML-2 ZONE
1. AN APPLICANT FOR DEVELOPMENT IN THE ML-1 OR ML-2 ZONE SHALL SUBMIT REQUIRED PLANS AND DOCUMENTS TO THE APPROVING AGENCY FOR REVIEW AND APPROVAL AS REQUIRED BY THE TOWNSHIP OF MAHWAH SUBDIVISION AND SITE PLAN ORDINANCES. THE APPROVING AGENCY SHALL DISTRIBUTE THE PLANS TO THOSE AGENCIES REQUIRED BY LAW TO REVIEW AND/OR APPROVE DEVELOPMENT PLANS AND TO TOWNSHIP AGENCIES WHICH NORMALLY REVIEW DEVELOPMENT PLANS.
2. THE APPROVING AGENCY SHALL HOLD A PUBLIC HEARING ON THE APPLICATION. THE HEARING SHALL BE HELD NOT LESS THAN THIRTY (30) DAYS NOR MORE THAN FORTY-FIVE (45) DAYS FROM THE DATE OF SUBMISSION OF A COMPLETE APPLICATION.
3. NOTWITHSTANDING ANY OTHER ORDINANCE REQUIREMENT OF THE TOWNSHIP OF MAHWAH OR N.J.S.A. 40:55D-46 OR N.J.S.A. 40:55D-48, THE TIME PERIOD FOR OFFICIAL ACTION ON COMPLETE SUBDIVISION AND SITE PLAN APPLICATIONS FOR PRELIMINARY APPROVAL SHALL BE SEVENTY FIVE (75) DAYS UNLESS *218 THE APPLICATION IS FOR LESS THAN 10 LOTS OR LESS THAN 10 ACRES OR UNLESS THE APPLICANT CONSENTS TO AN EXTENSION OF TIME.
4. IN ADDITION TO MATERIAL SUBMITTED FOR REVIEW AS REQUIRED BY THE TOWNSHIP OF MAHWAH SUBDIVISION AND SITE PLAN ORDINANCES, THE APPLICANT MUST ALSO SUBMIT A HOUSING PLAN DETAILING THE TYPE, SALE, AND RENTAL SCHEDULE FOR ALL HOUSING UNITS. THIS PLAN SHALL INCLUDE BUT NOT BE LIMITED TO INFORMATION ACCORDING TO THE FOLLOWING:
1. MARKETING OF UNITS
2. SALE PRICE AND RENT SCHEDULE
3. NUMBER OF UNITS TO BE SOLD AND/OR RENTED
4. NUMBERS OF BEDROOMS
5. SQUARE FOOTAGE OF UNITS
6. OTHER REASONABLE INFORMATION AS REQUIRED BY MAHWAH HOUSING COMMISSION AND/OR PLANNING.
COMMENT: Section 9C represents a bona fide effort by Mahwah to establish a fast track procedure for Mount Laurel II applications. It requires the Planning Board to hold a hearing and act within 75 days following receipt of a completed application instead of the 95 days provided in N.J.S.A. 40:55D-46(c). However, this provision fails to establish a mechanism to process these applications in an expedited manner. Developers are still required to obtain approvals from municipal agencies not subject to time limits set forth in the Municipal Land Use Law. The date an application is deemed complete can be delayed for a number of reasons beyond the applicant's control. For example, Mahwah ordinances require obtaining Environmental Impact Statements from the Municipal Environmental Commission and soil removal permits from the Township Committee. These bodies should be required to act promptly and report specific objections early in the process.
The interjection of the Mahwah Housing Commission into the review process merely adds another layer to the existing bureaucracy. *219 Rahenkamp testified developers are reluctant to assert their statutory right to have applications granted because of the failure of planning boards to act in the time required. Rather than face certain litigation, they have in the past preferred to grant extensions.
The Planning Board cannot be expected to continue its normal work and process Mount Laurel II applications within this short time frame. Lay members of the Planning Board should receive assistance from independent technical experts in handling preliminary matters. An entirely new procedure is required to accomplish the desired fast-track processing.

ORDINANCE #851 § 9D  DEVELOPMENT STANDARDS

1. GROSS DENSITY SHALL NOT EXCEED FOURTEEN (14) DWELLING UNITS PER ACRE.
COMMENT: William F. Murphy, an architect, and planner for Kilmer Woods, testified other provisions in Ordinance #851 make it impossible to design for this density even on a trouble-free site.
However, this provision is reasonable provided it is interpreted to allow more than 14 units per acre in certain areas, as long as the overall density of the project does not exceed 14 units per acre.

2. NO MORE THAN EIGHTEEN (18) DWELLING UNITS SHALL BE PERMITTED WITHIN A RESIDENTIAL STRUCTURE.
COMMENT: The most cost efficient structure which can be built today is a 3 story condominium flat containing 24 units. All developers have included this type of dwelling in their proposals because it allows back-to-back construction with common stairways which comply with the BOCA Code. Fire rating and construction materials, rather than an arbitrary number, should govern the units per building.

3. SETBACKS AND BUFFER ZONES.
*220 A. FROM A COLLECTOR STREET  35 FOOT SETBACK
B. FROM ALL TRACT LOT LINES:
1. FOR TRACTS LESS THAN 5.0 ACRES  A MINIMUM SETBACK OF 20 FEET SHALL BE REQUIRED IN THE ML-1 AND ML-2 ZONES.
2. FOR TRACTS GREATER THAN 5.0 ACRES  A MINIMUM BUFFER OF 50 FEET AND A MAXIMUM BUFFER OF 100 FEET SHALL BE PROVIDED IN ALL ML-2 ZONES.
THE APPROVING AUTHORITY SHALL CONSIDER THE FOLLOWING PERFORMANCE STANDARDS: TOPOGRAPHY OF AREA, EXTENT OF NATURAL GROUND COVER, RELATIVE LOCATION OF PROPOSED STRUCTURES, LOCALIZED DENSITY, NATURE OF ADJACENT ZONE AND LAND USES, EXTENT OF PEDESTRIAN AND VEHICULAR ACTIVITY AND ANY OTHER SITE CONDITION FACTORS DEEMED RELEVANT BY THE APPROVING AGENCY.
THE USE OF SITE SCREENING DESIGN DEVICES SUCH AS BERMS, SPECIALIZED LANDSCAPING, FENCING, AND OTHER SIMILAR DEVICES SHALL BE ENCOURAGED BY THE APPROVING AGENCY. IN THE ML-1 ZONE, SAID BUFFER SHALL BE A MINIMUM OF 35 FEET AND A MAXIMUM OF 50 FEET, SUBJECT TO THE PERFORMANCE STANDARDS NOTED ABOVE.
FOR TRACTS GREATER THAN 5.0 ACRES IN THE ML-1 ZONE, SAID BUFFER SHALL BE A MINIMUM OF 35 FEET AND A MAXIMUM OF 50 FEET SUBJECT TO THE PERFORMANCE STANDARDS SPECIFIED HEREIN.
C. RESIDENTIAL STRUCTURES SHALL BE SET BACK NO LESS THAN TWENTY-FIVE (25) FEET FROM ANY PAVED VEHICULAR TRAVELED WAY OR PARKING AREA.
COMMENT: The 35 foot set back in Paragraph A is overly rigid, wastes space and adds costs. A 20 foot set back from collector streets would be adequate.
*221 A sliding scale of set backs, from between 20 and 50 feet, depending upon adjacent zoning is more appropriate than the 50 to 100 feet provided in Paragraph B. The performance standards to be considered by the approving agency in setting particular buffer distances are in accord with the current state of the art.
Paragraph C, however, requires excessive cost producing site clearing. A 10 foot set back from paved roadways would allow sufficient area for landscaping and walkway; the 25 foot minimum forces buildings toward the external property boundaries and may cause an encroachment toward neighboring residences.

4. BUILDING HEIGHT
NO STRUCTURE SHALL EXCEED THE LESSER OF THREE (3) STORIES OR THIRTY-FIVE (35) FEET IN HEIGHT.
COMMENT: The 3 story maximum is reasonable; the 35 foot height limitation is not. An increase to 40 feet would give architectural flexibility and permit construction of gable roofs while complying with the BOCA Code.

5. DISTANCE BETWEEN BUILDINGS
THE MINIMUM DISTANCE BETWEEN ANY TWO BUILDINGS SHALL NOT BE LESS THAN THE AVERAGE HEIGHT ABOVE FINISHED GRADE OF THE HIGHER OF TWO OPPOSING WALLS, BUT SHALL IN NO CASE BE LESS THAN 20 FEET.
COMMENT: The 20 foot minimum is standard for emergency vehicle access. The additional distance, if the building height test is applied, is cost generating because the additional width will increase the linear feet of utilities without providing corollary public benefit.

6. PARKING REQUIREMENTS
A. PARKING STALLS SHALL MEASURE NOT LESS THAN NINE (9) FEET IN WIDTH AND EIGHTEEN (18) FEET IN LENGTH.
*222 B. THERE SHALL BE A MINIMUM OF ONE AND ONE HALF (1 1/2) PARKING SPACES PROVIDED FOR EACH ONE BEDROOM DWELLING UNIT AND TWO (2) PARKING SPACES FOR ALL OTHER DWELLING UNITS.
C. THE WIDTH OF ALL AISLES PROVIDING DIRECT ACCESS TO INDIVIDUAL PARKING STALLS SHALL NOT BE LESS THAN:

 PARKING ANGLE AISLE WIDTH
 0 DEG. 12'
 30 " 12'
 45 " 13'
 60 " 18'
 90 " 24'

D. ONLY ONE-WAY TRAFFIC SHALL BE PERMITTED IN AISLES SERVING PARKING SPACES PLACED AT AN ANGLE OTHER THAN 90 DEGREES.
COMMENT: The Mahwah Site Plan Review Ordinance (Mahwah Code § 145) requires parking stalls measure not less than 10 feet in width by 20 feet in length. The new requirement of 9 by 18 is equivalent to the top of the range of acceptable sizes according to research studies of the Urban Land Institute and National Association of Home Builders. The nationally recognized recommended size is 8.5 by 17. Paragraph A results in 15%-18% less paving which lowers the cost of parking lot construction and storm water detention.
Paragraph B reduces the present requirement of 2 parking spaces for each dwelling unit to 1.5 spaces for 1 bedroom units, but does not affect larger units.
There was no adverse testimony about any of these provisions which are both reasonable and cost reducing.

7. PEDESTRIAN WALKWAYS
ALL RESIDENTIAL DEVELOPMENTS SHALL PROVIDE A SYSTEM OF CONTINUOUS PAVED WALKWAYS NOT LESS THAN FIVE (5) FEET IN WIDTH LINKING PRIMARY RESIDENTIAL ENTRANCES TO OFF-SITE TOWNSHIP, *223 COUNTY OR STATE ROADS. SUCH WALKWAYS NEED NOT PARALLEL STREETS OR DEDICATED ROADS. THE WALKWAY SYSTEM SHALL LINK-UP WITH ADJACENT PUBLIC FACILITIES WHERE FEASIBLE. SIDEWALKS SHALL BE PROVIDED ADJACENT TO COLLECTOR STREETS.
COMMENT: In well planned developments, as much as 50% of conventionally required walkways can be eliminated at substantial cost savings with no harm to residents. In most instances 4 feet in width is adequate. Basically, this provision appropriately deals with the subject matter by greater reducing excessive sidewalk requirements. Rahenkamp suggests bike paths may be more desirable than walkways in some locations.

8. REFUSE COLLECTION AND STORAGE
PROVISION SHALL BE MADE FOR THE PROPER STORAGE AND COLLECTION OF REFUSE AND SHALL BE WITHIN AN ENCLOSED BUILDING OR STRUCTURE OF APPROPRIATELY SCREENED AND LANDSCAPED, AND SHALL BE REASONABLY ACCESSIBLE FOR VEHICULAR COLLECTION.
COMMENT: A reasonable provision.

9. COMMON OPEN SPACE REQUIREMENTS
A. A MINIMUM OF TWENTY (20) PERCENT OF THE LAND AREA OF ANY DEVELOPMENT OTHER THAN SINGLE OR TWO-FAMILY HOUSING AND WHICH MAY INCLUDE ENVIRONMENTALLY RESTRICTED LAND, SHALL BE DESIGNATED FOR CONSERVATION, OPEN SPACE, RECREATION AND/OR OTHER COMMON OPEN SPACE.
B. ALL PROPERTY OWNERS AND TENANTS SHALL HAVE THE RIGHT TO USE THE COMMON OPEN SPACE.
C. ALL COMMON OPEN SPACE DEEDED TO AN OPEN SPACE ORGANIZATION, TRUST OR PRIVATE ORGANIZATION, *224 SHALL BE OWNED AND MAINTAINED AS PROVIDED FOR IN N.J.S.A. 40:55D-43.
D. COMMON OPEN SPACE MAY INCLUDE TRACT SETBACK AREAS FOR COMPUTATION PURPOSES. SUCH SPACE SHALL BE READILY ACCESSIBLE TO ALL RESIDENTS OF THE DEVELOPMENT, AND NO AREA DESIGNATED AS OPEN SPACE SHALL BE LESS THAN THIRTY-FIVE (35) FEET IN WIDTH.
COMMENT: In Paragraph C, the municipality has elected not to require developers to deed open space to the township. This leaves the burden of future maintenance with the residents of these Mount Laurel II developments and will increase monthly payments. Nevertheless, this is a valid exercise of municipal discretion.
The other common open space requirements are reasonable except for the 35 foot wide minimum in Paragraph D which is unwarranted and unrelated to public health and safety.

10. DRAINAGE
A. STORM SEWERS, OPEN CHANNELS, BRIDGES, AND CULVERTS SHALL BE DESIGNED FROM MINIMUM FLOW CAPACITIES AS FOLLOWS:

DESIGN CAPACITY FREQUENCY OF STORMS
COLLECTION SYSTEMS 15 YEARS
CULVERTS 25 YEARS
DETENTION SYSTEMS 25 YEARS
EMERGENCY SPILLWAY SYSTEM
 FROM DETENTION SYSTEM 100 YEARS
PROJECTS REQUIRING A DEP
 STREAM ENCROACHMENT PERMIT 100 YEARS

B. ALL MATERIALS USED IN THE CONSTRUCTION OF (SEWERS) BE IN ACCORDANCE WITH THE SPECIFICATIONS OF THE "STANDARD SPECIFICATIONS FOR ROAD AND BRIDGE CONSTRUCTION OF THE NEW JERSEY HIGHWAY DEPARTMENT" CURRENT EDITION, AND *225 ANY SUPPLEMENTS AND MODIFICATIONS THEREOF UNLESS OTHERWISE SPECIFIED BY THE REVIEWING MUNICIPAL AGENCY.
C. SURFACE WATER RUNOFF SHALL BE REGULATED BY SECTION 145-25(J) AND 154-30(C) OF THE CODE OF THE TOWNSHIP.
D. WHERE REQUIRED BY THE TOWNSHIP AND AS INDICATED ON AN IMPROVED DEVELOPMENT PLAN, A DRAINAGE RIGHT-OF-WAY EASEMENT SHALL BE PROVIDED TO THE TOWNSHIP WHERE A TRACT OR LOT IS TRAVERSED BY A DRAINAGE SYSTEM, CHANNEL OR STREAM. THE DRAINAGE RIGHT-OF-WAY EASEMENT SHALL CONFORM SUBSTANTIALLY WITH THE LINES OF SUCH WATERCOURSE AND, IN ANY EVENT, SHALL MEET ANY MINIMUM WIDTHS AND LOCATIONS AS SHOWN ON ANY OFFICIAL MAP AND/OR MASTER PLAN OR AS RECOMMENDED BY THE TOWNSHIP ENGINEER.
COMMENT: Prior to Ordinance #851, drainage was regulated by identical provisions in the Site Plan Review and Subdivision Ordinances. Both Mahwah Code § 145-25(j) and § 154-30(c) provided: "Development shall not create more than zero (0%) percent increase in surface water run-off." While the changes made in the above provisions are not objectionable, Rahenkamp recommended adoption of additional specific cost saving measures.
The New Jersey Soil Erosion and Sediment Control Act (N.J.S.A. 4:24-39 et seq.) and the New Jersey Storm Water Management Act (N.J.S.A. 40:55D-93 et seq.) have, to some extent, pre-empted municipal control in this area. Storm water drainage systems in every type of development must be designed to carry the 100 year frequency storm with a duration of 24 hours. One recognized method employs primarily pipes, inlets and other capital intensive structural solutions. Another, at a substantial reduction in cost, uses a series of drainage swales conforming to the natural contour of the land whenever possible. *226 Rahenkamp believes the low technology alternative can be implemented on most sites to provide an equally effective solution to the management of storm water run-off if the following methodology is permitted:
(a) That surface runoff be permitted to enter streets from the front yards of residences; (b) That runoff from and along streets be carried by turf swales or standard curb and gutter at minimal grades and discharges into drainage swales, natural drainage courses, and retention ponds; (c) That street drainage not be allowed to cross local street intersections; (d) That storm sewers be designed for minimum number of inlets and pipes; (e) That surface runoff from rear yards of residences be collected in drainage easements and the open space drainage system; (f) That surface runoff from multi-family areas be collected in drainage swales and/or storm sewers, depending on volume and velocity standards; (g) That drainage swales be designed to carry runoff within each drainage area according to the best methods for preserving the natural character of the site; (h) That detention ponds be designed to retain and control increased stormwater runoff based on a 100-year storm frequency of 20 minutes duration and an intensity of 6.2 inches per hour; (i) That sediment basins and detention ponds be designed and constructed to provide for sediment storage and a minimum permanent pool water depth of 4 feet, and/or adequate flood storage capacity as established by the Standards for Soil Erosion and Sediment Control in New Jersey.

11. LIGHTING
A. STREET LIGHTING SHALL BE PROVIDED FOR ALL STREET INTERSECTIONS AND ALONG ALL COLLECTOR AND LOCAL: STREETS, PARKING AREAS, AND ANYWHERE ELSE DEEMED NECESSARY FOR SAFETY REASONS.
B. ANY OUTDOOR LIGHTING SUCH AS BUILDING AND SIDEWALK ILLUMINATION, DRIVEWAYS WITH NO ADJACENT PARKING, THE LIGHTING OF SIGNS, AND ORNAMENTAL LIGHTING, SHALL BE SHOWN ON THE LIGHTING PLAN IN SUFFICIENT DETAIL TO ALLOW A DETERMINATION OF THE EFFECTS UPON ADJACENT PROPERTIES, ROADS, AND TRAFFIC SAFETY FROM GLARE, REFLECTION, AND OVERHEAD SKY GLOW IN ORDER TO RECOMMEND STEPS NEEDED TO MINIMIZE THESE IMPACTS.
*227 C. SPECIFIC LIGHTING REQUIREMENTS. THE MAXIMUM INTENSITY OF LIGHTING PERMITTED ON ROADWAYS SHALL BE AS FOLLOWS:

 AVERAGE MAINTAINED HORIZONTAL ILLUMINATION FOR RESIDENTIAL
AREAS:
STREET INTERSECTIONS 3.0 FOOTCANDLES
PARKING AREAS 1.0 FOOTCANDLES

COMMENT: The detailed lighting requirements spelled out in Mahwah Code § 145-28 of the Site Plan Review Ordinance and the above modifications are reasonable.

12. SANITARY SEWERS
THE DEVELOPER SHALL DESIGN AND CONSTRUCT SANITARY SEWER FACILITIES IN ACCORDANCE WITH THE N.J.D.E.P. PERMIT REQUIREMENTS AND IN SUCH MANNER AS TO MAKE ADEQUATE SEWAGE TREATMENT AVAILABLE TO EACH LOT AND STRUCTURE WITHIN THE DEVELOPMENT. IF A PUBLIC OR PRIVATE TREATMENT AND COLLECTION SYSTEM IS INCLUDED AS PART OF A DEVELOPMENT APPLICATION, THE DEVELOPER SHALL INSTALL SEWERS, INCLUDING CONNECTIONS TO EACH UNIT TO BE CONSTRUCTED.
COMMENT: Mahwah does not have the authority to deviate from Department of Environmental Protection standards in the area of sanitary sewers. The requirement that private collection systems include separate connections to each unit is unnecessarily cost generating. Single connections to service individual buildings are equally acceptable and substantially less costly. Robert D. McAuliffe, Kilmer Woods' expert in this field, testified "ganging" of sewers would save $416,400 in that development alone.

13. STREETS
A. ALL DEVELOPMENTS SHALL BE SERVED BY PAVED STREETS IN ACCORDANCE WITH THE APPROVED *228 SUBDIVISION AND/OR SITE PLAN AND ALL SUCH STREETS SHALL HAVE ADEQUATE DRAINAGE.
B. LOCAL STREETS SHALL BE PLANNED SO AS TO DISCOURAGE THROUGH TRAFFIC.
C. THE MINIMUM PUBLIC STREET RIGHT-OF-WAY AND CARTWAY AND THE MINIMUM PRIVATE STREET CARTWAY SHALL BE IN ACCORDANCE WITH THE FOLLOWING SCHEDULE:

 R.O.W. CARTWAY
1. COLLECTOR STREET 50' 26'
2. LOCAL STREET SERVING SINGLE
 OR TWO FAMILY DETACHED
 DWELLINGS WITH NO ON-STREET
 PARKING 40' 24'
3. LOCAL STREET SERVING MULTI-FAMILY
 OR TOWNHOUSES WITH
 ATTACHED GARAGES OR OFF-STREET
 PARKING AND WITH NO
 ON-STREET PARKING 40' 24'
4. LOCAL STREET SERVING MULTI-FAMILY
 OR TOWNHOUSES WITH
 PARALLEL ON-STREET PARKING
 ONE SIDE ONLY. 40' 30'

D. STREET INTERSECTIONS SHALL BE AS NEARLY AT RIGHT ANGLES AS IS POSSIBLE AND IN NO CASE SHALL BE LESS THAN 80 DEGREES. APPROACHES TO ALL INTERSECTIONS SHALL FOLLOW A STRAIGHT LINE FOR AT LEAST 100 FEET OR A CURVE WITH A RADIUS OF NOT LESS THAN 600 FEET. NO MORE THAN TWO STREETS SHALL MEET OR INTERSECT AT ANY POINT AND THE CENTERLINES OF BOTH INTERSECTING STREETS SHALL PASS THROUGH A COMMON POINT.
E. A TANGENT OF AT LEAST 100 FEET SHALL BE PROVIDED BETWEEN REVERSE CURVES ON COLLECTOR STREETS.
*229 F. CUL-DE-SACS SHALL BE NO MORE THAN 1,000 FEET IN LENGTH AND SHALL PROVIDE ACCESS TO NO MORE THAN 80 DWELLING UNITS. A TURNAROUND SHALL BE PROVIDED AT THE END OF THE CUL-DE-SAC WITH A PAVED TURNING RADIUS OF 40 FEET AND A R.O.W. IN THE CASE OF PUBLIC STREETS OF 100 FEET.
G. THE PAVEMENT STANDARD FOR ALL ROADS SHALL BE AS FOLLOWS:
I. AN UNYIELDING WELL COMPATED SUBGRADE.
II. A FOUR (4) INCH THICK MACADAM BASE COURSE CONSISTING OF TWO AND ONE-HALF (2 1/2) INCH DIAMETER STONES BOUND WITH DUST.
III. A TWO (2) INCH THICK BITUMINOUS STABILIZED BASE COURSE, N.J.D.O.T. MIX #I-2.
IV. A ONE AND ONE-HALF (1 1/2) INCH THICK BITUMINOUS CONCRETE SURFACE COURSE, N.J.D.O.T. MIX #I-5.
V. ALL MATERIALS SHALL MEET THE REQUIREMENTS AND SHALL BE INSTALLED IN ACCORDANCE WITH "STANDARD SPECIFICATION FOR ROAD AND BRIDGE CONSTRUCTION OF THE NEW JERSEY HIGHWAY DEPARTMENT" CURRENT EDITION, AND ANY SUPPLEMENTS, AND MODIFICATIONS THEREOF UNLESS OTHERWISE SPECIFIED BY THE REVIEWING AGENCY.

H. STREET GRADES
GRADES FOR COLLECTOR STREETS SHALL NOT EXCEED EIGHT (8) PERCENT AND GRADES FOR LOCAL STREETS SHALL NOT EXCEED TEN (10) PERCENT. NO STREET SHALL HAVE A GRADE LESS THAN 0.5 PERCENT.
COMMENT: Mahwah Code § 145-31 requires extensive use of sidewalks and curbing in connection with all street improvements. Paragraphs A and B are reasonable; Paragraph C *230 providing the 24 foot cartway for local streets serving multi-family or townhouse units with parking on one side only is reduced to 20 feet, is also adequate. However, despite the size of the right-of-way, local streets designed for no parking should be no wider than 20 feet. Wider streets attract parking regardless of signs and, as a result, become hazardous. Narrower streets are visually recognized as local residential streets, discourage parking, and reduce speeding.
Paragraphs D, E and F are reasonable provided the approving authority is given sufficient flexibility in granting waivers where appropriate.
The pavement standard adopted in Paragraph G is reasonable if developers are granted the option to use suitable alternative materials which conform with N.J. DOT specifications.
Paragraph H increases the permitted grade on local streets from 8% to 10%. Rahenkamp believes there is no safety reason to prohibit grades up to 15% in areas with no permitted parking and no intersections.
Mahwah's requirement that curbing be installed for all parking areas and all roadways is unnecessarily costly. Alternatives to the extraordinarily expensive curb should be considered for purposes of pavement edge protection and separation of people from automobile traffic. Rahenkamp testified equally effective low technology methods can accomplish these purposes at a fraction of the cost. In his opinion, curbing cannot be justified as a safety barrier because in most instances, vehicles striking curbs will mount them out of control. The alternative solution to unraveling blacktop edges is to simply run the base out 18 to 24 inches beyond the asphalt edge. Curbs should only be utilized at intersections and on steep grades. To illustrate his point, Rahenkamp noted there are no curbs on the Garden State Parkway.

*231 14. WATER SUPPLY
WATER MAINS AND CONNECTIONS LINES SHALL BE CONSTRUCTED IN SUCH A MANNER AS TO MAKE ADEQUATE WATER SERVICE AVAILABLE TO EACH BUILDING OR LOT WITHIN THE DEVELOPMENT. THE SYSTEM SHALL BE DESIGNED AND CONSTRUCTED IN ACCORDANCE WITH REQUIREMENTS AND STANDARDS OF THE AGENCY OR AUTHORITY HAVING WATER SUPPLY JURISDICTION. FIRE HYDRANTS SHALL NOT BE MORE THAN 500 FEET APART.
COMMENT: The water system in Mahwah is operated by a Water Department functioning under the control and jurisdiction of the Township Committee. Mahwah Code § 176-1 et seq. It is an integrated system consisting at present of 5 wells with a capacity of 5,000,000 gallons per day. The municipal wells are not scattered throughout the township but, rather, are all located along the Ramapo River where geological factors are most favorable. The largest consumer of water in the past had been the Ford Plant which is closed; the Abex Company, another large user, is in the process of shutting down. The water system is functioning adequately at present and has the capacity to serve a much larger population. Three factors attest to this conclusion: (1) the municipality is currently selling 255.5 million gallons of water a year to the neighboring municipality of Ramsey under a contract in effect since February 25, 1980; (2) The Northwest Bergen County Sewer Authority designed Mahwah's sewerage system based upon an estimated population of 28,000 people; and (3) no previous proposed development has been denied Planning Board approval based on inadequate water supply.
Peter Popoff, Mahwah's Water and Sewer Engineer, studied the existing system to determine the capacity and added cost of supplying water and sewerage to the proposed Mount Laurel II developments. Not knowing which projects would ultimately be approved, he estimated costs based on the assumption a new well would be required for each project. He testified his estimates would have to be revised downward once the extent *232 of development and nature of required improvements are determined. His off-site sewer and water improvement cost estimate ran as high as $1.5 million for High Debi Hills. However, the issue of cost aside, all experts agreed Mahwah's water and sewer systems have the requisite capacity to service all the proposed new developments.
Not addressed by Ordinance #851, but discussed during the trial, is the issue of utility costs. Major off-site improvements, where required, should be constructed in the most cost efficient manner and paid for in accordance with the statutory mandate of N.J.S.A. 40:55D-42 and principles set forth in Divan Builders v. Wayne Tp. Planning Board, 66 N.J. 582 (1975). There is no evidence in this case to justify exempting these developers from paying a reasonable portion of major off-site improvement costs necessitated by their construction.
The uncontradicted testimony, however, established other utility charges are apparently excessive as compared to the cost in other municipalities. There is a sewer connection charge ranging from $280 for 1 bedroom or efficiency apartments to $350 for 3 or more bedroom apartments set forth in Ordinance #855. There is a water capacity charge for new construction from $520 for a 1 bedroom or efficiency apartment to $700 for a 3 or more bedroom apartment and a tapping charge ranging from $300 to $550 in Mahwah Code § 176-6. Rahenkamp calculated the total of utility and hook-up fees will average $1,575 per unit. These fees, as they affect market rate units, must be reviewed in light of the methodology approved in White Birch Realty Corp. v. Gloucester Tp. Municipal Utilities, 80 N.J. 165 (1979) and must be waived entirely for subsidized units. See also Luv Condominiums Ass'n. v. Stanhope, 192 N.J.Super 159 (App.Div. 1983).

15. WAIVERS
THE APPROVING AGENCY WHEN REVIEWING APPLICATIONS FOR ML-1 AND ML-2 DEVELOPMENT SHALL HAVE THE POWER TO GRANT EXCEPTIONS TO THE *233 ABOVE DESIGN REQUIREMENTS AS MAY BE REASONABLE AND WITHIN THE GENERAL PURPOSE AND INTENT OF THE ML ZONES IF THE LITERAL ENFORCEMENT OF ONE OR MORE OF THE PROVISIONS IS IMPRACTICABLE OR WILL EXACT UNDUE HARDSHIPS BECAUSE OF PECULIAR CONDITIONS PERTAINING TO THE LAND IN QUESTION.
This provision is a positive measure which allows for flexibility by the approving agency in reviewing applications. It is in line with N.J.S.A. 40:55D-39(b) and 40:55D-40(b), which reflect the Legislature's intent to encourage economy in layout and design rather than adherence to rigid requirements. Waivers which result in cost reduction should be granted by the Planning Board unless there are clear health and safety reasons to the contrary.
Rahenkamp criticized two ordinances dealing with matters not addressed by Ordinance #851 as detrimental to the production of lower income housing. Mahwah Code § 145-24 requires developers submit a copy of their application to the Mahwah Environmental Commission. Within 15 days from receipt of the application, the Commission must notify the developer whether it must furnish an Environmental Impact Statement. This statement requires extensive information, involves large expenditures and, in some instances, calls for long open-ended studies. Mount Laurel II invalidated an ordinance provision calling for this type of exhaustive study by developers in this context. See 92 N.J. at 304, n. 54. In addition, the sites involved in this litigation have been subjected to thorough scrutiny, much of the data which would normally be required by an Environmental Impact Statement has already been furnished. If the Mahwah Environmental Commission is to be involved in the approval process, the burden should be upon it to ask for specific environmental protective measures in a timely manner. Mahwah Code § 145-24 as applied to Mount Laurel II developments is unreasonable.
*234 Another potential cause for delay is found in Mahwah Code § 148, which requires developers to obtain soil removal permits from the Township Committee. The Governing Body has retained jurisdiction over this basic developmental function eliminating both the Planning Board and the time constraints imposed by the Municipal Land Use Law. Developers, while processing applications before the Planning Board, are compelled to shuttle back and forth between it and the Township Committee seeking the same approvals. Although "soil mining" is a proper subject for regulation and the requirement of filing detailed soil removal plans is reasonable, Mahwah Code § 148 is unreasonable as applied to Mount Laurel II development because of its propensity to cause costly delays.
The price of housing is directly related to the amount of time it takes to complete a project. Processing delays cause substantial cost increases which are ultimately passed on to the consumer. Notwithstanding the remedial provisions in the Municipal Land Use Law, administrative delay is still considered a major contributing factor to increased housing costs. Rahenkamp reported additional costs of up to $4,000 per dwelling unit (in 1979 dollars) can result from each year of delay.
The evidence established the need for a more efficient method of processing Mount Laurel II applications. Expenses engendered by protracted municipal proceedings must be reduced if housing is to be sold at affordable prices in Mahwah.[12] A methodology to achieve these savings was an integral part of Rahenkamp's recommendations.
Rahenkamp's conclusions about the cost effectiveness of Ordinance #851 compared to savings he believes can be accomplished without jeopardizing public health and safety, are shown on the chart below:

*235
 ESTIMATED SAVINGS FROM:
 Mahwah Rahenkamp's
 Ordinance Recommendations
 Activity Category #851
---------------------------------------------------------------------------
1. Streamlined Review and
 Approval Procedure $ 8,000 $ 77,600
2. Reduced Municipal Fees and
 Escrow Funds $ 563 $ 170,563-195,563
3. Modernized Site Development
 Standards $120,551 $ 563,725
4. Reduced Utility System
 Access Fees $ 0 $ 483,575
 ________ _______________
TOTAL SAVINGS $129,114 $1,295,463-1,320,463
SAVINGS PER UNIT $ 344 $ 3,455-3,521

Testimony indicates cost reductions of up to $3,500 per unit can be accomplished by removing requirements not necessary for the protection of public health and safety. Ordinance #851 will result in savings of approximately $350 per unit. This measure fails to remove excessive restrictions and exactions to the extend mandated by Mount Laurel II.

IX  FINDINGS-MANDATORY SET ASIDE PROVISIONS
All the provisions in Ordinance #851 relating to mandatory set-aside development are invalid for the following reasons:
1. § 4 fails to provide a reasonable opportunity for construction of a sufficient number of lower income units. Only three tracts, Kilmer Woods, Franklin Commons West and Lotito were designated ML-2. At the ordinance-required density of 14 units per acre and applying a 25% set-aside, the maximum number of lower income units produced would be 379. A total of 706 units must be provided through mandatory set-aside provisions.
2. Section 7(1) by requiring a 25% mandatory set-aside inhibits the likelihood of construction.
*236 3. The ordinance, in its entirety, fails to remove excessive restrictions and exactions to the extent required by Mount Laurel II.
4. The ordinance fails to establish a mechanism to insure the expeditious processing by the municipality of developers' proposals for Mount Laurel II housing.
Therefore, it becomes the Court's sole responsibility to enforce Mahwah's constitutional obligation to provide the private sector with a reasonable opportunity to produce 706 units of lower income housing. Nevertheless, since the municipal officials have made a bona fide attempt to comply with the Court's rezoning order, great weight will be afforded to the planning choices enunciated in the ordinance. In that regard, the proposal of each Plaintiff-Intervenor must be weighed in the light of Mount Laurel II and the municipality's stated planning desires. The remedies to be afforded in order to achieve compliance must be carefully measured against the potential negative impact upon the residents of the municipality.
Aside from Beaver Creek, none of the developers sought a builder's remedy as described in Mount Laurel II. 92 N.J. at 279. The other Plaintiff-Intervenors played no role in the preceding litigation and submitted proposals for the first time after the municipality was ordered to rezone. Since only developers who succeed in Mount Laurel II litigation are entitled to builders' remedies, these later participants fall into a different category. The builder's remedy test which places the burden on the municipality to establish that a project is environmentally unsound or clearly contrary to sound land use planning, plays no role in this context. In granting "compliance remedies", however, the Court must determine the most appropriate site for Mount Laurel II development. This will encompass all the principles of sound planning including consideration of surrounding land uses, development of infrastructure, topographical conditions, the intensity of the proposed development and environmental impact. It is the Court's obligation to make *237 every effort to cushion the impact of these developments on the municipality and safeguard the general public interest.

X  REVIEW AND APPROVAL PROCESS
A new procedure for review and approval of mandatory set-aside development applications in the Township of Mahwah is hereby established:
(1) AN INDEPENDENT PROFESSIONAL TECHNICAL REVIEW GROUP (PTRG) SHALL BE CREATED TO REVIEW AND PROCESS ALL MANDATORY SET-ASIDE DEVELOPMENT APPLICATIONS. THE PTRG SHALL CONSIST OF 3 MEMBERS: AN ENGINEER, A PLANNER AND AN ARCHITECT. ALL MEMBERS OF THE PTRG SHALL BE LICENSED IN THEIR FIELD BY THE STATE OF NEW JERSEY, HAVE NO DIRECT OR INDIRECT FINANCIAL INTEREST IN ANY PROPOSED DEVELOPMENT AND NOT BE CONNECTED WITH THE MUNICIPALITY IN ANY MANNER.
COMMENT: The function of the Planning Board, assisted by municipal professionals, is to apply the standards set forth in local ordinances promulgated for the protection of health and safety. In mandatory set-aside developments, however, different criteria must be used in the review and approval process. The PTRG will screen the developers cost reduction proposals and offer an independent professional viewpoint to the Planning Board. Although engineering and design criteria are generally reviewed by engineers and planners, an architect has been included in the PTRG to assure structural and aesthetic integrity in Mount Laurel II projects.
(2) THE MASTER WILL OVERSEE THE PROCESSING OF ALL MANDATORY SET-ASIDE DEVELOPMENT APPLICATIONS AND SHALL APPOINT MEMBERS OF THE PTRG FOR EACH INDIVIDUAL APPLICATION. THE MASTER MAY, IN HIS DISCRETION, SERVE AS A MEMBER OF THE PTRG FOR ONE OR MORE APPLICATION; HE MAY ALSO *238 APPOINT THE SAME PTRG MEMBER OR MEMBERS TO SERVE ON MORE THAN ONE APPLICATION.
COMMENT: This provision ensures that the organization and operation of the PTRG will be implemented under the Master's guidance. It affords a measure of flexibility to the Master since more than one PTRG may be required to efficiently process an influx of development applications at a particular time.
(3) THE PTRG SHALL PREPARE AN APPLICATION FORM WITH INSTRUCTIONS AND A CHECKLIST SETTING FORTH THE REQUIREMENT FOR ALL MANDATORY SET-ASIDE DEVELOPMENTS. IN THE EVENT OF ANY CONFLICT BETWEEN THE PTRG APPLICATION AND THE PLANNING BOARD APPLICATION, THE PTRG REQUIREMENTS SHALL PREVAIL.
COMMENT: Under present procedures, developers may not be advised of the need to make substantial revisions until a considerable amount of time has elapsed from the filing of an application. Planning Board members are generally laypeople who require input from their professional consultants before discussing changes with applicants. The purpose of this provision is to involve independent professionals early in the process so preliminary submissions may be revised or abandoned quickly.
(4) THE PTRG MAY, IN ITS DISCRETION, APPROVE DESIGN STANDARDS AND CONSTRUCTION TECHNIQUES NOT PERMITTED UNDER PRESENT MAHWAH REGULATIONS.
COMMENT: In Mount Laurel II developments, the obligation to remove unnecessary cost generating requirements not necessary for the protection of public health and safety changes the standards to be applied. The PTRG must determine whether mandatory set-aside development satisfies the requirements set forth in this opinion.
(5) WITHIN 2 WEEKS FOLLOWING SUBMISSION, THE PTRG SHALL PROVIDE THE DEVELOPER WITH WRITTEN *239 DETERMINATION AS TO WHETHER ITS APPLICATION IS COMPLETE. IF THE APPLICATION IS CONSIDERED INCOMPLETE, THE APPLICANT SHALL BE NOTIFIED IN WRITING AS TO THE ADDITIONAL MATERIALS REQUIRED. THE PTRG MAY, IN ITS DISCRETION, HOLD A PRELIMINARY DESIGN MEETING WITH THE APPLICANT.
COMMENT: N.J.S.A. 40:55D-46 dealing with preliminary site plan approvals and N.J.S.A. 40:55-48 dealing with preliminary subdivision approval have recently been amended for the second time by N.J.S.A. 40:55D-10.3 (effective July 1, 1984). Evidence adduced during the trial proved Planning Board failure to consider an application complete remains a primary source of costly delays despite Legislative efforts to expedite decisions on land use applications. Developers remain reluctant to invoke their rights to a statutory approval because of the inevitable ensuing litigation. This, and the following provision, will shift responsibility in this area from the Planning Board to the PTRG.
(6) WITHIN 2 WEEKS OF RECEIPT OF WRITTEN NOTIFICATION, THE DEVELOPER SHALL PROVIDE THE PTRG WITH THE REQUIRED ADDITIONAL MATERIAL. AT THIS POINT, REGARDLESS OF THE DEVELOPERS COMPLIANCE, THE PROJECT SHALL BE CONSIDERED COMPLETE AND THE PLANNING BOARD SHALL FORWARD COPIES OF THE APPLICATION TO MUNICIPAL AGENCIES IN ACCORDANCE WITH ITS BYLAWS.
COMMENT: If the developer fails to provide the required information or if the PTRG determines the data submitted is insufficient the Planning Board may deny the application or approve it on condition. This places the burden on the developer to comply with the PTRG request within two weeks. If the necessary information cannot be furnished in time, the application is presumed to have been prematurely filed. Any resubmission *240 will be treated as a new application and the time will begin to run from the new filing date.
Furnishing a copy of the application to interested municipal agencies at this early stage will also expedite matters. For example, the Mahwah Environmental Commission will be furnished the details of an application and can begin its evaluation.
(7) WITHIN 3 WEEKS FROM THE DATE AN APPLICATION IS DEEMED COMPLETE: (A) THE PTRG SHALL FILE ITS REPORT WITH THE PLANNING BOARD RECOMMENDING APPROVAL, DENIAL OR APPROVAL ON CONDITION; (B) INTERESTED MUNICIPAL AGENCIES SHALL FILE THEIR REPORTS WITH THE PLANNING BOARD. FAILURE TO FILE A REPORT SHALL BE DEEMED APPROVAL OF THE APPLICATION BY A MUNICIPAL AGENCY; (C) ALL DOCUMENTATION FILED WITH THE PLANNING BOARD SHALL BE MADE AVAILABLE TO THE PUBLIC AT LEAST 14 DAYS IN ADVANCE OF A PUBLIC HEARING.
COMMENT: This provision shifts the initial burden of furnishing information from the developer to the municipal agency which has the benefit of expert advice and knowledge of the community. For example, instead of imposing the burden of filing an Environmental Impact Statement upon the developer, the Mahwah Environmental Commission is presumed to know the problems involved in a particular site. It must request specific corrective measures in a limited time frame. This may require calling special meetings, but Mahwah's Mount Laurel II obligation requires such measures.
(8) THE PLANNING BOARD SHALL GRANT OR DENY PRELIMINARY APPROVAL WITHIN 95 DAYS OF THE DATE THE SUBMISSION OF THE APPLICATION IS DEEMED COMPLETE.
COMMENT: This is in accordance with N.J.S.A. 40:55D-46(c) and N.J.S.A. 40:55D-48(c). For a detailed historical review of the actions of both the Court and the Legislature in attempting *241 to expedite municipal decisions on land use applications see Diane Lizak, et al. v. Faria, et al. 96 N.J. 482 (1984)
(9) THE MASTER, IN HIS DISCRETION, AT THE REQUEST OF THE PTRG MAY APPOINT SUCH ADDITIONAL EXPERT OR EXPERTS AS HE CONSIDERS NECESSARY TO ASSIST THE PTRG IN ITS REVIEW OF A PARTICULAR APPLICATION.
COMMENT: Proof submitted during the trial indicated the assistance of other experts might be helpful to the PTRG in deciding site improvement requirements applicable to particular sites. A hydrologist may be needed to assist in the design of a detention pond or a traffic specialist in the design of access roads to insure minimal impact on neighboring residential neighborhoods. These services should be available to the PTRG.
(10)(A) FEES PAID TO THE MASTER FOR HIS GENERAL SERVICES IN SUPERVISING THE DEVELOPMENT APPLICATION PROCESS SHALL BE EQUITABLY APPORTIONED AMONG THE PRIVATE DEVELOPERS AND SUBMITTED TO THE COURT FOR APPROVAL.
(B) FEES PAID TO THE MEMBERS OF THE PTRG AND OTHER EXPERTS APPOINTED BY THE MASTER SHALL BE SET BY THE MASTER BASED UPON AN AGREED HOURLY RATE. DETAILED VOUCHERS SHALL BE SUBMITTED TO THE MASTER FOR HIS APPROVAL.
(C) ALL BILLS SHALL BE APPROVED BY THE COURT OR THE MASTER, AND PAID BY THE DEVELOPER WITHIN 10 DAYS FROM THE DATE OF APPROVAL. IF THE DEVELOPER FAILS TO PAY A VOUCHER WITHIN 10 DAYS AFTER APPROVAL BY THE COURT OF THE MASTER, PROCESSING OF ITS APPLICATION SHALL CEASE, NO BUILDING PERMITS SHALL BE GRANTED AND NO CERTIFICATES OF OCCUPANCY ISSUE UNTIL PAYMENT IS MADE.
*242 COMMENT: This provision eliminates the need to establish escrow funds to insure payment by the developer of these fees. Rahenkamp estimated, based upon a 375 unit development, between $170,563 and $195,563 could be saved in the reduction of municipal fees and escrow funds. He suggested a flat escrow deposit of from $65 to $75 per townhouse and $30 per apartment unit with a waiver of escrow deposits for lower income units. However, these sanctions adequately assure prompt payment without the necessity of a cost additive escrow fund provision.
The Master's approval of vouchers provides an impartial review as to the reasonableness of these professional fees. Should the municipality elect to have a review by its own consultants, it will be entirely at its own cost.
(11) DEVELOPERS NEED NOT DEPOSIT ESCROW FUNDS TO COVER INSPECTION FEES AND OTHER PROFESSIONAL SERVICES REQUIRED TO BE PERFORMED BY MUNICIPAL EXPERTS. MUNICIPAL EXPERTS PERFORMING SERVICES SHALL SUBMIT A DETAILED VOUCHER AS TO THE SERVICES PERFORMED AND HOURLY RATE CHARGE TO THE MASTER FOR HIS APPROVAL. FAILURE OF A DEVELOPER TO PAY SUCH VOUCHER WITHIN 10 DAYS FOLLOWING THE MASTER'S APPROVAL SHALL RESULT IN THE SAME SANCTIONS AS SET FORTH IN PARAGRAPH 10(c).
COMMENT: N.J.S.A. 40:55D-53(h) requires developers to reimburse the municipality for all reasonable inspection fees paid to the municipal engineer for inspection of improvements and authorizes the requirement of a deposit for "all or a portion of the reasonably anticipated fees to be paid to the municipal engineer for such inspections". This statutory requirement, although valid in other types of development, is unnecessarily cost generative in Mount Laurel II development. As indicated in the comment to Section 10, the alternative method set forth in this provision adequately protects the municipal interests.
*243 (12) APPLICATIONS SHALL BE PROCESSED WITHIN THE TIME FRAME SET FORTH IN THE ACTIVITY TIMETABLE BELOW:

 ACTIVITY TIMETABLE
1. Application made to PTRG. 0 day
2. PTRG provides developer with written determination
 as to whether application is complete. 14 days
3. Developer furnishes PTRG with required additional
 material. Planning Board forwards copy of
 applications to municipal agencies. Application is
 deemed complete. 28 days
4. PTRG and interested municipal agencies file their
 reports with the Planning Board. All documentation
 is made available to the public. 49 days
5. Planning Board holds public hearing. 63-77 days
6. The Planning Board grants or denies preliminary
 approval. 95 days
 ___________
 Total Time 95 days

COMMENT: Although the PTRG will play an active role in expediting applications, the ultimate authority remains with local Planning Board. This mechanism is designed to enable the Planning Board to discharge its regular functions and still adhere to this timetable.

XI  MANDATORY SET ASIDE REMEDIES: GENERAL CONDITIONS
Before discussing the individual Plaintiff-Intervenors, general conditions applicable to all mandatory set-aside construction must be established. The following provisions have not been commented upon because they have been discussed earlier in this opinion.

GENERAL CONDITIONS
1. WITHIN THE ENTIRE DEVELOPMENT IF DEVELOPED IN ONE STAGE, OR WITHIN EACH STAGE IF THE DEVELOPMENT IS A STAGED PROJECT, LOWER INCOME *244 HOUSING SHALL BE PHASED IN ACCORDANCE WITH THE FOLLOWING SCHEDULE IN ORDER TO ASSURE THAT CONSTRUCTION OF BOTH TYPES OF HOUSING SHALL OCCUR IN TANDEM:

MARKET RATE HOUSING LOWER INCOME HOUSING
PERCENTAGE (MAXIMUM) PERCENTAGE (MINIMUM)
 UP TO 25% 0% (NONE REQUIRED)
 25% + 1 UNIT AT LEAST 10%
 UP TO 50% AT LEAST 25%
 UP TO 75% AT LEAST 50%
 75% + 1 UNIT AT LEAST 75%
 UP TO 100% 100%

2. THE PLANNING BOARD AND/OR TOWNSHIP OF MAHWAH SHALL WAIVE SUBDIVISION, VARIANCE, WAIVER AND SITE PLAN APPLICATION FEES FOR EVERY UNIT DESIGNATED AS LOW AND MODERATE INCOME HOUSING.
3. FOR ALL MARKET RATE UNITS THE FOLLOWING FEES SHALL ACCOMPANY THE APPROPRIATE APPLICATION.
A. FILING FEES FOR PRELIMINARY APPROVAL: ONE HUNDRED DOLLARS ($100) PLUS FIVE ($5.00) DOLLARS FOR EACH PROPOSED MARKET RATE DWELLING UNIT.
B. FILING FEE FOR FINAL APPROVAL: TWO DOLLARS AND FIFTY CENTS ($2.50) FOR EACH PROPOSED MARKET RATE DWELLING UNIT.
C. THESE FEES SHALL BE RETAINED BY THE TOWNSHIP FOR GENERAL ADMINISTRATIVE EXPENSES.
4. THE PTRG SHALL ADOPT NEW COST SAVING CONNECTION AND METERING PROCEDURES WHEREVER POSSIBLE, WHICH SHALL INCLUDE, BUT NOT BE LIMITED, TO THE FOLLOWING:
*245 A. ALLOW INSTALLATION OF SEWER LINES ALONG CURVED ALIGNMENTS TO REDUCE NUMBER OF MANHOLES.
B. ALLOW THE USE OF A SINGLE SANITARY SEWER LATERAL FOR EACH BUILDING REGARDLESS OF THE NUMBER OF DWELLING UNITS.
C. WHERE THE SITE PERMITS, INCREASE SPACING BETWEEN MANHOLES AND USE CLEANOUTS IN LIEU OF MANHOLES.
D. ALLOW THE SUPPLY OF WATER SERVICE TO MORE THAN ONE DWELLING UNIT FROM A SINGLE COMMON TAP INTO THE STREET WATER MAIN.
E. ALLOW MULTIPLE WATER METERS IN A SINGLE BUILDING COMMON METER BOX AND THE USE OF A SINGLE COMMON WATER MAIN FOR EACH BUILDING.
F. ALLOW POLYVINYL CHLORIDE PIPE (PVC) FOR BOTH WATER AND SEWER SYSTEMS.
5. THE CONSTRUCTION CODE PERMIT FEE AND CERTIFICATE OF OCCUPANCY FEE NORMALLY CHARGED BY THE TOWNSHIP OF MAHWAH (EXCLUSIVE OF ANY PORTION DUE THE STATE OF NEW JERSEY) SHALL BE WAIVED AS TO ALL LOW AND MODERATE DWELLING UNITS. THIS SHALL INCLUDE ALL FEES CHARGED PURSUANT TO MAHWAH ORDINANCE #857 COVERING CONSTRUCTION FEES, ENGINEERING FEES, FIRE FEES AND SPECIAL FEES.
6. GROSS DENSITY SHALL NOT EXCEED FOURTEEN (14) UNITS PER ACRE. HOWEVER, DENSITY IN A DEVELOPMENT MAY BE MORE CONCENTRATED THAN FOURTEEN (14) UNITS PER ACRE IN CERTAIN AREAS, PROVIDED THE OVERALL DENSITY OF THE PROJECT DOES NOT EXCEED FOURTEEN (14) UNITS PER ACRE.
7. A WAIVER FROM ANY OF THE DEVELOPMENT STANDARDS OF THE CODES OF THE TOWNSHIP OF *246 MAHWAH SHALL BE GRANTED BY THE PLANNING BOARD OR OTHER APPROVING AUTHORITY UPON THE RECOMMENDATION OF THE PTRG WHENEVER IT IS DETERMINED TO BE REASONABLY NECESSARY IN ORDER TO ATTAIN THE GOAL OF PRODUCING LOWER INCOME HOUSING AT THE LOWEST POSSIBLE COST, PROVIDED THAT THE GRANTING OF SUCH WAIVER DOES NOT JEOPARDIZE THE PUBLIC HEALTH AND SAFETY. THE PTRG SHALL MAKE SPECIFIC WRITTEN RECOMMENDATIONS TO THE PLANNING BOARD AS TO ALL REQUESTED WAIVERS CONTAINED IN ANY PROJECTS SUBMITTED FOR APPROVAL.
8. NO STRUCTURE SHALL EXCEED THE LESSER OF THREE (3) STORIES OR FORTY (40) FEET IN HEIGHT. THERE SHALL BE NO MAXIMUM NUMBER OF UNITS PER BUILDING PROVIDED BUILDING AND FIRE CODES ARE NOT VIOLATED.
9. (A) RESIDENTIAL STRUCTURES SHALL BE SET BACK FROM PARKING AREAS A MINIMUM OF TEN (10) FEET.
(B) RESIDENTIAL STRUCTURES SHALL BE A MINIMUM OF TWENTY (20) FEET APART OR WHATEVER GREATER DISTANCE IS REASONABLY NECESSARY TO COMPLY WITH FIREWALL RATING REQUIREMENTS AND FOR EMERGENCY VEHICLE ACCESS.
(C) RESIDENTIAL STRUCTURES SHALL BE SET BACK NO LESS THAN TWENTY (20) FEET FROM ANY PAVED ROADWAY, EXCEPT FOR ACCESS AND EXIT DRIVEWAYS FOR PARKING AREAS WHICH SHALL BE CONSIDERED AS A PORTION OF THE PARKING AREA.
(D) A BUFFER ZONE OF NO LESS THAN 50 FEET SUITABLY SCREENED AND LANDSCAPED, SHALL BE ESTABLISHED AND MAINTAINED FROM ALL TRACT BOUNDARY LINES ADJACENT TO PROPERTIES EITHER ZONED OR USED AS ONE FAMILY RESIDENCES.
*247 (E) IN ALL OTHER ZONES, A VARIABLE BUILDING SET BACK OF NO LESS THAN TWENTY (20) FEET FROM ALL TRACT BOUNDARY LINES SHALL BE PROVIDED. IN APPROVING A BUILDING SET BACK OF LESS THAN THIRTY FIVE (35) FEET FOR ANY BUILDING, THE APPROVING AUTHORITY SHALL CONSIDER THE FOLLOWING:
1. THE TOTAL HEIGHT OF THE PROPOSED STRUCTURE.
2. THE PERCEIVED HEIGHT OF THE PROPOSED STRUCTURE FROM ADJACENT RESIDENCES.
3. THE EXISTENCE OF AND THE TYPE OF EXISTING VEGETATION AND GROUND COVER.
4. THE LANDSCAPE TREATMENT PROPOSED INCLUDING, BUT NOT LIMITED TO BERMS, DECORATIVE FENCES, ETC.
HOWEVER, IN THE EVENT AN EXISTING BUFFER LINE ON A FILED MAP AND/OR APPROVED ADJACENT PLAN EXISTS ON AN ADJACENT PARCEL OR IF VACANT UNDEVELOPED ADJACENT PROPERTY EXISTS WHICH WOULD BE LIKELY TO BE SUBJECT TO THE IMPOSITION OF A BUFFER ZONE OR LINE WHEN DEVELOPED, THE DEVELOPMENT SHALL BE REQUIRED ONLY TO PROVIDE THE MINIMUM 20 FEET BUFFER AREA.
(F) EACH DEVELOPMENT SHALL HAVE A MINIMUM OF TWENTY PERCENT (20%) OF ITS LAND AREA AS COMMON OPEN SPACE WHICH SHALL CONSIST OF PREDOMINATELY NON-IMPERIOUS AREAS INCLUDING BUFFERS, RECREATIONAL AREAS, AND OTHER OPEN AREAS.
10. (A) PARKING STALLS SHALL MEASURE NOT LESS THAN NINE (9) FEET IN WIDTH AND EIGHTEEN (18) FEET IN LENGTH.
*248 (B) THERE SHALL BE A MINIMUM OF ONE AND ONE HALF (1 1/2) PARKING SPACES PROVIDED FOR EACH ONE BEDROOM OR EFFICIENCY DWELLING UNIT AND TWO (2) PARKING SPACES FOR ALL OTHER DWELLING UNITS.
(C) THE WIDTH OF ALL AISLES PROVIDING DIRECT ACCESS TO INDIVIDUAL PARKING STALLS SHALL NOT BE LESS THAN:

 PARKING ANGLE AISLE WIDTH
 0 DEGREE 12'
 30 " 12'
 45 " 13'
 60 " 18'
 90 " 24'

(D) ONLY ONE-WAY TRAFFIC SHALL BE PERMITTED IN AISLES SERVING PARKING SPACES PLACED AT AN ANGLE OTHER THAN 90 DEGREES.
(E) NO CURBING OF PARKING AREAS AND DRIVEWAYS SHALL BE REQUIRED.
11. (A) THE FOLLOWING MINIMUM PUBLIC STREET RIGHT OF WAY AND CARTWAY (PAVED ROADWAY) SHALL BE APPLICABLE:

 RIGHT OF WAY CARTWAY
COLLECTOR STREET 50' 26'
LOCAL STREET SERVING MULTI
FAMILY OR TOWNHOUSE UNITS
WITH NO ON STREET PARKING 40' 20'
LOCAL STREET SERVING MULTI
FAMILY OR TOWNHOUSE UNITS
WITH ON STREET PARKING ON ONE
SIDE ONLY 40' 30'

(B) MINOR STREETS SHALL BE SO DESIGNED AS TO DISCOURAGE THROUGH TRAFFIC.
(C) RESIDENTIAL DEVELOPMENT BOUNDED BY ANY ARTERIAL OR COLLECTOR STREET SHALL CONTROL *249 ACCESS TO SAID STREETS BY HAVING ALL DRIVEWAYS INTERSECT MINOR STREETS. WHERE CIRCUMSTANCE(S) MAY DICTATE THAT A DRIVEWAY ENTER AN ARTERIAL OR COLLECTOR STREET, THE LOT SHALL PROVIDE ON-SITE TURNAROUND FACILITIES AND ABUTTING LOTS MAY BE REQUIRED TO USE ONE DRIVEWAY CUT. ALL LOTS WITH REVERSE FRONTAGE SHALL HAVE UP TO AN ADDITIONAL 25 FEET OF LOT DEPTH TO PROVIDE A BUFFER AREA WHICH SHALL BE EITHER MAINTAINED IN ITS NATURAL STATE WITH SUPPLEMENTAL PLANTINGS, IF REQUIRED BY THE PLANNING BOARD, PLANTED WITH NURSERY GROWN TREES, OR WHERE TOPOGRAPHY PERMITS, EARTHEN BERMS MAY BE CREATED. BERMS SHALL NOT BE LESS THAN 5 FEET IN HEIGHT, SHALL BE STABILIZED BY GROUNDCOVER, AND BE PLANTED WITH EVERGREENS AND DECIDUOUS TREES ACCORDING TO A LANDSCAPING PLAN.
(D) NO SUBDIVISION SHOWING RESERVE STRIPS CONTROLLING ACCESS TO STREETS SHALL BE APPROVED EXCEPT WHERE THE CONTROL AND DISPOSAL OF LAND COMPRISING SUCH STRIPS HAS BEEN PLACED IN THE GOVERNING BODY OR HOMEOWNERS ASSOCIATION UNDER CONDITIONS APPROVED BY THE PLANNING BOARD.
(E) GRADES OF ARTERIAL AND COLLECTOR STREETS SHALL NOT EXCEED EIGHT PERCENT (8%). GRADES ON OTHER STREETS SHALL NOT EXCEED FIFTEEN PERCENT (15%). NO STREET SHALL HAVE A MINIMUM GRADE OF LESS THAN (.5%).
(F) STREET JOGS WITH CENTER-LINE-OFFSETS OF LESS THAN ONE HUNDRED TWENTY-FIVE (125) FEET SHALL BE PROHIBITED.
*250 (G) A TANGENT AT LEAST ONE HUNDRED (100) FEET LONG SHALL BE INTRODUCED BETWEEN REVERSE CURVES ON ARTERIAL AND COLLECTOR STREETS.
(H) WHEN CONNECTING STREET LINES DEFLECT FROM EACH OTHER AT ANY ONE (1) POINT BY MORE THAN TEN DEGREES (10° ) AND NOT MORE THAN FORTY-FIVE DEGREES (45° ) THEY SHALL BE CONNECTED BY A CURVE WITH A RADIUS OF NOT LESS THAN ONE HUNDRED (100) FEET FOR MINOR STREETS AND THREE HUNDRED (300) FEET FOR ARTERIAL AND COLLECTOR STREETS.
(I) ALL CHANGES IN GRADE SHALL BE CONNECTED BY VERTICAL CURVES OF SUFFICIENT RADIUS TO PROVIDE A SMOOTH TRANSITION AND PROPER SIGHTDISTANCE.
(J) THE MAXIMUM LENGTH OF A CUL-DE-SAC STREET SHALL NOT EXCEED 1,000 FEET IN LENGTH UNLESS TOPOGRAPHY OR OTHER UNUSUAL CIRCUMSTANCE PREVENTS SUCH COMPLIANCE. IF A CUL-DE-SAC DOES EXCEED THE 1,000 FOOT REQUIREMENT, THEN ADDITIONAL TURN-AROUND AREAS AND FIRE HYDRANTS SHALL BE PROVIDED TO INSURE MAXIMUM EASE OF VEHICULAR MOVEMENT AND SAFETY. IN NO EVENT SHALL THE CUL-DE-SAC EXCEED 1,500 FEET.
(K) THE MINIMUM RADIUS OF A CUL-DE-SAC TURN-AROUND SHALL BE 45 FEET FOR THE CARTWAY AND 55 FEET FOR THE RIGHT-OF-WAY.
(L) NO STREET SHALL HAVE A NAME WHICH WILL DUPLICATE OR SO NEARLY DUPLICATE AS TO BE CONFUSED WITH THE NAMES OF EXISTING STREET WHICH HAVE THE SAME NAME.
(M) IN ORDER TO PROMOTE THE SMOOTH FLOW OF TRAFFIC NO PARKING WILL BE PERMITTED ON ARETERIAL OR COLLECTOR ROADS. A PAVED SHOULDER OF 4' AND A STABILIZED PAVING EDGE SHOULD BE *251 REQUIRED ON ARTERIAL AND COLLECTOR ROADS TO PROVIDE ADEQUATE AREA FOR VEHICLES TO RUNOFF IN THE EVENT OF AN EMERGENCY.
12. ALL STREET AND PARKING AREA CONSTRUCTION METHODS AND MATERIALS SHALL BE IN CONFORMANCE WITH NEW JERSEY DEPARTMENT OF TRANSPORTATION SPECIFICATIONS FOR STATE AID SECONDARY ROADS.
13. THE APPROVING AUTHORITY SHALL WHEREVER POSSIBLE PERMIT ALTERNATIVE TECHNIQUES TO THE REQUIREMENT OF ROADWAY CURBING WHICH SHALL INCLUDE SURFACE DRAINAGE SOLUTIONS ALONG ROADWAYS (SWALES). WHERE CURB ON STREETS ARE ELIMINATED IN FAVOR OF NATURAL DRAINAGE SYSTEMS, THE ROADWAY EDGE SHALL BE FURTHER STABILIZED BY AT LEAST AN 18"-24" EXTENSION OF THE GRAVEL ROADBASE ALONG BOTH SIDES OF THE ROADWAY. NO CURBS SHALL BE REQUIRED FOR PARKING AREAS INCLUDING ENTRANCE AND EXIT DRIVEWAYS.
14. SIDEWALKS AT ALL PRIMARY ROAD ENTRANCES SHALL BE REQUIRED FOR ALL PLANS; EXCEPTING WHERE THE PTRG FINDS THAT THE DEVELOPER HAS PROVIDED FOR PEDESTRIAN MOVEMENT THROUGH AN EQUALLY ACCEPTABLE OPEN SPACE PATHWAY SYSTEM. SUCH SYSTEMS ARE TO BE ENCOURAGED TO SEPARATE VEHICLES FROM PEDESTRIANS.
15. SIDEWALKS SHALL BE A MAXIMUM OF FIVE (5) FEET IN WIDTH. SIDEWALKS AND PEDESTRIAN PATHS SHALL BE OF CONCRETE OR BITUMINOUS CONSTRUCTION, ACCORDING TO NEW JERSEY DEPARTMENT OF TRANSPORTATION STANDARDS FOR CONSTRUCTION.
16. ALL SIDEWALK  CURB CONNECTIONS SHALL BE RAMPED ACCORDING TO STATE STANDARDS TO PERMIT FULL ACCESS BY MOBILITY IMPAIRED PERSONS.
*252 17. AT THE DISCRETION OF THE PTRG, BIKEWAYS MAY BE SUBSTITUTED FOR SIDEWALKS. BICYCLE TRAFFIC SHALL BE SEPARATED FROM MOTOR VEHICLE AND PEDESTRIAN TRAFFIC AS MUCH AS POSSIBLE. BIKEWAYS SHALL GENERALLY NOT EXCEED A GRADE OF THREE (3) PERCENT, EXCEPT FOR SHORT DISTANCES, AND SHALL BE A MINIMUM OF SIX (6) FEET WIDE. BIKEWAYS SHALL HAVE A MAXIMUM FOUR (4) INCH BASE OF CRUSHED STONE AND A 2 INCH FABC-2 SURFACE COURSE. WHERE BIKE PATHS INTERSECT A STREET, THE CURBING (WHERE APPLICABLE) SHALL BE RAMPED FOR ACCESS TO THE STREET GRADE.
18. EACH DEVELOPMENT'S STORMWATER MANAGEMENT SYSTEM SHALL BE DESIGNED TO ASSURE PROTECTION OF PUBLIC SAFETY AND IN COMPLIANCE WITH THE NEW JERSEY STORMWATER MANAGEMENT ACT; HOWEVER, WHEREVER THE SITE PERMITS, THE FOLLOWING COST REDUCING TECHNIQUES MAY BE UTILIZED SUBJECT TO THE RECOMMENDATION OF THE PTRG.
(A) SURFACE RUNOFF MAY BE PERMITTED TO ENTER STREETS FROM THE FRONT YARDS OF RESIDENCES.
(B) RUNOFF FROM AND ALONG STREETS MAY BE CARRIED BY TURF SWALES OR STANDARD CURB AND GUTTER AT MINIMAL GRADES AND DISCHARGES INTO DRAINAGE SWALES, NATURAL DRAINAGE COURSES, AND RETENTION PONDS.
(C) STREET DRAINAGE SHALL NOT BE ALLOWED TO CROSS LOCAL STREET INTERSECTIONS.
(D) STORM SEWERS SHALL BE DESIGNED FOR A MINIMUM NUMBER OF INLETS AND PIPES.
(E) SURFACE RUNOFF FROM REAR YARDS OF RESIDENCES SHALL BE COLLECTED IN DRAINAGE EASEMENTS AND THE OPEN SPACE DRAINAGE SYSTEM.
*253 (F) SURFACE RUNOFF FROM MULTI-FAMILY AREAS MAY BE COLLECTED IN DRAINAGE AREAS AND SWALES AND/OR STORM SEWERS, DEPENDING ON VOLUME AND VELOCITY STANDARDS.
(G) DRAINAGE SWALES MAY BE DESIGNED TO CARRY RUNOFF WITHIN EACH DRAINAGE AREA ACCORDING TO THE BEST METHODS FOR PRESERVING THE NATURAL CHARACTER OF THE SITE.
(H) DETENTION PONDS MAY BE DESIGNED TO RETAIN AND CONTROL INCREASED STORMWATER RUNOFF BASED ON A 100-YEAR STORM FREQUENCY OF 20 MINUTES DURATION AND AN INTENSITY OF 6.2 INCHES PER HOUR.
(I) SEDIMENT BASINS AND DETENTION PONDS MAY BE DESIGNED AND CONSTRUCTED TO PROVIDE FOR SEDIMENT STORAGE AND A MINIMUM PERMANENT POOL WATER DEPTH OF 4 FEET, AND/OR ADEQUATE FLOOD STORAGE CAPACITY AS ESTABLISHED BY THE STANDARDS FOR SOIL EROSION AND SEDIMENT CONTROL IN NEW JERSEY AND APPROVED BY THE PTRG.
19. SOIL REMOVAL APPLICATION REQUIREMENTS IN APPLICABLE MAHWAH CODES SHALL NOT BE APPLICABLE TO MANDATORY SET-ASIDE PROVIDED THE OWNER IS NOT MINING AND EXPORTING FROM THE SITE A TOTAL AMOUNT EXCEEDING 5,000 CUBIC YARDS PER ACRE.
20. WHEREVER IT IS POSSIBLE TO PROTECT THE PUBLIC GOOD AND ALSO TO REDUCE THE COST OF DEVELOPMENT, THE APPROVING AUTHORITY UPON THE RECOMMENDATION OF THE PTRG MAY MODIFY THE REQUIREMENTS FOR PERFORMANCE AND MAINTENANCE GUARANTEES. SUCH ACTIONS MAY INCLUDE, BUT NOT BE LIMITED TO PROMPT SITE INSPECTIONS AND RELEASE OF BONDS FOR WORK PROPERLY COMPLETED AND ACCEPTANCE OF SUITABLE LETTERS OF CREDIT *254 FROM COMMERCIAL BANKS IN LIEU OF SURETY BONDS.
21. A. AT THE OPTION OF THE DEVELOPER, LOWER INCOME DWELLING UNITS IN MANDATORY SET ASIDE DEVELOPMENTS MAY BE EITHER RENTED OR SOLD TO QUALIFIED HOUSEHOLDS.
B. ALL LOWER INCOME DWELLING UNITS SHALL BE REQUIRED TO HAVE COVENANTS RUNNING WITH THE LAND TO CONTROL THE RESALE PRICE OF LOWER INCOME FOR-SALE UNITS, OR TO EMPLOY OTHER LEGAL MECHANISMS WHICH SHALL BE APPROVED BY THE MAHWAH HOUSING COMMISSION AND THE MASTER SO AS TO ENSURE SUCH HOUSING WILL REMAIN AFFORDABLE TO PERSONS OF LOWER INCOME. SAID COVENANTS SHALL EXPIRE NO SOONER THAN TWENTY FIVE (25) YEARS FROM THE ISSUANCE OF THE CERTIFICATE OF OCCUPANCY FOR EACH UNIT.
C. PRIOR TO ISSUANCE OF A CERTIFICATE OF OCCUPANCY, THE OWNER OF EVER LOWER INCOME RENTAL UNIT SHALL PROVIDE LEGAL DOCUMENTATION IN A FORM TO BE APPROVED BY THE MAHWAH HOUSING COMMISSION ASSURING THERENTAL UNITS WILL REMAIN AFFORDABLE TO PERSONS OF LOWER INCOME.
D. QUALIFIED PURCHASERS OF LOWER INCOME UNITS MAY RENT THEIR UNITS PROVIDED THEY COMPLY WITH GENERAL CONDITION 20C.
E. SALES PRICES AND RENTS SHALL BE DEEMED TO BE INCREASED ANNUALLY IN ACCORDANCE WITH THE ANNUAL METROPOLITAN NEW JERSEY REGIONAL CONSUMER PRICE INDEX FOR HOUSING OF THE DEPARTMENT OF LABOR AS IT APPLIES TO THE EIGHT (8) COUNTY REGION OF WHICH MAHWAH IS A PART OR TO A SIMILAR INDEX APPROVED BY THE MASTER.
22. AT LEAST TWENTY (20%) PERCENT OF THE TOTAL NUMBER OF RESIDENTIAL UNITS WITHIN EACH MANDATORY *255 SET-ASIDE DEVELOPMENT SHALL BE MADE AFFORDABLE AND SOLD OR RENTED TO LOWER INCOME PERSONS.
23. AT LEAST TEN (10%) PERCENT OF THE LOWER INCOME UNITS IN EACH MANDATORY SET-ASIDE DEVELOPMENT SHALL CONSIST OF THREE (3) OR MORE BEDROOM UNITS.

XII  REMEDIES: KILMER WOODS AND RIDGE GARDENS[13]
Kilmer Woods is a 93 acre tract of land in the east-central section of Mahwah known as Ramapo Ridge. It is an elongated, irregularly shaped parcel with a long stretch of frontage on Ridge Road and relatively little depth. Fitting into its southerly boundary lines like the missing piece of a jugsaw puzzle, is the 38 acre Ridge Gardens property. There is no dispute these 131 acres should be considered in tandem for road design, water supply and sewerage disposal purposes.
TRAFFIC PATTERN: The key road for future development purposes is Ridge Road, a municipal street connecting with Route 17 on the north and leading into Darlington Avenue in Ramsey on the south. It runs along the entire western boundary of Kilmer Woods and also provides westerly access to Ridge Gardens. MacArthur Boulevard, a newly constructed road, runs along the northern boundary of Kilmer Woods in an easterly direction between Ridge Road and Central Avenue which ultimately leads to Route 17. Ramsey Road is to the south of these proposed developments running westerly from Ridge Road to its terminus at a bend in Darlington Avenue. Traveling easterly along Darlington Avenue through the Borough of Ramsey leads to Grove Street which runs north through an established residential neighborhood in Ramsey into *256 Myrtle Avenue. Myrtle Avenue, in turn, is an east-west borough road leading into the business section of Ramsey. Another point of access to Ridge Gardens is provided through Peterson Road, an unimproved Mahwah street running south off Myrtle Avenue.
According to the Kilmer Woods proposal, access will be provided through a loop from Ridge Road near the southerly boundary of the tract which snakes its way northward parallel with Ridge Road to the middle of the tract and re-enters Ridge Road about two-thirds of the way through the property. Yet another point of access will be provided by a second interior road running south off MacArthur Boulevard and connecting with the loop. A network of ancillary roadways will connect the clusters of apartments and condominiums to the interior roads.
Ridge Gardens has been designed to provide a single point of access from Ridge Road which will run along the southerly part of the tract in an easterly direction, curve to the north and connect with an extension of Peterson Place at the northeastern corner of the property. The conceptual plan labels this interior road as Peterson Place and provides for an ancillary network leading to the clusters of dwelling units.
Mahwah's traffic expert, Jack A. Artale of Travers Associates, filed a report with the Court. He concluded that although continued development of the Ramapo Ridge section will result in a significant increase in levels of future traffic, Ridge Road and MacArthur Boulevard are presently underutilized and have the capacity to handle the anticipated increased flow. He anticipates the necessity of only minor improvements in the future: installation of a traffic signal at the intersection of MacArthur Boulevard and Ridge Road and the dualization of MacArthur Boulevard. While Artale considered the Kilmer Woods project to be well designed from a traffic viewpoint, he found Ridge Gardens conceptual plan objectionable in two ways. He objected to having only a single method ingress and *257 egress through Ridge Road and found the proposed 2,400 foot extension of Peterson Place unrealistic because of anticipated community resistence to the direction of traffic through established Ramsey residential streets.
Andrew Marshall, Ridge Gardens traffic expert, found the Peterson Road extension feasible. In his opinion the traffic pattern as presented was adequate and Artale's criticism colored by his membership on the Ramsey Planning Board. He agreed with Ridge Gardens and Mahwah's planners, that all traffic should be funneled into Ridge Road to avoid the use of Ramsey's residential streets.
All the evidence established the existing roads in Ramapo Ridge have the capacity to handle the increased traffic flow which will be generated by both parcels if they are developed as proposed. By treating Kilmer Woods and Ridge Gardens as a single project, the interior roadways can be connected. This will provide flexibility in designing the safest possible method of ingress and egress from Ridge Road. Ridge Gardens should be redesigned to eliminate access from Peterson Place even if only a single point of access can be provided from Ridge Road.
TOPOGRAPHY: Topographically speaking, Kilmer Woods may be characterized as a trouble-free parcel, relatively flat and easy to develop. George James, an Emsey-McBride engineer, testified in his opinion no erosion problems will be encountered during development and most finished grades will be less than 6%.
Andrew Marshall reported Ridge Gardens has only moderate grades which can be designed for minimum slopes to keep roads and courtyards at reasonable percentages. He anticipates on-site slopes will be reduced below 10% after development. The property has two existing drainage points which were addressed in his conceptual plan by providing a 3 1/2 acre detention pond on the southerly part of the property. The detention pond is required only to hold rain water; with it a 0% runoff can be easily accomplished.
*258 There was no evidence of any topographical condition which would adversely impact upon development of either of these sites as proposed.
ACCESS TO UTILITIES: Peter Popoff, the municipal water and sewerage engineer, found water storage facilities adequate in this area but anticipated the need for a new well to be drilled and constructed if both projects go forward. He was of the opinion the existing water main in MacArthur Boulevard abutting the northern end of Kilmer Woods should be looped to the existing water main on Route 17 at a cost of approximately $30,000 to secure proper water supply for these projects. Popoff also felt, should both projects proceed, an additional municipal well may be required. Andrew Marshall questioned both the need for a loop between MacArthur Avenue and Route 17 and an additional well. He suggested an independent study be conducted to determine the necessity of these off-site improvements but opined the per unit cost, even if both were required, would be reasonable.
Although these properties are currently unsewered, the Darlington Avenue sewer line has been designed by the municipality at an estimated total construction cost of approximately $580,000. The Township planned to install the Darlington Avenue extension to service future growth in Ramapo Ridge in accordance with the zoning prior to the adoption of Ordinance #851. If both projects are undertaken, the size of the sewer line would have to be increased to handle the flow at an additional cost of approximately $80,000.
Popoff and Marshall agreed a pumping station will be required in Ridge Gardens should the Darlington Avenue extension be used. The lowest proposed Ridge Gardens buildings are approximately 20 to 25 feet below the grade of Ridge Road. The total distance of off-site sewer to be run up to Darlington Avenue will be 1,700 feet or .32 miles. In Marshall's opinion, the cost for this type of sewerage disposal is reasonable.
*259 An alternative, largely discounted because of the anticipated lack of municipal cooperation, is a tie-in with the Ramsey system. Ramsey has an existing sewerage line in Alita Place about 300 feet to the south of Ridge Gardens. Sewerage from both projects could flow by gravity into the Ramsey line, a much more economical method than connecting with the proposed Darlington Avenue extension. Since both Mahwah and Ramsey are members of the Northwest Bergen County Sewer Authority, there is no reason why this alternative should not be studied. The Northwest Bergen County Sewer Authority is a regional facility and the obligation to afford an opportunity to construct lower income housing is a regional responsibility. Since cost reduction is essential, Mahwah should seek the cooperation of both Ramsey and the Authority. If resistence is encountered, judicial intervention may be required.
SURROUNDING DEVELOPMENT AND ZONING: According to Kauker, the Township Committee has earmarked the Ramapo Ridge section as the place for most of its Mount Laurel II development. Since 1976, almost all of the district's vacant land has been zoned for townhouses and office buildings. Prior to Ordinance #851, both tracts were zoned PRD-6, townhouses at a density of 6 units per acre. Ordinance #851 rezoned Kilmer Woods to ML-2, but left Ridge Gardens with its prior zoning. The reason for the disparate treatment, Kauker explained, is because Kilmer Woods was ranked number 1 by the municipal planners. Ridge Gardens was ranked third behind Franklin Commons East and, since only two large proposals were rezoned ML-2, it was left out. Subsequent to the adoption of Ordinance #851 an error in the rating calculations was discovered. Ridge Gardens was awarded more points than Franklin Commons East and their positions reversed. During the trial, Kauker testified at this time these proposals are the two most desirable from the township's point of view.
To the northeast of these properties, separated from Kilmer Woods by 8 acres of commercially developed land, is McBride's Ramapo Ridge development. Townhouses at an average density *260 of 4 1/2 units per acre are now selling in the $150,000 to $200,000 range and construction of a new section is just getting underway. To the south of Ramapo Ridge on the westerly side of Ridge Road is McBride's commercial development. IBM and Paulist Press already occupy office buildings in this 180 acre tract and 1.2 million square feet of office space is in the planning stage. The land to the south and east, not owned by McBride, lies in both Mahwah and Ramsey, is residentially zoned and partially developed with one family houses.
Robert D. McAuliffe, Executive Vice President of McBride Enterprises and one of Kilmer Woods' planners, designed this project to "fit in with Ramapo Ridge". He was particularly concerned with the negative impact of Mount Laural II type development because of the large amount of vacant land in the area controlled by McBride. McAuliffe concluded if Kilmer Woods is developed as proposed, it will be compatible with the existing uses and not depreciate surrounding land values.
PROJECT DESCRIPTIONS:[14] Kilmer Woods proposes to develop its property by constructing 1,393 units of housing which represent a density of 15 units per acre.[15] It was designed by William F. Murphy, an architect and planner with vast experience who has designed a least cost housing project for Hovnanian. For development purposes, he divided the project into 3 separate parcels. The most northerly section adjacent to MacArthur Boulevard will contain 252 single family attached and garden type condominium units. They will be contained in clusters of two story buildings with two parking spaces per unit *261 and a density of 9 units per acre. The central parcel will be developed with 448 units of combination townhouses and condominium garden units in 2 and 3 story buildings. Parking will be furnished at the rate of 1.75 spaces per unit and the density will be 14 units per acre. The most southerly parcel which abuts Ridge Gardens will contain 693 condominium garden style units in three story structures. Parking at the rate of 1.5 spaces per unit will be provided and the density will be 21 units per acre. All of the lower income units will be constructed on this parcel.
Murphy testified the gradation of mix and styles was planned to blend with the surrounding development. He plans to offer a wide variety of home styles and choice of quality to suit the demand of the marketplace. To make the site more attractive variable set-backs, variety of roof lines, private patios and deck areas are to be offered. On-site amenities, though limited, will include tennis courts and basketball courts. Emphasis will be placed upon the accessibility of nearby public recreational facilities: Darlington Park and a Bergen County golf course are about a mile away.
McAuliffe testified the overall plan is to sell the most expensive market rate units in the northerly section with the least density, reduce the prices and increase the density in the central section and locate all of the lower income units in the most densely designed southerly parcel of the tract. He believes segregation of the subsidized units is required to achieve a better marketing situation. Since some market rate units are projected to sell for as much as $90,000, he feels potential purchasers will not want to live next to units occupied by lower income people. McAuliffe believes a blending together of subsidized and market rate units will create an unreasonable marketing risk. In his words, a better marketing situation can be achieved by offering potential purchasers a "smorgasbord" rather than a "homogenized development". If required to disburse the lower income units throughout the development, *262 he would recommend abandonment of the Kilmer Woods project because it would involve too great a marketing risk.
The lower income units in Kilmer Woods will consist of 50% two-bedroom units, 40% one-bedroom units and 10% three-bedroom units. Those to be sold at the market rate will be mostly two-bedroom units, a few one-bedroom units and a limited number of three bedroom units. Lower income units will be smaller in size than the market rate units. From a developer's point of view, McAuliffe opined the market rate sales prices will range from $60,000 to $90,000. This opens the market to people who can afford to buy houses and lessens the risk which is more important than increasing the profits. He testified Emsey-McBride would cooperate with Ridge Gardens in providing off-site improvements on a pro rata basis.
The Ridge Gardens conceptual plan was designed at a density of 14 units per acre. It will consist of 540 units located on 38.55 acres and will provide 1,080 parking spaces. Buildings will cover 10.84% of the site and 56% of the tract will be kept in its natural state.
Carl Mecky, Ridge Gardens' planner and architect, testified the lower income units will be exactly the same size as market rate units. Efficiency apartments will be 500 square feet, one bedroom units will be 700 square feet, two bedroom units will be 900 square feet and three bedroom units will be 1,100 square feet. At this stage of planning, he estimates 50% of the units will be two bedroom and only a few will be efficiency or three bedrooms.
Mecky, contrary to Kilmer Woods' and Beaver Creek's planners, believed the subsidized units should be fully and totally integrated into every building if possible. In this homogenized project, market rate units are projected to sell from the high $50,000 range to the high $70,000 range.
Ridge Gardens, Mecky testified, will cooperate with Kilmer Woods in providing off-site improvements. In his opinion, the placement of all lower income units by Kilmer Woods at a *263 density of 21 units per acre in the parcel adjoining Ridge Gardens will have a severe negative impact if it were to remain zoned as PRD-6. However, should a remedy be granted Ridge Gardens, this will have no negative impact and a buffer between the two developments would make no sense.
COMPLIANCE REMEDIES: Kilmer Woods and Ridge Gardens are granted compliance remedies in accordance with the GENERAL CONDITIONS set forth previously in this opinion. In addition, the following SPECIAL CONDITIONS shall be applied to these tracts:
(1) Both projects shall be considered in tandem for road design, water supply and sewerage disposal purposes.
(2) The PTRG shall investigate the comparative cost of designing the sewerage disposal system for both projects to connect with the existing line in Alita Place in Ramsey. If a significant cost reduction will be realized, the Mahwah Planning Board and Mahwah Township Committee shall negotiate with the Ramsey Governing Body and Northwest Bergen County Sewer Authority to obtain permission for Kilmer Woods and Ridge Gardens to tie in to the Ramsey system.

XIII  REMEDIES: FRANKLIN COMMONS
The Franklin Commons properties lie in the northeastern section of Mahwah flush against the New York State boundary line. Franklin Commons West proposes to build a 284 unit project on a 20.3 acre tract and Franklin Commons East seeks to construct a 624 unit project on a 44.82 acre tract. Their applications present another situation where two proposals should be treated as a single planning entity. They were originally submitted during the rezoning process as one development but were divided at the request of Mahwah officials. Although these parcels are not exactly contiguous, the southeast corner of Franklin Commons West and the northwest corner of Franklin Commons East share a common boundary line for approximately 500 feet and both conceptual plans show *264 a linkage of interior road networks. Obviously, identical planning criteria will apply for road design, water supply and sewerage disposal purposes.
TRAFFIC PATTERNS: Franklin Turnpike, a major north-south Bergen County road which traverses Mahwah from Ramsey on the south into the Village of Suffern, New York on the north, parallels the western boundaries of both parcels about 400 feet to their west. Ingress and egress to Franklin Turnpike is available through a pair of 50 foot wide existing municipal streets: Christie Avenue begins at the easterly side of Franklin Turnpike and runs northeasterly into the junction of the southwest corner of Franklin Commons West and the northeast corner of Franklin Commons East; Cedar Hill Avenue connects with the westerly side of Franklin Turnpike and runs parallel to Christie Avenue about 300 feet south of it into the Franklin Commons East property. Although not contemplated in the conceptual plans, there are two other existing points of access to Franklin Turnpike; Fox Lane, a 50 foot wide municipal street which becomes Maplewood Boulevard, forms the northern boundary line of Franklin Commons West, and runs into New York State; and Ward Lane, a 25 foot road running parallel to and approximately 200 feet north of Christie Avenue into the Franklin Commons West tract. These streets all traverse a 60 foot wide strip owned by North Jersey Transit Company Railroad which runs parallel to Franklin Turnpike and forms the westerly boundary line of both tracts.
According to the report filed by Jack A. Artale, the municipality's traffic expert, the access to Franklin Turnpike provided via Christie Avenue and Cedar Hill Avenue will satisfactorily handle the projected increase in traffic. Although he found present volumes on Franklin Turnpike to be significant, in his opinion the added traffic which would be imposed by these proposals can be accommodated with minor improvements. Artale feels future widening of Franklin Turnpike will be necessary at both intersections and anticipates the need for a traffic signal control at one of these locations. Andrew Marshall, *265 Franklin Commons' expert, agrees Franklin Turnpike has the capacity to handle the projected increased traffic flow. However, should both projects go forward, he questions the need for any improvements to Franklin Turnpike at these intersections.
In order to provide access to these sites, the developers propose Christie Avenue be extended along the southerly boundary of Franklin Commons West about 800 feet to an interior road which will be looped to the southeast and connected with an extension of Cedar Hill Avenue. From that point, the interior road will curve in a northwesterly direction forming the shape of a horseshoe when it once again reaches the boundary line between the tracts about 400 feet east from the point where the loop began. Here, it will branch off and run in two directions: one road will run north along the eastern boundary of Franklin Commons West, and the other will run east along the northern boundary of Franklin Commons East.
The Franklin Commons West interior road network consists of three parallel north-south roads which feed into Christie Avenue and the horseshoe loop. They provide access to two clusters of residential housing and are wide enough to accommodate all the necessary parking spaces.
Franklin Commons East's interior road network consists of a single road running along the perimeter of the tract beginning at the horseshoe loop and terminating at its juncture with the southerly line of Cedar Hill Avenue. Eleven interior roadways traversing the property from north to south all connect to the perimeter road in two locations, provide access to the housing clusters and are designed to include the necessary parking spaces.
PROJECT DESCRIPTION: Both conceptual plans were designed at a density of 14 units per acre. Franklin Commons West will consist of 284 units located on 20.3 acres and will provide 576 parking spaces. Buildings will cover 11% of the site and 65% of the tract will be kept in its natural state.
*266 Franklin Commons East consists of 624 units located on a 44.82 acre tract and will provide 1,142 parking spaces. The conceptual plan does not show the computation of building and lot coverage.
Carl Mecky, the planner and architect who designed Ridge Gardens also conceived the preliminary proposals submitted for both developments. As in Ridge Gardens, the lower income units will be exactly the same size as market rate units. Efficiency apartments will be 500 square feet, one bedroom units will be 700 square feet, two bedroom units will be 900 square feet and three bedroom units will be 1,100 square feet.
Peter Abeles, another Franklin Commons planner, projected the sales price for market rate units from the upper $50,000 range to the $80,000 range. He voiced no opinion as to whether these subsidized units should be integrated in the same buildings with market rate units or segregated as in the case of Kilmer Woods. Mecky favored "homogenization" but testified he did not have authorization from the developer to make a commitment on this point.
No on-site amenities are shown on either conceptual plan.
TOPOGRAPHY: Traveling in an easterly direction from the western border of Franklin Commons West, the terrain is relatively level for the first 150 feet, then it begins to rise to a 10% to 18% grade. According to Marshall the existing grades present no developmental problems from an engineering standpoint. The conceptual plan shows a large detention pond roughly triangular in shape covering the lowest part of the tract along the western border.
Mecky testified negotiations between the owners of Franklin Commons West and the municipality have been in progress over a period of 2 years concerning a solution to drainage problems in the entire area. At one point, plans were tentatively approved by the municipality to permit removal of vast quantities of soil in order to construct a large detention pond on this site. This pond was designed to alleviate off-site flooding problems *267 for the surrounding area. In consideration, the municipality was to rezone Franklin Commons West to permit general industrial use on the balance of the tract. Although the property was rezoned, the drainage plan has recently been rejected by Mahwah. The detention pond shown on this conceptual plan is much smaller in scope, but will adequately provide drainage for both parcels.
From a topographical point of view, Franklin Commons West is an easily developable parcel.
Franklin Commons East presents an entirely different situation, basically because it lies on the side of a steep hill. The site rises from an elevation of approximately 300 feet over a distance of approximately 3,200 feet to a height of 575 feet at its peak. It has slopes ranging from 6% to 18% in small stretches and an average slope of 8.6%. Mecky testified the available topographical data was obtained from the U.S. Geodetic Survey Map. He admitted an aerial survey will be necessary to accurately ascertain the existing grades. However, utilizing the geodetic data and walking the site, in his opinion, provided enough information to prove the tract developable. Mecky concluded housing clusters can be placed to take advantage of existing grades to create an aesthetically pleasing project.
Marshall testified the on-site grades of Franklin Commons East can be reduced to a maximum slope of 10% for all finished roadways. He foresees no difficulty in designing the parking areas and major intersections using standard engineering methodology. Marshall did admit the topography may significantly reduce the number of units which can actually be constructed. But, he observed, a 1,000 unit multi-family development has been successfully constructed on an adjacent parcel in New York State with identical topographical conditions.
Abeles found the topography of Franklin Commons East not unusual for Bergen County. In his opinion, this type of sharply *268 graded site is suitable for single family dwellings and can be more efficiently used for construction of multi-family housing.
Although these topographical conditions will have to be dealt with during the course of construction, the evidence clearly establishes that Franklin Commons East site is suitable for this type of development.
ACCESS TO UTILITIES: Both water and sewerage are available near the site. Peter Popoff testified water storage facilities are adequate in this area but development of both tracts may require drilling of an additional well. He was also of the opinion the water main in Franklin Turnpike will have to be reinforced in order to secure proper water supply for these projects.
Insofar as sewerage is concerned, Popoff felt the line in Franklin Avenue must be reinforced from Christie Avenue to the Northwest Bergen County Utilities Authority interceptor, a distance of 1,750 feet at an estimated cost of $150,000. He also stated the existing sewerage main in Ward Lane will have to be reinforced with a 10 inch line costing approximately $237,000.
Marshall disputed Popoff's conclusion about the extent of off-site water improvements required. He found the existing six-inch main in Christie Avenue adequate but, if improvements are required, the only upgrading needed would be about 2,000 feet of 8 inch water main to replace the 6 inch main running from Stevens Lane to Christie Avenue. He also disagreed with the suggested improvements to the sewer system. Marshall stated the existing 8 inch lines on Christie Street and Cedar Hill Avenue are adequate. If not, he proposed two alternatives: the 10 inch main in Franklin Turnpike be extended along Cedar Hill Avenue to replace the existing 8 inch line or a new system be designed to store sewerage flow from the development on site and pump the excess volumes off at peak hours.
In any event, there is no question about the availability of adequate water supply and sewerage disposal facilities for use in the development of this property.
*269 SURROUNDING DEVELOPMENT AND ZONING: The land abutting Franklin Turnpike in the vicinity of the subject site has been strip-zoned for and developed with a variety of business uses: a bus terminal, two automobile dealerships, a car wash, a supermarket and a bank. The property to the west of Franklin Turnpike is zoned for and developed with garden apartments. The area between Franklin Turnpike and the westerly boundary of Franklin Commons has been developed with a mix of commercial uses, older single family houses and a factory building. The entire northerly boundary line of Franklin Commons West runs along the border between New York and New Jersey. It is separated from the northern borderline of Franklin Commons East, which also runs along the State boundary line, by a parcel that fits between them in the shape of an inverted triangle.
In New York State, immediately north of Franklin Commons West is a development of older one family houses on 7,000 square foot lots. Stonegate, a 1,000 unit multi-family development, abuts the inverted triangular parcel and the northern boundary of Franklin Commons East. The inverted triangular parcel lies in Mahwah and consists of two privately owned lots: an Elks Club building and picnic ground occupies one, the other is vacant. All the land to the south and east of Franklin Commons East is zoned for one family residential use and partially developed with houses on lots of varying sizes.
Mecky testified a proposed use plan, prepared several years ago, included a six acre detention pond on the westerly side of Franklin Commons West, a light manufacturing area above it and cluster housing on the Franklin Commons East tract. He stated nearby bus and rail transportation, a library, a shopping center and easy access to Route 17 make this location extremely desirable for the proposed type of development. Abeles agreed and added the one family residences in the vicinity of Christie Avenue would not suffer any depreciation in value.
*270 Kauker agreed with Mecky's position that Mount Laurel II type housing can be accommodated in this neighborhood without any significant negative impact. He characterized it as a transition area with some blight and older run-down commercial uses. In his opinion the development as proposed would upgrade the entire vicinity.
Prior to the adoption of Ordinance # 851, Franklin Commons West was zoned GI-200 for general industrial use and Franklin Commons East was zoned for single family houses on half acre lots. Ordinance # 851 rezoned Franklin Commons West to ML-2, but left Franklin Commons East with its prior zoning. The rezoning of Franklin Commons West voiced the Township Committee's planning preference for the location of Mount Laurel II housing in this area. Franklin Commons East was not included because of its topographical problems and the municipality's calculation of the number of required units.
The evidence clearly established, from a planning perspective, both Franklin Commons West and Franklin Commons East are eminently suitable for the type of development proposed.
COMPLIANCE REMEDIES: Franklin Commons West and Franklin Commons East are granted compliance remedies in accordance with the GENERAL CONDITIONS set forth previously in this opinion.

XIV  REMEDIES: BEAVER CREEK
The Beaver Creek property is a 48 acre tract of land in the northeastern section of Mahwah lying partially in the Masonicus neighborhood and partially in Cragmere. The proposed development will consist of 672 units, 135 of which will be lower income housing.
TOPOGRAPHY: In 1974, a Natural Resources Inventory was prepared for the Township of Mahwah by Geonics. The maps included in the inventory characterized this site as having gentle slopes; intermediate internal drainage; no critical areas except for a potential ground water recharge area in the *271 northeast corner of the tract; and vegetation identified as being maple-ash-poplar succession.
Kauker questioned the suitability of this site for residential development because some of its slopes exceed 14%. However, Laura C. Staines, an architect and Senior Vice President of the Martin Organization of Philadelphia testified the proposed development was designed to take advantage of the topography. Utilizing a site plan and site concept plan, she described how the buildings had varying roof lines and could be `broken' in several ways to accommodate grade changes and to provide a variety of appearance. She noted the site grades, trees and stream were strong assets of the project which would make the finished development very attractive and marketable. Herbert Schlesinger, a licensed engineer and partner in Conklin Associates, concluded the undulating terrain existing on the site, if anything, made the tract more desirable for this type of residential development.
Masonicus Brook runs north to south near the eastern border of the tract; consequently, part of the site is designated as lying in a flood plain. Eugene B. Golub, Beaver Creek's consultant hydrologist on the project, stated there was no problem with development of the site from a hydraulic or hydrologic perspective. He felt the drainage solution would be relatively standard and quite similar to an adjacent and downstream existing PRD-4 project. Actual measurement of the flood plain, in his opinion, will establish its width as approximately 110 feet, comparable to the adjacent PRD-4 development. Golub concluded Beaver Creek, from a drainage standpoint, is a fully developable site in conformance with sound engineering practices and the proposed site plan can be constructed on this property with no difficulty.
The site inspection confirmed the physical developability of the site. Upstream, immediately to the north of the tract, are 3 one-family homes fronting on Airmont Avenue. Masonicus Brook runs through their backyards relatively close to the *272 structures, provides an attractive setting and apparently causes no difficulty to the residents. Indian Fields, the PRD-4 development directly to the south, has maintained Masonicus Brook and the area surrounding it in a natural state, using it as an attractive open area.
The evidence clearly establishes the topography of this site readily lends itself to the type of residential development proposed.
ACCESS TO UTILITIES: Herbert Schlesinger described the availability of water and sewers at and through the site. There is a two million gallon municipal water storage tank at the end of East Slope Road abutting the property and a utility easement over the adjacent property to the south which provides access for extending the existing sanitary sewer 250 feet to the site. According to Peter Popoff, the municipality's water and sewer engineer, the combined off-site utility cost for Beaver Creek would be the second lowest of the projects.
Water supply and sewerage facilities are both adequate and readily available for use in the development of this property.
TRAFFIC PATTERN: The tract fronts on Airmont Avenue, a County road which traverses Mahwah running from Ramsey on the south into New York State on the north. Masonicus Road, an east-west local street, presently terminates at its intersection with Airmont Avenue on the eastern boundary of the site. The Master Plan calls for its future improvement through the subject property to connect with Franklin Turnpike about a half mile to the west. Franklin Turnpike is a major north-south artery which intersects with Route 17. Another local street, Bellgrove Drive, runs off Airmont Avenue to service the PRD-4 development to the south. East Slope Road abuts the northwestern part of the tract and connects with Airmount Road a short distance to the north. Airmount Road, in turn, runs in an east-west direction connecting Franklin Turnpike and Airmont Avenue.
*273 The major method of ingress and egress would be through the extension of Masonicus Road. The developer proposes to continue Masonicus Road from Airmont Avenue by curving it in a northwesterly direction and extending it to a point just south of the terminus of East Slope Road. A network of ancillary roadways will connect the clusters of apartments and condominiums to the extended Masonicus Road. A secondary method of access is a proposed connection with Airmont Avenue to the north of the main entrance. Hence, traffic in and out of the development will be directed onto Airmont Avenue. Only emergency access is contemplated for East Slope Road to prevent travel through the residential section on the west.
John Christ, Beaver Creek's traffic engineer concluded the development as designed could be built without the requirement of major off-site improvements. He stated a traffic light will be required at the intersection of Airmont Avenue and Masonicus Road and left-turn stacking lanes should be constructed at the intersection. Christ concluded the existing road network will be able to handle the traffic generated by the 672 new units with only minor to moderate improvements.
Mahwah's existing network of roads, with some reasonable improvements, is sufficient to handle the additional traffic which will be generated by this development and maintain a satisfactory level of service.
SURROUNDING DEVELOPMENT AND ZONING: The parcel currently consists of a partially farmed basically vacant tract of land. Its present R-20 zoning designation permits only construction of one family houses on half acre lots. Indian Fields, the PRD-4 development immediately to the south, is substantially completed. It is an extremely attractive project consisting of townhouses and one family homes at an overall density of four units per acre. The units sell in the range of $150,000, all the existing dwellings are sold and there is a waiting list for new construction. Adjacent to Indian Fields on the west is a garden apartment complex which fronts on Franklin Turnpike.
*274 An R-10 district developed with older one family houses on small lots borders the property on the northeast. The property to the north and northeast of Beaver Creek is zoned for and at present sparsely developed with one family houses on either one-half acre or one acre lots. The land to the west of the tract is a vacant parcel zoned R-20.
There is a firehouse nearby on Masonicus Road and a municipal park on Airmont Avenue about a half mile away from the site. Schools are 2 miles away, but bus service is provided by the township. Two of the area's largest shopping center's, Interstate and Ramsey Square are about one mile from the premises. Regional bus service is available at Franklin Turnpike, a mile from the site.
Elizabeth C. McKenzie, one of Beaver Creek's planners, found the tract eminently suited for the proposed development. In her opinion the surrounding area has been developed with a mix of townhouses, apartments and single family residences. She believes the pattern of having multiple family and single family residential uses adjoining each other has already been established in this section of Mahwah and development at a density of 14 units per acre would be in conformance with sound planning and zoning. The relatively small size of the units will help offset the visual impact of the higher density and keep the lot coverage down.
Kauker, Mahwah's planner, characterized this as a "good project in the wrong place." He pointed out that Masonicus/Cragmere is the most densely populated section of the township. He prepared an Area Study Map showing land uses in the northeastern part of Mahwah, Suffern, New York, Ramsey and Saddle River to emphasize the existing congestion in the area. Since the Beaver Creek site is in the most fully-developed part of the township, approval of this development would, in his opinion, be inconsistent with sound planning. Kauker relied upon the language in Mount Laurel II: "The Mount Laurel doctrine should ordinarily be able to be accommodated, *275 for example, without placing lower income housing projects in the middle of long-settled middle or upper income sections of a town." 92 N.J. at 240, n. 15. On the witness stand, however, he testified he had no opinion as to the relative ranking of Beaver Creek.[16]
The evidence established from a zoning and planning viewpoint this site is appropriate for the proposed type of development.
PROJECT DESCRIPTION: The detailed site plan shows 672 proposed dwelling units at a density of 14 units per acre in clusters of two and three story condominium apartments and townhouses. The developer intends to sell all the units and offer none for rent. There will be 537 market rate condominiums which will sell in the $60,000 to $80,000 price range as recommended by the Real Estate Research Corporation study. These market rate units will vary in size from 800 square feet to about 1,100 square feet.
The 135 lower income units will be located in two separate apartment clusters, one in the northeast corner and the other in the southwest corner of the site. The buildings containing lower income units are designed to be similar in style, scale and finish to the market rate buildings. However, since the units are smaller more are accommodated in each building. The one bedroom unit will provide 568 square feet of space, while the two bedroom units are about 775 square feet. The developer has not submitted information on the ratio of one to two bedroom units, but it does not intend to build any three or more bedroom lower income units.
Laura C. Staines described the proposed roadways, walkway system and buffer areas. She discussed the amenity package including clubhouse buildings and pools which are the only *276 structures located in the flood plain area. 1,344 parking spaces, an overall ratio of two for each unit, are shown on the site plan. The Masonicus Road extension is projected as a two lane boulevard divided by a landscaped island.
BUILDERS REMEDY: Beaver Creek was the first developer-applicant to intervene in the suit and has vigorously pursued its builder's remedy application. Its attorney participated in the fair share hearings and subsequently furnished the Court, at the expense of Beaver Creek with a substantial amount of relevant evidence. It provided the "Housing Market and Feasibility Analysis" prepared by Real Estate Research Corporation; "Recommended Additional Cost Reduction Items For Inclusion In Mahwah N.J. Ordinance #851" prepared by John Rahenkamp & Associates and a report by Allan Mallach establishing permissible sales prices for lower income units. These documents were of general application and assisted the Court in formulating a number of General Conditions. In addition, Beaver Creek produced reports and testimony specifically relating to its project from experts in the field of planning, architecture, hydrology, traffic, civil engineering, water supply and sewerage.
The municipality contends Beaver Creek is not entitled to a builder's remedy because it did not participate in this action until well after the Supreme Court remanded the case. The Urban League stood alone for the first 14 years of litigation and this intervenor did not appear on the scene until success was virtually assured. The principals of Beaver Creek are characterized as speculators seeking to make a windfall profit by taking advantage of the Supreme Court mandate. The township further alleges the site was acquired with full knowledge of the present zoning limiting development to one family houses on half acre plots. To prove this point, during the trial the municipality's attorney called one of the principals of Beaver Creek as a witness. On proffer of proof, this line of questioning was held to be irrelevant.
*277 The test set forth in Mount Laurel II does not concern itself with the individual financial transactions of developers seeking to build lower income housing. Land prices and potential profits play no role in making a decision as to a builder's remedy. The first criteria to be applied is whether the developer has succeeded in Mount Laurel litigation and proposes a project providing a substantial number of lower income housing. Here, Beaver Creek has without question contributed substantially to the success of this litigation and certainly proposes to provide a substantial amount of subsidized housing. The second criteria, as set forth in Mount Laurel II, is:
A builders remedy should be granted unless the municipality establishes that because of environmental or other substantial planning concerns, the plaintiff's proposed project is clearly contrary to sound land use planning. We emphasize that the builders remedy should not be denied solely because the municipality preferred some other location for lower income housing, even if it is in fact a better site. Nor is it essential that considerable funds be invested or that the litigation be extensive. [92 N.J. at 279-280.]
Here the municipality has failed to meet its burden. The evidence shows this project is consistent with sound land use planning and there are no substantial environmental concerns. Therefore, Beaver Creek is entitled to a builders remedy.

XV  REMEDIES: HIGH DEBI HILLS
The High Debi Hills property is a dog-leg shaped tract in the geographical center of Mahwah. It lies in the municipality's 18 square mile conservation area as designated in the State Development Guide Plan. The proposed development will consist of 438 units, 88 of which will be lower income housing.
TOPOGRAPHY: The uniqueness of this site was graphically demonstrated through a video tape which was marked into evidence and shown during the trial. Andrew Papanestor, the developer's construction supervisor, narrated as the video camera recorded various points of interest from a moving car.
The tract consists of 32 acres and is part of a 40 acre former Nike Missile Base. The only means of access is through the remaining 8 acres which were retained by the United States *278 Government. The property rises from this point of entry on its eastern boundary to a ridge which runs north and south through the center of the site. The flat top of the ridge is the highest point in Bergen County and was the actual missile launching site. On the west side of the ridge, the grade becomes steep making descent difficult.
The center of the property is covered with the remains of the huge concrete launching platform. Underground silos formerly used for storage of missiles, a dilapidated Army barracks, a mess hall and a pillbox still exist on the tract.
Allan J. Dresdner, High Debi Hill's planner, classified the slopes throughout the site, ranging from 5% to 20%, as moderate. He described the undisturbed part of the site as a typical heavily-treed mountaintop with thin soil cover over a rocky subsurface. Dresdner concluded debris from the Nike Base, especially underground silos, present a safety problem which must be addressed during any future development.
Despite the fact that the topography as altered by its former use may present some difficulties, this site can feasibly be developed in the manner proposed.
SURROUNDING DEVELOPMENT AND ZONING: Although this privately-owned tract lies in the conservation area, the present zoning designation is R-40, which allows construction of one-family homes on 1 acre lots. To keep it as open space would require payment of just compensation to the owner. See Morris County Land, etc. v. Parsippany Troy-Hills Tp., Supra.
Papanestor explained the Nike base was abandoned 10 years ago. The remaining eight acres, directly to the east, were not sold because of the existence of houses which are still occupied by United States Government employees. These homes are older bungalow-style structures of the type furnished to non-commissioned officers on Army bases. Measured by Mahwah zoning standards, they are nonconforming and have been characterized as substandard housing. Further to the east, directly *279 across Campgaw Road is a private tennis facility known as the Darlington Racquet Club, a cemetery and church-owned vacant property.
The north and west boundaries of the site are a 435 acre tract owned by the Roman Catholic Archdiocese of Newark, site of the Immaculate Conception Seminary. The Archdiocese is in the process of selling the property and relocating the Seminary to the Seton Hall University Campus. On April 18, 1984, the Board of Adjustment adopted a resolution approving development plans which call for conversion of existing structures to a clubhouse, meeting hall and apartments; allowing 100 town-houses and requiring one-family houses in accordance with the ordinance on the remaining 360 acres. On July 27, 1984, the Governing Body unanimously adopted a resolution reversing the Board of Adjustment approval. Hence, development of this tract and installation of its required off-site improvements in the immediate future is questionable.
The south and southeast of the site is bounded by a large area of open space owned by the Bergen County Park Commission and known as the Campgaw Mountain Reservation. It is used for passive recreation, skiing and camping facilities are the only activities permitted. Some of the Nike launching pad extends onto this property.
In sum, the surrounding area can be characterized as unimproved woodland spotted with a few residential and recreational uses. There is no public transportation available, and the nearest shopping is about five miles away.
PROJECT DESCRIPTION: Dresdner's site plan is based upon a density of 13.7 units per acre. The conceptual plan shows 54% of the area left in a natural state and a recreational area adjacent to the County Park which includes tennis courts and a pool. The tennis courts are to be constructed at the builder's expense on the County Park portion of the Nike launching pad. Of the 438 proposed units, 20% will be 800 square feet, one bedroom units; 20% will be 1,200 square feet three bedroom *280 units and 60% will be 1,000 square feet two bedroom units. They will be contained in three story structures and clustered in cul-de-sacs throughout the site. Subsidized units will be the same size as and integrated with market rate units. The anticipated sales price of the market rate units will range from $50,000 to $80,000.
ACCESS TO UTILITIES: According to Popoff, water supply is not readily available to the site at the present time and present water storage facilities in the area are inadequate. In order to secure proper water supply, he testified the existing 12 inch main in Campgaw Road will have to be extended at a cost of approximately $160,000. He also feels an alternative source should be made available for emergencies through the County park at a cost of approximately $97,000. Even with these improvements, part of the development will experience low pressure. This will necessitate construction of a storage tank at an estimated cost of $680,000 as well as individual booster pumps. Adding the possibility of an additional well, the total off-site cost to provide water will be $1,246,000. Future sewerage connections can be made through the Darlington Avenue interceptor which is now in the planning stage. Popoff believes this project will require an increase in the proposed capacity of that line making the total off-site improvement costs for sewerage approximately $266,000. Because of the extent of these costs, Popoff concluded High Debi Hills should not be attempted until the area becomes more fully developed.
The developer's engineer, Howard Boswell, Jr., disputed Popoff's estimate of costs. He testified water can be provided from three existing sources: by running a 5,000 foot main from Darlington Park; by running a 6,500 foot main from Ramapo College or by running a 5,000 foot main from the intersection of Campgaw and Fyke Road. The major on-site improvement required would be a water tank which, because of the topography, could be laid flat on the ground at the highest point in the tract. Boswell estimated the total cost of supplying water would be approximately $200,000. Insofar as sewerage is *281 concerned, he believes this property should tie into an extension to be constructed in connection with the then approved plan for development of the adjacent Archdiocese of Newark property. By sharing costs with the developer of that project, or tying into the municipal line in Campgaw Road near Darlington Avenue, off-site sewerage expenditures should not exceed $165,000.
Differing opinions aside, the undisputed evidence established this site is about a mile away from existing sewer and water connections. Furnishing utilities, at this point in time, might be too expensive for the developer to provide Mount Laurel II housing. However, future development of other large parcels of vacant land in this area may change the picture. While approval of this proposal cannot be ruled out strictly on the basis of the lack of access to utilities, it is a factor to be considered.
TRAFFIC PATTERNS: This tract is approximately 500 feet west of Campgaw Road, the nearest public street. The only access currently existing from Campgaw Road to this site is Patrick Brems Road, a cul-de-sac street which provides traffic circulation through the 8 acre government owned parcel. Because Patrick Brems Road is not a municipal street and only paved to a width of 21 feet, its adequacy as the only method of ingress and egress was questioned. The developer's preliminary site plan shows access from Campgaw Road will be provided by a 60 foot easement over the intervening tract to the southwesterly corner of High Debi Hills. This easement has not yet been acquired from the Federal Government, but representations as to its availability were made during the course of the trial. An interior road running off the 60 foot wide access easement will provide traffic circulation to the clusters of dwelling units.
Campgaw Road is a north-south Bergen County road which runs from Darlington Avenue in the north to Pulis Avenue in Franklin Lakes in the south. Darlington Avenue, another *282 County road, connects with Ramapo Valley Road and runs into Route 17.
Jack A. Artale, Mahwah's traffic expert, found Campgaw Road in its present condition more than adequate to handle the projected increase in traffic. The only off-site improvement he anticipated was a possible widening of Campgaw Road at the point of access to the development. Although he was critical of using Patrick Brems Road as the only method of ingress and egress, he did not consider this to be critical to the feasibility of the project.
David Mendelson, the developer's traffic engineer, conducted a comprehensive study of traffic patterns in this area. He had been retained to do a traffic study for the proposed development of the adjacent Archdiocese of Newark property. That study recommended the signalization and widening of the intersection of Ramapo Valley Road and Darlington Avenue. In his opinion, the relatively small number of housing units involved in this proposal can be accommodated without the requirement of any further off-site improvements.
The evidence established traffic movements along all access roads and their intersections currently operate at fair to excellent levels of service. The existing road network is more than adequate to handle the projected increased traffic flow and any required improvement will be minor in nature. Although the developer failed to prove the existence of an adequate method of ingress and egress to the tract from Campgaw Road, at this preliminary planning state approval should not be denied on this basis.
COMPLIANCE REMEDY: Dresdner asserts this site is particularly well-suited for the type of development proposed despite being in a conservation area. He found little natural value left because the land is heavily stressed with asphalt and concrete, honey-combed with subsurface silos and burdened with abandoned buildings. It is also on the outer fringe of the conservation area only a short distance from the Ramapo Ridge section, *283 Mahwah's primary growth area. Existing Federal Government housing similar to the type proposed, open parkland and the Archdiocese of Newark tract encircle the property. Dresdner maintains none of these surrounding uses will be negatively impacted to the extent of those abutting proposed Mount Laurel II developments in other sections of the township.
On the other hand, Kauker testified this development would be an incursion into Mahwah's recreational area. He felt the Archdiocese of Newark tract, if developed as contemplated, will be at a much lower density and not compatible with this proposal. The lack of available utilities and absence of nearby off-site amenities also contributed to his conclusion of the inappropriateness of this site for Mount Laurel II development.
Distance from water and sewerage connections, or lack of frontage on a public street, or location in the conservation area individually is not enough to preclude the granting of a compliance remedy. However, the High Debi Hills tract is a full mile away from the nearest existing water and sewer point of connection. The method of access over the 500 foot distance separating the tract from Campgaw Road is uncertain. And, most importantly, Court ordered Mount Laurel II development should be located in growth areas, not conservation districts. See Orgo Farms and Greenhouses v. Colts Neck Tp., 192 N.J. Super. 599 (Law Div. 1983) (holding availability of a builder's remedy in a limited growth area is not foreclosed as a matter of law but will be sparingly granted).
Here, substantial compliance can be achieved by granting remedies to other proposed developments not burdened with these problems. Therefore, High Debi Hills is denied a remedy.

XVI  CONCLUSION
Throughout these proceedings, evidence has been offered concerning the economic feasibility of each of the proposed developments. Under traditional Land Use Law, the financial *284 viability of a particular application is completely immaterial. Here, however, the likelihood of development is a crucial factor to be weighed in deciding whether to grant a remedy. Consequently, the willingness and ability of each developer to promptly and expeditiously undertake these projects becomes material.
To that end, each proposal has been analyzed in detail, not only from a planning viewpoint, but also from the perspective of actual readiness to build. Topography, access to utilities, traffic patterns and preliminary conceptual plans have been examined and discussed. All the developers involved have continually voiced their intention to proceed should the Court grant approval on reasonable conditions. They have expended a great deal of money on trial costs and professional consultant fees. There has been no evidence of using any of these applications as a "bargaining chip in a builder's negotiations with the municipality." 92 N.J. at 280. There has been no evidence that any of the Plaintiff-Intervenors are not ready, willing and able to proceed with construction.
As established earlier in this opinion, 706 units of lower income housing are required to be provided through mandatory set-asides. The individual remedies granted will provide a reasonable opportunity for the construction of 684 of these units in the following manner:

 INTERVENOR TOTAL UNITS LOWER INCOME UNITS
Kilmer Woods 1302 260
Ridge Gardens 540 108
Franklin Commons West 284 57
Franklin Commons East 624 124
Beaver Creek 672 135
 ____ ___
Totals 3422 684
 ==== ===

*285 Although this leaves a deficit of 22 lower income units, construction of all these developments will nearly double Mahwah's housing stock. Providing an opportunity for the construction of 684 lower income units under these circumstances substantially complies with the Supreme Court mandate and fulfills the municipality's fair share obligation.
The legal, moral, social and political correctness of the Mount Laurel doctrine is not the issue in this case. The requirement that municipal land use regulations provide a realistic opportunity for low and moderate income housing is now deeply entrenched in New Jersey land use law. That doctrine, first enunciated by a unanimous Supreme Court in 1975, was unanimously reaffirmed eight years later in Mount Laurel II. There, the Court declared itself to be "more firmly committed to the original Mount Laurel doctrine than ever, and  determined, within appropriate judicial bounds, to make it work." 92 N.J. at 199.
The issue in this case is implementation of that doctrine. Mahwah officials have been advised of the specific number of lower income units which must be provided in order to satisfy its fair share obligation. This is necessary, not because the Supreme Court thinks scientific accuracy is possible, but because it believes this requirement is most likely to achieve Mount Laurel goals. 92 N.J. at 257. Mahwah officials also know the mechanism to be used and the timetable to be followed in order to achieve compliance. This clear, concise blueprint for future municipal action has, as a direct result of Mount Laurel II, eliminated the previous uncertainty in this field and brought about the immediate prospect of actual construction of lower income housing in Bergen County.
Prior to 1983, the prevailing practice in this field allowed municipalities to appeal a trial Court's determination invalidating its ordinance and adopt another inadequate ordinance while the appeal was pending. This meant the new ordinance then had to be litigated and the litigation-legislation carousel began.
*286 The Mount Laurel II court, in reviewing prior enforcement attempts, found the length and complexity of trials "often outrageous" and the expense of litigation prohibitively costly. It also found uncertainty and inconsistency at the trial level and the application of inflexible review criteria at the appellate level.
Justice Pashman recognized this problem and predicted the difficulty in administrating this doctrine in his concurring opinion filed in the original Mount Laurel decision. The following passage, written in 1975, illustrates his concern:
Therefore, I join in the thoughtful and eloquent majority opinion of Justice Hall. I differ from the majority only in that I would have the Court go farther and faster in its implementation of the principles announced today. The fact that abuses of the municipal zoning power are now widespread and derive from attitudes and premises deeply ingrained in the suburban planning and zoning processes requires that the Court not restrict itself to the facts of this particular case but, rather, lay down broad guidelines for judicial review of municipal zoning decisions which implicate these abuses. [So. Burlington County N.A.A.C.P. v. Mount Laurel, 67 N.J. 151 at 194; emphasis supplied.]
The history of this specific case graphically illustrates the early difficulties encountered in attempts to enforce compliance. The original complaint was filed in February, 1972 and languished on the Court docket for more than five years while the simple issue of the plaintiff's standing was being appealed. Urban League of Essex County v. Mahwah Township, 147 N.J. Super. 28 (App.Div.), certif. den., 74 N.J. 278 (1977). Before the standing issue was finally resolved, Mount Laurel I was published and the municipality rezoned in an attempt to comply with its mandate. It was not until March 1979, seven years after the suit was started, that a final judgment was entered by the trial Court.
This type of experience caused the Supreme Court to conclude that the absence of a strong judicial hand was resulting not in housing, "but in paper, process, witnesses, trials and appeals" and motivated it to adopt the detailed guidelines suggested by Justice Pashman. The effectiveness of Mount *287 Laurel II can be measured by the subsequent proceedings in this case.
In the 18 months since the opinion was published: (1) a fair share hearing has been conducted; (2) a complete revision of Mahwah's zoning ordinances has been promulgated by the Township Committee with the assistance of the Master; (3) six major developers interested in building lower income housing intervened in this case without filing formal pleadings; (4) a two month trial concerning the validity of the new zoning ordinance was conducted and a final judgment entered by the trial Court only six months after its adoption.
Without the "steel" put into the Mount Laurel doctrine by the Supreme Court, in all probability, at this point in time there would have been no trial. Proceedings would have been stayed and the parties would still be waiting an appellate determination as to the fair share allocation. By eliminating single issue hearings and endless interim appeals, Chief Justice Wilentz has made this case, from a procedural standpoint, "an example of trial efficiency that needs copying, not explaining." 92 N.J. at 293.
But even more important, clarification of the doctrine has assisted both the trial Court and municipal officials in fulfilling their constitutional duties. The adoption of Ordinance # 851 by Mahwah's governing body was bona fide attempt at compliance. Allowing accessory apartments and taking steps to secure public sector housing for lower income people reflect a substantial effort. Although there is a difference of opinion as to the mandatory set-aside provisions, Ordinance #851 formed the basis for the remedies fashioned in his opinion.

APPENDIX
Whereas the Township of Mahwah protests the trial court's determination of fair share and non-compliance, and
*288 Whereas the municipality elects to revise its land use regulations "under protest" and to file an appeal upon entry of final judgment by the trial court,
Now therefore be it ordained by the Township Committee of the Township of Mahwah that the Land Use Ordinances of the Township of Mahwah shall be revised "under protest" as follows:
SECTION 1. Section 179-4 of the Code is amended by the addition of the following new section 179-4-K: It is the intent of the ML-1 and ML-2 zone regulations to provide a realistic opportunity for the construction of a variety of housing types for a variety of income levels in the Township, including housing for lower income households; and to encourage the development of such lower income housing, and other housing, by providing specific land use regulations addressing those needs. These regulations are designed to meet the mandate of SOUTH BURLINGTON COUNTY N.A.A.C.P. VS. MOUNT LAUREL TOWNSHIP, 92 N.J. 158 (1983) also referred to herein as MOUNT LAUREL II. Any provisions of this or any other ordinance in conflict with the ML-1 and ML-2 zoning regulations and which imposes higher standards not related to health and safety shall be applicable.
SECTION 2. Section 179-6 of the Code is amended by the addition of the following definitions:
GROSS DENSITY: The total number of dwelling units on the tract divided by the total area of the tract, including environmentally sensitive or restricted areas. The result is expressed as dwelling units per acre (du/ac).
NET DENSITY: The total number of dwelling units within a designated residential land use parcel divided by the total land area of the designated residential land use parcel less major recreational facilities, streets and public facilities within the parcel. The result is expressed as dwelling units per acre (du/ac).
*289 LOW AND MODERATE INCOME HOUSEHOLDS: The income eligibility limits for a household designated as low and very low contained in the H.U.D. Section 8 Rental Assistant Program income by Family Size for the appropriate housing region for various size households, or other generally accepted state or federal agency standards. H.U.D. very low income is synonomous with MOUNT LAUREL II low income and H.U.D. low income is synonomous with MOUNT LAUREL II moderate income.
LOWER INCOME HOUSING: Those dwelling units which are affordable to lower income families according to the following. For Sale Housing: 28% of gross annual household income must be adequate to meet the aggregate cost of principal estate taxes, and homeowner association fees, if any. In case of rental housing, the gross rent on an apartment (including utilities) should not exceed 30% of gross household income.
SECTION 3. Section 179-7 of the Code is amended by the addition of the Zone Designations. ML-1 Moderate and Low Residential, ML-2 Moderate and Low Residential.
SECTION 4. Section 179-8, Zoning Map, is amended by the addition of the following sections.
F. The following lots constitute the entire ML-1 zone:

*290
Lot Block
 ----------------------------------------------------------------
44A 17 to 44A 27 66
44B 1 to 10 and 19 to 29
44C 12 to 44C??
19, 19B, 19F, 19K 45
Rear half of Lot 1[*] 26
G. The following Lots constitute the entire NL-2 zone:
A. 24-4 and 24 68
 1, 3, 8, 9A
B. 1B 69
C. 2, and front 1/2 of Lot 1 32
D. 44A 1 to 44A 16 26
 44B 11 to 44B 18
 44C 1 to 44C 11

SECTION 5. Section 179-10 of the Code and the schedule of use Regulations are amended by the addition of new sections as follows:
D. Accessory Apartments shall be permitted as a conditional accessory use in all residential zones upon the conditions established in section 179-19(J).
E. ML Zones. The following uses are permitted in both the ML-1 and ML-2 zones:
1. Residential dwelling units,
2. Recreational facilities accessory to the residential use,
3. Off-Street parking.
SECTION 6. Section 179-19 of the Code is amended by the addition of the following new section: J. Accessory Apartment Uses. Notwithstanding any other provisions in this Code or any ordinance, Accessory apartments shall be permitted in any residential zone upon the following conditions:
1. A maximum of one accessory apartment shall be permitted for each existing or future single family residence. The accessory apartment must be located entirely within the habitable portion of the principal dwelling and no apartment or *291 portion thereof will be permitted in any garage, outbuilding or accessory structure.
2. The minimum floor area of the accessory apartment shall be 400 square feet and the maximum floor area shall be 800 square feet. In no instance shall the apartment represent more than 30 percent of the habitable living space of the principal dwelling.
3. A maximum of three occupants per apartment shall be permitted.
4. Each dwelling unit shall be required to have its own kitchen and bath facilities, and each apartment must have at least one separate entrance to the outdoors, although an entrance on a hallway leading to the outside will be permitted. No additional entrances will be permitted on the front of the principal dwelling, and the main dwelling must continue to resemble a single family home.
5. The building in question must be owner occupied at all times. Occupancy of the accessory apartment by the owner will be permitted.
6. The owner shall demonstrate that adequate off-street parking exists on the property or will be provided for both the principal and accessory dwelling units.
7. The owner shall be required to obtain a certificate of occupancy prior to renting the accessory apartment. To obtain the certificate of occupancy the owner shall complete an application form supplied by the Construction Official. The completed application shall indicate the size of both proposed units, the proposed monthly gross rental, the name(s) of the occupants of both units, a notarized statement from the head of the lower income household indicating the gross household income for the prior two years.
8. The certificate of occupancy shall be issued only if the application satisfies all the requirements of this section and *292 only if at least one of the households has a low or moderate income as defined in section 179-6.
9. The certificate of occupancy shall expire if any of the following events occurs: sale of the subject building, vacation of the unit occupied by the lower income household, or occupancy by more than three persons. Upon expiration of the certificate for any of the above reasons, the owner may apply for a new certificate.
10. Every three (3) years after issuance of the certificate of occupancy, the owner shall file a further statement with the Township Housing Commission as required by the Commissioner.
SECTION 7. Section 179-19 of the Code is further amended by the addition of the new section K.
K. ML-1 and ML-2 zones.

1. LOWER INCOME HOUSING REQUIREMENTS
All developments in the ML-1 zone districts shall be required to provide one hundred (100) percent of all dwelling units to be affordable for lower income households.

2. ELIGIBILITY STANDARD
At least one-half of all lower income units in the ML-1 and in the ML-2 zones shall meet H.U.D. Section 8 eligibility requirements for very low income. The balance shall meet H.U.D. Section 8 eligibility requirements for low income. If the federal Section 8 housing program is discontinued or substantially changed, then the eligibility requirements of a similar successor program, if any, shall apply.

3. SUBSIDIES
Government subsidies may be used at the discretion of the applicant to fulfill the requirements of the section. The lack of *293 said subsidies shall in no way alter or diminish the lower income requirements of this ordinance.

4. RESALE AND RENTAL OF LOWER INCOME HOUSING
A. All lower income dwelling units with the ML-1 and ML-2 zones shall be required to have covenants running with the land to control the resale price of for-sale units, or to employ other legal mechanisms which shall be approved by the Mahwah Township Housing Commission and Township Attorney so as to ensure that such housing will remain affordable to persons of lower income.
B. Prior to issuance of certificates of occupancy, the owner of every lower income rental unit shall provide legal documentation in a form to be approved by the Township Housing Commission and Township Attorney assuring that the rental units will remain affordable to persons of lower income. Every three (3) years thereafter, said owners shall file a further statement in a form to be established by the Township Housing Commission with the Township Housing Commission regarding each unit.
C. An owner of a lower income dwelling unit may rent that unit provided it conforms with section 6B above.
D. The Township and the applicants may develop reasonable qualifications for occupants of lower income housing and may arrange for third party administration of tenant selection.
E. Sales prices and rents may be increased in accordance with the annual Metropolitan New York Regional Consumer rice index for Housing of the Department of Labor.
SECTION 8. Chapter 179 of the Code is amended by the addition of new section 179-52.
179-52 Housing Commission.
A. There is hereby established a Municipal Housing Commission consisting of seven (7) members appointed by the *294 governing body to serve without compensation. This Commission shall not function as a Municipal Housing Authority as defined by statute.
B. The membership shall consist of one (1) member of governing body, two (2) members of the Planning Board who are not members of the governing body, the municipal Welfare Director, and three (3) citizens of the municipality who holds no other office or appointment.
C. The terms of the governing body member shall be for a period of one (1) year or shall terminate at the termination of his respective term of office, whichever comes first.
D. The terms of the governing body members shall be two years with the initial terms being one and two year staggered terms.
E. The term of the Welfare Director shall be for as long as he remains Welfare Director.
F. The terms of the citizens at large shall be for a period of three years with the initial appointments being staggered terms of one, two, and three years.
G. The Municipal Housing Commission is an advisory board organized with the purpose of advising and making recommendations to the governing body, planning board and other boards and agencies.
H. The specific duties of the Municipal Housing Commission shall be:
1. To review and comment upon any applications for development of lower income housing referred to the Commission by any other municipal agency or department.
2. To monitor the implementation of lower income housing development within the municipality and to recommend municipal action if lower income developments are not constructed or operated under the terms of approval.
3. To evaluate the housing needs of the municipality and the region and specifically to evaluate the existing lower income *295 housing programs in the municipality and to make periodic reports to the governing body and planning board regarding these evaluations at least annually.
4. To act as liason between the municipality and any other governmental or private agencies seeking to provide housing in the municipality.
5. To provide public relations, counseling and outreach services for housing opportunities within the municipality.
6. To recommend changes to the Planning Board and governing body regarding modifications of the municipal Housing Plan, Master Plan, or Land Use Regulations so as to meet the municipal Housing Plan Goals.
I. The commission may utilize the services of the appointed Township officials.
SECTION 9. Chapter 145 of the Code of the Township of Mahwah is amended by the addition of the new section 145-53:
145-53. ML-1 and ML-2 Applications for Development.
Notwithstanding any of the provisions of Chapter 145 entitled Site Plan Review or Chapter 154 entitled Subdivision Land, the following provisions shall apply to all applications for development in the ML-1 and ML-2 zones:

A. PHASING
1. The approving agency, may require the construction of a development in two or more stages and may phase the construction of stages in periods of two or three years between issuance of building permits for each stage.
2. Within the entire development if developed in one step, or within each stage if the development is a staged project, lower income housing shall be phased in accordance with the following schedule:

*296
 MINIMUM
PERCENTAGE OF TOTAL PERCENTAGE OF LOWER
DWELLING UNITS INCOME DWELLING UNITS
(BUILDING PERMITS) (CERTIFICATES OF OCCUPANCY)
 25 10
 50 25
 75 50
 100 100

The above percentage shall refer to the percentage of total dwelling units having final site plan or subdivision approval and the percentage of lower income dwelling units completed and certificates of occupancy issued.

B. FEES AND WAIVER OF FEES
1. The applicable approving agency shall waive subdivision and site plan application fees for every unit designated as lower income housing.
2. For all non-lower income units the following fees shall accompany the appropriate application.
1. Filing fee for preliminary approval: One-hundred dollars ($100) plus five (5f) dollars for each proposed market rate dwelling unit.
2. Filing fee for final approval: Two dollars and fifty cents ($2.50) for each proposed market rate dwelling unit.
3. Notwithstanding any other ordinance requirement of the Township of Mahwah, professional and legal review fees shall be proportionately reduced by the percentage of lower income units contained in the development.
4. The applicant shall deposit the sum of five (5%) percent of the cost of site improvements to cover engineering inspection or other inspections or review of the project. Such sum shall be in the form of escrow accounts in amounts and in a form acceptable to the approving agency. Such funds shall be used by the Township only for purposes relating to the application, and *297 shall be expended only for the actual outlays incurred as a result of the application. If actual inspection costs based upon time and expense records are less than the five (5%) percent deposited, the balance shall be returned to the applicant.

C. APPLICATION PROCEDURE FOR DEVELOPMENT IN THE ML-1 OR ML-2 ZONE.
1. An applicant for development in the ML-1 or ML-2 zone shall submit required plans and documents to the approving agency for review and recommendation as required by the Township of Mahwah subdivision and site plan ordinances. The approving agency shall distribute the plans to those agencies required by law to review and/or approve development plans and to Township agencies which normally review development plans.
2. The Approving Agency shall hold a public hearing on the application. The hearing shall be held not less than thirty (30) days nor more than forty-five (45) days from the date of submission of a complete application. Approvals shall be governed by N.J.S.A. 40-55D-46 and N.J.S.A. 40:55D-48.
a. All buildings, structures and uses shall be set back no less than thirty-five (35) feet from all tract lot lines and right of way lines of dedicated streets.
b. Residential structures shall be set back no less than twenty-five (25) feet from any paved vehicular traveled way or parking area.

4. Building Height
No structure shall exceed the lesser of three (3) stories or thirty-five (35) feet in height.

5. Distance between buildings
The minimum distance between any two buildings shall not be less than the average height above finished grade of the higher of two opposing walls, but shall in no case be less than 20 feet.

*298 6. Parking Requirements
a. Parking stalls shall measure nine (9) feet in width and eighteen (18)) feet in length.
b. There shall be a minimum of one and one half (1 1/2) parking spaces provided for each one bedroom dwelling unit and two (2) parking spaces for all other dwelling units.
c. The width of all aisles providing direct access to individual parking stalls shall not be less than:

 Parking Angle Aisle Width
 0 deg. 12'
 30" 12'
 45" 13'
 60" 18'
 90" 24'

d. Only one-way traffic shall be permitted in aisles serving parking spaces placed at an angle other than 90 degrees.

7. Pedestrian Walkways
All residential developments shall provide a system of continuous paved walkways not less than five (5) feet in width linking primary residential entrances to off-site Township, County or State Roads. Such walkways need not parallel streets or dedicated roads. The walkway system shall link-up with adjacent public facilities where feasible. Sidewalks shall be provided adjacent to collector streets.

8. Refuse Collection and Storage
Provision shall be made for the proper storage and collection of refuse and shall be within an enclosed building or structure or appropriately screened and landscaped, and shall be reasonably accessible for vehicular collection.

9. Common Open Space Requirements
a. A minimum of twenty (20) percent of the land area of any development other than single or two-family housing and which may exclude environmentally restricted land, shall be designated for conservation, open space, recreation and/or other common open space.
*299 b. All property owners and tenants shall have the right to use the common open space.
c. All common open space deeded to an open space organization, trust, or private organization, shall be owned and maintained as provided for in N.J.S.A. 40-55D-43.
d. Common open space may include tract setback areas for computation purposes. Such space shall be readily accessible to all residents of the development, and no area designated as open space shall be less than thirty-five (35) feet in width.

10. Drainage
a. Storm sewers, open channels, bridges, and culverts shall be designed from minimum flow capacities as follows:

DESIGN CAPACITY FREQUENCY OF STORMS
Collection Systems 15 Years
Culverts 25 Years
Detention Systems 25 Years
Emergency Spillway System from
Detention System 100 Years
Projects Requiring a DEP Stream
 Encroachment Permit 100 Years

b. All materials used in the construction of storm sewers, bridges and other drainage structure) shall be in accordance with the specifications of the "Standard Specifications for Road and Bridge Construction of the New Jersey Highway Department," current edition, and any supplements, and modifications thereof unless otherwise specified by the reviewing municipal agency.
c. Surface water runoff shall be regulated by section 145-25(J) and 145-30(C) of the Code of the Township.
d. Where required by the Township and as indicated on an improved development plan, a drainage right-of-way easement shall be provided to the Township where a tract or lot is traversed by the Township Engineer. The drainage right-of-way easement shall conform substantially with the lines of such *300 watercourse and, in any event, shall meet any minimum widths and locations as shown on any official map and/or master plan.

11. Lighting
a. Street lighting shall be provided for all street intersections and along all collector and local streets, parking areas, and anywhere else deemed necessary for safety reasons.
b. Any outdoor lighting such as building and sidewalk illumination, driveways with no adjacent parking, the lighting of signs, and ornamental lighting, shall be shown on the lighting plan in sufficient detail to allow a determination of the effects upon adjacent properties, roads, and traffic safety from glare, reflection, and overhead sky glow in order to recommend steps needed to minimize these impacts.
c. Specific lighting requirements. The maximum intensity of lighting permitted on roadways shall be as follows:
Average Maintained Horizontal Illumination for Residential Areas:

 Street Intersections 3.0 footcandles
 Parking Areas 1.0 footcandles

12. Sanitary Sewers
The developer shall design and construct sanitary sewer facilities in accordance with the N.J.D.E.P. permit requirements and in such manner as to make adequate sewage treatment available to each lot and structure within the development. If a public or private treatment and collection system is included as part of a development application, the developer shall install sewers, including connections, to each unit to be constructed.

13. Streets.
a. All developments shall be served by paved streets in accordance with the approved subdivision and/or site plan all such streets have adequate drainage.
*301 b. Local streets shall be planned so as to discourage through traffic.
c. The minimum public street right-of-way and cartway and the minimum private street cartway shall be in accordance with the following schedule:

 R.O.W. CARTWAY
a. Collector Street 50' 26'
b. Local Street serving single or two-family
detached with no on-street parking. 50' 24'
c. Local Street serving multi-family or
townhouses with attached garages or off-street
parking with no on-street parking. 40' 24'
d. Local Street serving multi-family or townhouses
with parallel on-street parking one side only. 40' 30'

d. Street intersections shall be as nearly at right angles as is possible and in no case shall be less than 80 degrees. Approaches to all intersections shall follow a straight line for at least 100 feet or a curve with a radius of not less than 600 feet. No more than two streets shall meet or intersect at any point and the centerlines of both intersecting streets shall pass through a common point.
e. A tangent of at least 100 feet shall be provided between reverse curves on collector streets.
f. Cul-de-sacs shall be no more than 1,000 feet in length and shall provide access to no more than 80 dwelling units. A turnaround shall be provided at the end of the cul-de-sac with a paved turning radius of 40 feet ...
g. The pavement standard for all raods shall be as follows:
I. An unyielding well compacted subgrade.
II. A four (4) inch thick macadam base course consisting of two and one-half (2 1/2) inch diameter stones bound with dust.
III. A two (2) inch thick bituminous stabilized base course, N.J.D.O.T. Mix # 1-2.
*302 IV. A one and one-half (1 1/2) inch thick bituminous concrete surface course, N.J.D.O.T. MIX # 1-5.
V. All materials shall meet the requirements and shall be installed in accordance with "Standard Specification for road and bridge construction of the New Jersey Highway Department."

h. Street Grades
Grades for collector streets shall not exceed eight (8) percent and grades for local streets shall not exceed ten (10) percent. No street shall have a grade less than 0.5 percent.

14. Water Supply
Water mains and connections lines shall be constructed in such a manner as to make adequate water service available to each building or lot within the development. The system shall be designed and constructed in accordance with requirements and standards of the agency or authority having water supply jurisdiction. Fire hydrants shall not be mor than 500 feet apart.

15. Waivers
The approving agency when reviewing applications for ML-1 ML-2 development shall have the power to grant exceptions to the above design requirements as may be reasonable and within the general purpose and intent of the ML zones if the literal enforcement of one or more of the provisions is impracticable or will exact undue hardships because of peculiar conditions pertaining to the land in question.

SECTION 10.

MISCELLANEOUS PROVISIONS
A. All ordinances or portions of ordinances inconsistent with the provisions of this ordinance are hereby repealed to the extent of such inconsistency.
B. This ordinance shall take effect immediately upon final passage as provided for by law and upon entry of a final *303 judgment of compliance by the trial court in the lawsuit URBAN LEAGUE OF ESSEX COUNTY ET. AL. VS. TOWNSHIP OF MAHWAH, ET. AL., Docket No. L 17112-71. However, the Township if Mahwah adopts this ordinance under protest as provided for by the MOUNT LAUREL II decision. If any court with proper jurisdiction declares this ordinance or any section of this ordinance to be unconstutional, illegal, null or void, then this entire ordinance shall become void and the pre-existing regulations shall be restored.
Jan. 13  Fee: $699.84

 INDEX
 PAGE
I PROCEDURAL HISTORY 175
II ACCESSORY APARTMENTS 182
III PUBLIC SECTOR 187
IV OVERZONING 192
V COMMUNITY IMPACT 195
VI THE MANDATORY SET-ASIDE PERCENTAGE 200
VII THE LOW/MODERATE RATIO 206
VIII REMOVING EXCESSIVE RESTRICTIONS AND EXACTIONS 208
IX FINDINGS-MANDATORY SET ASIDE PROVISIONS 235
X REVIEW AND APPROVAL PROCESS 237
XI MANDATORY SET ASIDE REMEDIES: GENERAL CONDITIONS 243
XII REMEDIES: KILMER WOODS AND RIDGE GARDENS 255
XIII REMEDIES: FRANKLIN COMMONS 263
XIV REMEDIES: BEAVER CREEK 270
XV REMEDIES: HIGH DEBI HILLS 277
XVI CONCLUSION 283
 APPENDIX: FULL TEXT OF ORDINANCE #851 287

NOTES
[1] The Master was an active participant throughout these proceedings, as suggested in Mount Laurel II. 92 N.J. at 284. When it became apparent a suitable ordinance would not be finalized within the required time frame, the Township applied for an extension. Based upon Master's testimony that a good faith effort was being made, the deadline was extended from December 15, 1983 to January 23, 1984. See 92 N.J. at 281.
[2] Mount Laurel II calls the mandatory set-aside an "... effective inclusionary device that municipalities must use if they cannot otherwise meet their fair share obligations...." [92 N.J. at 267; emphasis supplied.]
[3] Ordinance #851 was adopted on January 23, 1984, the court-imposed deadline, by a unanimous vote. The Preamble recites "Whereas the municipality elects to revise its land use regulations `under protest' and to file an appeal upon entry of final judgment by the trial court." See 92 N.J. at 285.
[4] In this regard, Emil Michota, Mahwah's Director of Human Services, testified that qualified local residents, when queried, indicated great interest in applying for these loans.
[5] Low Moderate Total
 Fair Share Obligation 469 230 699
 Credited by Court -69 -65 -134
 ___ ___ ____
 Deficit 400 165 565
 === === ===

[6] To illustrate the uncertainties, during the trial Nicholas Lotito, one of the owners of a small parcel zoned ML-2 wrote to the Court. The letter stated that the property has been sold to a neighboring Honda dealer for expansion of its business.
[7] During the rezoning process census data became available which caused the Master to revise his figures upward. He determined the 1983 median family income for the 8 county Mahwah region to be $30,890. Alan Mallach, on behalf of Beaver Creek, then estimated 1 bedroom units would sell for $22,000 to low income households and $35,200 to moderate income households. Two bedroom units would sell for $27,600 and $44,100 respectively.
[8] The number of proposals varies in different reports depending whether Franklin Commons and Cherry Hills are each considered 2 projects. Cherry Hills West, Minetto, Cherry Hills East and Buehler did not seek intervention.
[9] According to Mount Laurel II: Moderate income families are those whose incomes are no greater than 80% and no less than 50% of the median income of the area, with adjustments for smaller and larger families. "Low income families are those whose incomes do not exceed 50% of the median income of the area, with adjustments for smaller and larger families. See 42 U.S.C. § 1437a(b)(2) (1982 Supp.), in which these definitions are used to define income standards for the Section 8 housing subsidy program. Our phraseology differs from that in the Section 8 program, which defines `lower income families' as analogous to our moderate income families, and `very low income families' as analogous to our `low income.' 42 U.S.C. § 1437a(b)(2) 1982 Supp." 92 N.J. at 221.
[10] One of the township planners speculated if a substantial number of plaintiff-intervenors attempt to develop their properties, there would be a glut of housing in the municipality. Consequently he felt developers would fail and half-completed projects would become a municipal problem. This testimony is totally discredited by all the studies made on the subject.
[11] Most new housing in the Metropolitan area is affordable only to households with incomes above $50,000; these constitute less than 6% of the area's families or 207,901 households. First time home buyers do not have sufficient income to carry new homes unless budgets are dangerously stretched. Affordability according to the Mortgage Guarantee Insurance Corporation is shown in the chart below:

WHAT FAMILIES CAN AFFORD
Lenders figure that families can spend 28% of their income on the costs of carrying a house (taxes, mortgage payments and insurance). Table shows the range of house prices buyers can afford at mortgage interest rates between 10 and 16 percent:
 Mortgage Income of Income of Income of Income of
 Rate $20,000 $30,000 $40,000 $50,000 
 10% $49,400 $74,100 $98,800 $123,500
 12% $43,000 $74,100 $86,100 $107,600
 14% $38,000 $57,500 $76,000 $95,000
 16% $33,000 $50,900 $67,900 $84,900
 === ======= ======= ======= ========
"Buying a home on $20,000-$50,000 a year," The New York Times, April 29, 1984, Section 8 at 1, col. 2.
[12] The method of fast track processing to be employed in Mahwah will be discussed in Section X, infra.
[13] On June 14, 1984 a site inspection of the sites involved in this litigation was conducted. Representatives of all parties were present. See Morris County Land, etc. v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963).
[14] Detailed discussions of the proposed projects is not for the purpose of approving or disapproving any conceptual plans. The submissions marked into evidence were prepared for trial purposes and varied greatly in the degree of details furnished to the Court. The developers, the PTRG and the Planning Board are free to accept, revise or reject these conceptual plans during the formal planning process.
[15] GENERAL CONDITION #6 limits density to 14 units per acre. Kilmer Woods will have to be redesigned to reduce the number of units to 1,302 including 260 units of lower income housing.
[16] Lawrence Walsh and Donald Drelich, nearby residents testified about their concern with added traffic, flooding, depreciation in the value of their homes and future maintenance of the proposed lower income housing.